UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZACHARY NIGHTINGALE, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, et al.,<br><br>        Defendants. | Case No.  19-cv-03512-WHO<br><br>**ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS FOR DECLARATORY AND INJUNCTIVE RELIEF; GRANTING MOTIONS TO SEAL**<br><br>Re: Dkt. Nos. 68, 70, 75, 78 |

Plaintiffs and class members are noncitizens and attorneys who challenge the systemic failure of the U.S. Department of Homeland Security ("DHS") and its component agencies, U.S. Citizenship and Immigration Services ("USCIS") and U.S. Immigration and Customs Enforcement ("ICE") (collectively "defendants"), to respond to their requests for Alien Registration Files ("A-Files") within the statutory deadlines mandated by the Freedom of Information Act ("FOIA").  Defendants admit that they have not complied with those FOIA deadlines for at least the past eight years.

This noncompliance has real life consequences.  Defendants serve as custodians of A-Files, prosecutors in removal proceedings, and adjudicators of applications for immigration benefits. Their delay in processing A-File FOIA requests deprives plaintiffs of the information they need to defend against removal, to obtain benefits, and to gain citizenship.  It undermines the fairness of immigration proceedings, particularly for the vast number of noncitizens who navigate our immigration system without assistance of counsel.

Despite defendants' recent efforts to reduce the backlog of A-File FOIA requests, they have not come close to resolving this systemic problem.  A comprehensive remedy is needed and is long overdue.

In light of the undisputed history of defendants' failure to meet FOIA statutory deadlines, I GRANT summary judgment in favor of plaintiffs.  I GRANT declaratory relief that defendants have violated the FOIA by failing to make timely determinations on plaintiffs' A-File FOIA requests within the mandated statutory time frames and that defendants have engaged in a pattern or practice of violating FOIA's statutory deadlines when responding to requests for A-Files.  I ORDER injunctive relief in the following form: (i) defendants are permanently enjoined from further failing to adhere to FOIA statutory deadlines for adjudicating A-File FOIA requests; (ii) **within sixty (60) days** of this order, defendants must make determinations on all A-File FOIA requests in USCIS's and ICE's backlogs; (iii) defendants must provide the court and class counsel with quarterly compliance reports, with the first report due **within ninety (90) days** of this order.

A Case Management Conference is set for April 6, 2021 at 2:00 p.m.  The parties shall file a joint case management statement by March 30, 2021.

## BACKGROUND

On October 15, 2019, I found that class certification was "appropriate in these extraordinary circumstances" because plaintiffs "established that noncitizens nationwide experience significant delays in obtaining their A-Files and that such delays are harmful to their immigration cases." *Nightingale v. U.S. Citizenship & Immigration Servs.*, 333 F.R.D. 449, 453 (N.D. Cal. 2019).  A "single injunction or declaratory judgment would provide relief to each member of the proposed classes – the timely determination of their time-sensitive A-File FOIA requests." *Id.*  The following two classes were certified:

> **USCIS Class**: All individuals who filed, or will file, A-File FOIA requests with USCIS which have been pending, or will be pending, with USCIS for more than 30 business days without a determination. **ICE Referral Class**: All individuals who filed, or will file, A-File FOIA requests with USCIS that USCIS has referred, or will refer, to ICE and which have been pending, or will be pending, for more than 30 business days from the date of the initial filing with USCIS without a determination.

*Id.* at 456.

Plaintiffs now move for summary judgment and seek an order (i) declaring this pattern or practice unlawful, (ii) permanently enjoining defendants from violating FOIA, (iii) ordering the

United States District Court
Northern District of California

2

elimination of existing backlogs within thirty (30) days, (iv) requiring regular compliance reports to the court and class counsel, and (v) ordering defendants to provide notice and a uniform procedural mechanism that will ensure that class members in removal proceedings can request and receive A-Files in a timely manner.  Plaintiffs' Notice of Motion and Motion for Summary Judgment ("MSJ") [Dkt. No. 70].

Defendants cross-move for summary judgment on grounds that plaintiffs have failed to establish a pattern or practice claim.  Defendants' Notice of Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Cross MSJ") [Dkt. No. 75].   Even if a pattern or practice is established, they ask that I decline to issue injunctive relief in light of their recent efforts to comply with FOIA's deadlines and reduce the backlog.  I heard oral argument on December 9, 2020.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

# DISCUSSION

## I.     PATTERN OR PRACTICE CLAIMS

Before discussing the merits of plaintiffs' pattern or practice claims, I start with an overview of defendants' obligations under FOIA and why those obligations are particularly important in this case.

### A.     FOIA Statutory Deadlines

The FOIA statute requires that an agency make a determination on a FOIA request within 20 business days.  5 U.S.C. § 552(a)(6)(A)(i).  An agency may extend its response time in case of "unusual circumstances," by no more than 10 business days provided it sends the requestor "written notice."  5 U.S.C. § 552(a)(6)(B)(i).

Congress recognized the importance of timely conveying the information sought through FOIA.  When it initially enacted a 10-day limit for responding to FOIA requests, it noted that "information is often useful only if it is timely" and that the purpose of the time limit was to require agencies "to respond to inquiries . . . within specific time limits."  H. Rep. No. 93-876, at 126 (1974), as reprinted in 1974 U.S.C.C.A.N. 6267, 6271.  When Congress extended the deadline to 20 days, it again recognized "[l]ong delays in access can mean no access at all," and urged agencies to "respond to requests in a timely manner."  H. Rep. No. 104-795, at 16-23, as reprinted in 1996 U.S.C.C.A.N. 3459, 3466.  Accordingly, "[i]n adopting the FOIA, Congress was specifically concerned that agencies would delay in responding to requests, and as a result 'an agency's failure to comply with the FOIA's time limits is, by itself, a violation of the FOIA.'" *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, No. 14-1130 SC, 2015 WL 4452136, at *7 (N.D. Cal. Jul. 20, 2015) (hereinafter "*OCE I*") (quoting *Gilmore v. U.S. Dep't of Energy*, 33 F. Supp. 2d 1184, 1187 (N.D. Cal. 1998)); *see also Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982) (concluding that an agency's unreasonable delay in disclosing non-exempt documents violates the FOIA and "courts have a duty to prevent these abuses").

Although courts recognize that resources for FOIA compliance may be "heavily taxed by the quantity and depth of FOIA requests (especially in light of budget constraints that limit personnel and resources assigned to an agency), that does not grant the agency carte blanche to

United States District Court
Northern District of California

1  repeatedly violate congressionally mandated deadlines." *OCE I*, 2015 WL 4452136, at *8.

2  Rather, it is incumbent on agencies to "inform Congress of the additional resources needed to fully

3  comply with the FOIA." *Gilmore*, 33 F. Supp. 2d at 1188 (quoting H. Rep. No. 104-795, as

4  reprinted in 1996 U.S.C.C.A.N. 3448, 3472).

5        **B.**    **Importance of Timely Obtaining A-Files**

6        Compliance with FOIA deadlines is especially important in the immigration context:  It

7  provides an essential safeguard to plaintiffs who require a copy of their A-Files to pursue

8  immigration benefits or defend themselves or their clients against removal.[1]  *See generally* Ex. A1,

9  Declaration of Zachary Nightingale ("Nightingale Decl."); Ex. A2, Declaration of Matthew

10  Hoppock ("Hoppock Decl."); Ex. A3, Declaration of Laura St. John ("St. John Decl."); Ex. A4,

11  Declaration of Andrea Sáenz ("Sáenz Decl."); Ex. A5, Declaration of Sabrina Damast ("Damast

12  Decl."); Ex. A6, Declaration of Hans Meyer ("Meyer Decl.").  A-Files include critical information

13  about past interactions between the individual and DHS; records of prior entries, admissions, or

14  removal orders; records of past statements; and records of past applications filed by the noncitizen

15  or on the noncitizen's behalf.  *See* Hoppock Decl.  ¶¶ 9–12, 15–18; Damast Decl. ¶¶ 11–13, 15;

16  Sáenz Decl. ¶¶ 8–9; St. John Decl. ¶ 6; Meyer Decl. ¶ 7; Nightingale Decl. ¶ 2.  Where an

17  individual is a victim of an immigration scam, mentally incompetent, or suffering from extreme

18  trauma, the A-File may be the only means available to discern their immigration history.  *See*

19  Hoppock Decl. ¶ 13; St. John Decl. ¶¶ 5–6, 9; Sáenz Decl. ¶12.

20        Timely access to A-Files is vital for noncitizens in removal proceedings.  A-File records

21  inform whether detained individuals—most of whom are unrepresented—can contest charges of

22  alienage or removability, are eligible for release on bond, and/or are eligible for relief from

23  removal.  *See* Nightingale Decl. ¶¶ 2, 4, 16; Hoppock Decl. ¶¶ 9–12, 15; St. John Decl. ¶ 6; Sáenz

24  Decl. ¶ 8; Damast Decl. ¶¶ 4, 5, 12; Meyer Decl. ¶¶ 6, 9.  Without access to the information in A-

25  Files, attorneys and pro se individuals are at a distinct disadvantage because the ICE prosecutor

26

27  [1] "An A-File, or Alien File, is the official Government record that contains information regarding noncitizens as they pass through the U.S. immigration and inspection process."  Ex. B,

28  Compliance Review of U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security Freedom of Information Act Program, at Bates 81744.

typically has access to and uses this information in prosecuting the case.  *See* Hoppock Decl. ¶14; Sáenz Decl. ¶¶ 9, 16; Nightingale Decl. ¶ 4.

Consequently, attorneys either must seek continuances to await the results of the FOIA request or risk going to trial without the A-File.  *See* Nightingale Decl. ¶ 6 (noting that ICE prosecutors oppose motions to continue to await response to A-File FOIA requests).  For detained individuals, continuances result in longer detention, which, for some, is intolerable and leads them to abandon meritorious claims in order to end detention.  *See* St. John Decl. ¶¶10–12; Sáenz Decl. ¶ 13; Nightingale Decl. ¶ 16; Hoppock Decl. ¶ 26; Meyer Decl. ¶ 7.  If the immigration judge ("IJ") denies the continuance, or the case moves forward without the A-File, attorneys and their clients must examine documents from the A-File for the first time at trial when the ICE prosecutor submits them.  *See* Hoppock Decl. ¶ 14; Damast Decl. ¶ 13.

Adherence to FOIA's timeframes is critical because there is no adequate substitute for the information contained in an A-File and FOIA is the primary, if not the only, mechanism for accessing A-Files.[2]  Failure to timely respond to A-File FOIA requests creates an information asymmetry that hinders plaintiffs in successfully applying for immigration benefits, challenging removal orders, or seeking release from detention.

---

[2] Defendants claim that noncitizens may access A-Files through *Touhy* regulations, criminal proceedings, and pursuant to the Ninth Circuit's holding in *Dent v. Holder*, 627 F.3d 365 (9th Cir. 2010.  But, as plaintiffs point out, *Touhy* motions are inapplicable to individuals in removal proceedings.  *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); 6 C.F.R. §§ 5.41– 5.45.  Defendants do not provide any evidence that DHS honors *Touhy* motions for any part of an A-File, much less the entire A-File.

For the subset of noncitizens subject to criminal proceedings, as defendants concede, any disclosure of records pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), "may [or may not] include all or part of an A-File."  Cross MSJ 4.

A request for an A-File under *Dent* is equally unreliable.  Defendants contend that "if requested by a respondent in an immigration proceeding (such as a removal proceeding) within the jurisdiction of the Ninth Circuit, government attorneys *may* provide A-File materials where appropriate[.]"  Cross MSJ 4 (emphasis added).  *Dent* does not cover the class members in this case who are outside of this Circuit.  Even within this Circuit, plaintiffs testify that *Dent* motions are met with obstruction from DHS prosecutors, who tell attorneys and noncitizens that they must file a FOIA request.  *See, e.g.*, Nightingale Decl. ¶ 5 (stating that *Dent* requests are "virtually always ineffective" because "OCC and DHS have not recognized an obligation under *Dent* to provide any evidence at all, let alone the entire A-File"); Hoppock Decl. ¶ 20–21; John Decl. ¶ 14; Sáenz Decl. ¶ 7; Damast Decl. ¶ 6.

United States District Court
Northern District of California

At least three prior lawsuits have raised similar nationwide pattern or practice claims in the immigration context.  All of them either settled or were dismissed on standing grounds.  *See Mayock v. I.N.S.*, 714 F. Supp. 1558 (N.D. Cal. 1989), *rev'd sub nom. Mayock v. Nelson*, 938 F.2d 1006 (9th Cir. 1991) (pattern or practice claim against then-named Immigration and Naturalization Service ("INS") brought by immigration attorney James R. Mayock; the parties settled after remand from the Ninth Circuit)[3]; *Hajro v. U.S. Citizenship & Immigration Servs.*, 832 F. Supp. 2d 1095 (N.D. Cal. 2011), *rev'd in part, vacated in part,* 811 F.3d 1086 (9th Cir. 2016) (pattern or practice claim against USCIS brought by noncitizen Misrad Hajro and Mayock, the same attorney who filed the earlier lawsuit; Ninth Circuit reversed for more fact-finding on the issue of standing); *Hajro v. United States Citizenship & Immigration Servs.*, 743 F. App'x 148, 149 (9th Cir. 2018) (affirming district court order finding Mayock lacked standing to pursue the pattern or practice claim);  *Brown v. U.S. Customs & Border Prot.*, 132 F. Supp. 3d 1170, 1171 (N.D. Cal. 2015) (denying motion to dismiss pattern or practice claim against CBP brought by several immigration attorneys and noncitizens; the parties settled before the court adjudicated the motion for class certification).  These cases have not led to compliance, or anything close to it, with FOIA's statutory deadlines.

### C.    Plaintiffs Have Established a Pattern or Practice of FOIA Violations

With that context in mind, I turn to plaintiffs' claim that defendants have a pattern or practice of failing to meet FOIA's statutory deadlines.  The parties disagree on what plaintiffs must show to establish their pattern or practice claims.

Defendants primarily cite D.C. Circuit law to argue that plaintiffs must clear an "extraordinarily high bar to succeed on a pattern or practice claim under FOIA" because they are required to show repeated delays that are "unexplained" or "unjustified," and the repeated delays here do not meet that threshold because defendants face an increasing FOIA workload.  Cross

---

[3] After remand from the Ninth Circuit, the parties entered into a settlement agreement in 1992, "in which INS agreed to implement expedited processing of a FOIA request where the requester demonstrates that an individual's life or personal safety would be jeopardized or that substantial due process rights of the requester would be impaired by the failure to process a request immediately."  *Hajro*, 811 F.3d at 1093.

United States District Court
Northern District of California

1    MSJ 9–12.  This articulation of the standard narrows what courts within this Circuit have found

2    sufficient to establish a FOIA pattern or practice claim.

3          The Hon. Paul S. Grewal's opinion in *Hajro*, the 2008 case alleging USCIS's pattern or

4    practice of FOIA violations, is instructive.  He addressed three issues: (i) whether immigration

5    attorney Mayock had standing to assert a pattern or practice claim against USCIS; (ii) whether

6    noncitizen Hajro and Mayock established a pattern or practice of USCIS FOIA violations; and (iii)

7    whether injunctive relief was warranted to remedy a pattern or practice of FOIA violations.

8    *Hajro*, 832 F. Supp. 2d at 1105–09.  In relevant part, he found that Hajro and Mayock established

9    their pattern or practice claim because not only was Hajro's November 2007 request left

10   unanswered past the statutory deadline, "Mayock's declaration [referred] to other requests for

11   which the government has not produced records in a timely manner, as well as the declarations

12   and exemplars of 26 other attorneys."  *Id.* at 1107.  These declarations "testif[ied] to USCIS's

13   persistent failures with respect to both requirements," *i.e.*, "the failure to provide a response within

14   twenty days and the failure to provide written notice setting forth the 'unusual circumstances' that

15   would qualify USCIS for a ten-day extension of time."  *Id.*

16         Judge Grewal rejected USCIS's argument that "an agency's delay in responding to a FOIA

17   request, standing alone, is not evidence of bad faith," finding the argument "confuse[d] whether

18   the evidence supports a finding of a pattern or practice of FOIA violations with the basis for

19   injunctive relief."  *Id.* at 1107.  He also rejected USCIS's argument that "there is no evidence of a

20   pattern of unreasonable delay in USCIS's FOIA responses to Hajro," in light of clear evidence that

21   the three-month delay in Hajro's request exceeded the time statutorily allowed for processing

22   FOIA requests.  *Id.*  Mayock similarly testified that USCIS never responded within the twenty-day

23   limit or with an explanation requiring more time for the FOIA requests he has made on behalf of

24   his clients.  *Id.*

25         Judge Grewal concluded:

26             In sum, the experiences of Plaintiffs establish a pattern or practice of
               violations.  And twenty-six other attorneys have testified to
27             encountering the same delays in the same context as Hajro and
               Mayock.  Defendants have not offered evidence to the contrary,
28             pointed out inconsistencies in the record that would suggest a genuine

8

> issue of fact for trial, or come forward with even assertions that
> USCIS is in compliance with the timing requirements of FOIA. Thus
> Defendants have not met their burden under Rule 56 and summary
> judgment on this issue in favor of plaintiffs is warranted.

*Id.* at 1108. He ultimately found that injunctive relief was warranted in order to remedy the pattern or practice of FOIA violations. *Id.*

The Ninth Circuit reversed and remanded on a separate issue. It found that Hajro's pattern or practice claim was moot once he became a citizen because "the probability that USCIS's delays 'will impair [Hajro's] lawful access to information in the future' is now remote." *Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1102 (9th Cir. 2016) (quoting *Payne Enters., Inc. v. U.S.*, 837 F.2d 486, 491 (D.C. Cir. 1988)). It "clarif[ied] the standing requirements to assert a FOIA pattern or practice claim," and remanded the case for determination of "whether Mayock has standing to bring a pattern or practice claim under this standard." *Id.* at 1092–93. The Ninth Circuit's decision only addressed the *standing* requirement for raising a pattern or practice claim, not the *standard* to establish the actual claim. Judge Grewal's opinion accurately describes the burden plaintiffs must meet in order to establish their pattern or practice claim.[4]

Another FOIA case from this District, *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, No. 14-1130 SC, 2015 WL 6331268 (N.D. Cal. Oct. 21, 2015) (hereinafter "*OCE II*"), further confirms that a FOIA pattern or practice claim can be established through evidence of chronic delay and backlogs. The evidence in that case "show[ed] an unmistakable history that the Fisheries Service fail[ed] to meet its statutory deadlines under FOIA and cause[d] Plaintiffs (and likely others similarly situated) to suffer unpredictable, unreasonable delays." *Id.* at *8. In particular, the court found that "[t]he fact that there was in the first place a backlog of over 100 cases to so dramatically reduce is itself a red flag indicating the potential for FOIA compliance issues," and "[t]his potential [was] confirmed by evidence Plaintiffs provide[d] of a pattern-and-practice of FOIA violations through affidavits, briefs, FOIA response letters, and inconsistencies within the NMFS's own documentation." *Id.* "Exhibits submitted by Plaintiffs show[ed] a history

---

[4] The Ninth Circuit subsequently affirmed Judge Grewal's finding that Mayock lacked standing to bring the claim, noting that because Hajro and Mayock did not bring their pattern or practice claim as a class action, they could not amend their complaint once their claims became moot. *Hajro*, 743 F. App'x at 150.

United States District Court
Northern District of California

of late responses, ranging but not limited to 4 days, 18 days, 51 days, 9 months, 10 months, and ongoing." *Id.*

Defendants in *OCE II* did not dispute "[t]he fact that these response were tardy"; instead, they claimed that the statutory deadlines are not absolute." *Id.* The court dismissed that argument because "laxity in the rules cannot justify the sheer volume of the violation history evidenced just between Plaintiffs and the Fisheries Service." *Id.* "[T]he evidence [was] clear as to whether a pattern-and-practice existed in the past," and plaintiffs provided a "reasonable basis to believe that these infractions will be ongoing." *Id.*

Similarly, no genuine issue of material fact exists here regarding defendants' "unmistakable history" of failing to make timely determinations on A-File FOIA requests. USCIS has reported a backlog for each of the last eight years, a backlog that is much larger than the one at issue in *OCE II*. The backlog has increased in recent years—growing from 16,247 in FY 2015 to 25,446 in August 2020. *See* Ex. H, USCIS 30(b)(6) Deposition of Tammy Meckley, Associate Director of the Immigration Records and Identity Services Directorate ("Meckley Dep.") at 49:16. It increased by more than 6,000 cases between June and August 2020. *See.* Ex. L, Email from Elliot B. Viker to Tammy Meckley et al. dated May 29, 2020; Ex. M, Email from Cynthia M. Cornell to Cynthia L. Holt et al. dated August 28, 2020. Ninety-nine percent of the total FOIA requests that USCIS receives are A-File FOIA requests that "account for the largest portion of DHS' FOIA backlog." Meckley Dep. at 51:12-16; Ex. N, Defendants' Response to Plaintiffs' First Set of Requests for Admission at 7. Plaintiffs submit the following table to summarize USCIS's historical backlog:

| DATE | RECEIVED | BACKLOG | SOURCE[5] |
|------|----------|---------|-----------|
| FY 2012 | 117,787 | 10,727 | Ex. I1, FY2012 DHS FOIA Report at 19–20 |
| FY 2013 | 132,797 | 3,394 | Ex. I2, FY2013 DHS FOIA Report at 18 |

---

[5] References to the "DHS FOIA Report" are to the Freedom of Information Report to the Attorney General of the United States and the Director of the Office of Government Information Services, which are available by fiscal year at https://www.dhs.gov/foia-annual-reports. Plaintiffs submit the relevant portions of those reports as Exhibit I.

| FY 2014 | 143,794 | 5,026 | Ex. I3, FY2014 DHS FOIA Report at 19 |
| FY 2015 | 162,986 | 16,247 | Ex. I4, FY2015 DHS FOIA Report at 20 |
| FY 2016 | 166,732 | 35,763 | Ex. I5, FY2016 DHS FOIA Report at 19–20 |
| FY 2017 | 190,941 | 37,887 | Ex. I6, FY2017 DHS FOIA Report at 19 |
| FY 2018 | 191,804 | 41,329 | Ex. I7, FY2018 DHS FOIA Report at 21 |
| June 19, 2019 – *Nightingale v. USCIS* filed | | | |
| September 2019 – USCIS invokes "unusual circumstances" in all Track 2 and 3 A-File FOIA Requests[6] | | | |
| FY 2019 | 200,174 | 14,773 | Ex. I8, FY2019 DHS FOIA Report at 29 |
| Jun. 30, 2020 | | 21,160 | Ex. K, Defendants' Response to Plaintiffs' Second Set of Interrogatories at 3 |
| Aug. 31, 2020 | | 25,446 | Meckley Dep. at 49:16 |

The average processing time for USCIS continues to exceed well beyond the statutory deadline of 20-days, or-30-days in "unusual circumstances." In June 2019, when this lawsuit was filed, the average processing time for Track 2 (the complex track where USCIS processes most A-File requests) was between 55 and 90 days. The average as of September 2020 was 71 days. Meckley Dep. at 152:8–15. Named plaintiffs and numerous other immigration attorneys also testified that USCIS has failed to respond to their A-File FOIA requests within the statutory timeframe. *See* Nightingale Decl. ¶¶ 11, 14 (reporting over seven month delays); Hoppock Decl. ¶ 22 ("[M]any months or years."); St. John Decl. ¶ 8–9 (three to six months for "basic" requests, and often over a year); Sáenz Decl. ¶ 11 ("[M]onths or even years."); Damast Decl. ¶ 9 (six months to over a year); Meyer Decl. ¶ 5 (reporting "six months to over a year" for USCIS files and "twelve to twenty-four months" for ICE documents).

---

[6] *See* Ex. I8, FY2019 DHS FOIA Report at 27 ("In September 2019 USCIS began claiming unusual circumstances for Track 2 and Track 3 requests. This change removed 2,338 cases from the backlog at the end of FY2019."). At the hearing, the parties disputed whether it was appropriate for USCIS to categorically invoke "unusual circumstances" under 5 U.S.C. § 552(a)(6)(B)(i) in this way. I need not decide that issue here. I note, however, that the certified USCIS Class and ICE Referral Class account for this additional time as it covers individuals who have had their A-File FOIA requests pending with defendants "for more than 30 business days without a determination."

United States District Court
Northern District of California

ICE has also reported a backlog for each year since 2012 that has steadily increased since 2015. As of August 11, 2020, ICE's backlog recorded at 56,661 requests. Ex. G, ICE 30(b)(6) Deposition of Catrina Pavlik Keenan ("Keenan Dep.") at 179:15–19. The "vast majority" of ICE's backlog consists of A-File FOIA requests; all of ICE's backlogged A-File FOIA requests originated with USCIS as the custodian of A-Files. *Id.* at 72:18–22, 78:13–22. Despite purported enhanced efforts in FY 2020, discussed further below, ICE projects that its backlog will not be eliminated until September 2021. Ex. 4, Declaration of Fernando Pineiro, ICE Acting FOIA Officer ("Pineiro Decl.") ¶ 5. Plaintiffs submit the following table to summarize ICE's historical backlog:

| DATE | RECEIVED | BACKLOG | SOURCE[7] |
|---|---|---|---|
| FY 2012 | 24,073 | 2,443 | Ex. I1, FY2012 DHS FOIA Report at 19 |
| FY 2013 | 34,161 | 4,714 | Ex. I2, FY2013 DHS FOIA Report at 18 |
| FY 2014 | 85,081 | 56,863 | Ex. I3, FY2014 DHS FOIA Report at 19 |
| FY 2015 | 44,748 | 555 | Ex. I4, FY2015 DHS FOIA Report at 20 |
| FY 2016 | 63,385 | 471 | Ex. I5, FY2016 DHS FOIA Report at 19 |
| FY 2017 | 47,893 | 391 | Ex. I6, FY2017 DHS FOIA Report at 19 |
| FY 2018 | 70,267 | 1,332[8] | Ex. I7, FY2018 DHS FOIA Report at 21 |
| June 19, 2019 – *Nightingale v. USCIS* filed | | | |
| FY 2019 | 64,231 | 1,493[9] | Ex. I8, FY2019 DHS FOIA Report at 14 |
| Jun. 30, 2020 | | 62,471 | Ex. K, Defendants' Response to Plaintiffs' Second Set of Interrogatories at 4 |

---

[7] *See supra* note 5.

[8] Plaintiffs contend that DHS's annual report did not account for 17,043 referrals from USCIS and that the actual backlog was 18,375. *See* Ex. I7, FY2018 DHS FOIA Report at 6; Ex. K, Defendants' Response to Plaintiffs' Second Set of Interrogatories at 2–3.

[9] Plaintiffs contend that DHS's annual report did not account for 59,123 referrals from USCIS and that the actual backlog was 60,616. *See* Ex. I8, FY2019 DHS FOIA Report at 14; Ex. K, Defendants' Response to Plaintiffs' Second Set of Interrogatories at 3.

United States District Court
Northern District of California

| Aug. 31, 2020 | 56,661 | Keenan Dep. at 179:15–19 |
|---|---|---|

DHS ultimately shares responsibility with its component agencies for the chronic failure to comply with the FOIA statute. It admits that "FOIA backlogs have continued to be a systemic problem at DHS" and that "[r]equests for A-file material comprise the vast majority of DHS's FOIA workload." Ex. E, DHS FOIA Backlog Reduction Plan 2020-2023 at Bates 88275–76; *see also* Ex. Z, Talking Points on FOIA Operations at DHS (Jun. 5, 2019), at Bates 103827 (acknowledging "FOIA backlogs are a systemic issue at DHS").[10]

Defendants do not rebut the evidence discussed above. They do not dispute that there has been a systemic failure across the agencies to make timely determinations on A-File FOIA requests and that noncitizens experience significant delays in obtaining their A-Files nationwide. *See* Ex. D, DHS Chief Privacy Officer Privacy Office Overview at Bates 85216-REP ("There are consistent and systematic delays with FOIA processing, which adversely impact [noncitizens], delays immigration proceedings, and potentially extends detention."); Ex. E, DHS FOIA Backlog Reduction Plan 2020-2023 at Bates 88274–75 ("Requestors need [A-File] records for personally critical and often time-sensitive reasons—they might be applying for benefits, facing deportations, or challenging their employment termination.").

Instead, defendants contend that the backlogs fail to reflect the incredible volume of incoming A-File requests received since 2012 and their good faith efforts to address the problem. But as Judge Grewal found in *Hajro*, this argument appears to "confuse whether the evidence supports a finding of a pattern or practice of FOIA violations with the basis for injunctive relief," a separate inquiry that I will address below. *Hajro*, 832 F. Supp. 2d at 1107.

---

[10] Defendants argue that plaintiffs cannot show that DHS has been engaging in its own independent pattern or practice of FOIA violations because, by design, DHS components have their own FOIA offices and DHS headquarters generally is not involved in the direct processing of FOIA requests received by its components. Cross MSJ 20; *see* Ex. 7, Declaration of James V.L.M. Holzer, DHS Deputy Chief FOIA Officer ("Holzer Decl.") ¶¶ 4–5. Nonsense. DHS is responsible for providing oversight of its components' FOIA programs. *Id.* ¶ 7. DHS also acknowledges that "[d]ecentralization of the FOIA program at the Department causes problems in program coordination and workforce management making it difficult for the DHS FOIA enterprise to share manpower coordinate surge efforts and plan for future challenges." Ex. E, DHS FOIA Backlog Reduction Plan 2020-2023 at Bates 88281; *see also* Ex. AA, DHS FOIA Presentation (Jun. 5, 2019), at Bates 103815, 103817 (listing "decentralization" as one of the "FOIA Primary Challenges").

1     Defendants cite *Mayock v. Nelson*, 938 F.2d 1006 (9th Cir. 1991), in support of their

2  contention that increased workloads and efforts to reduce backlogs are part of the pattern or

3  practice inquiry here.  Cross MSJ 11.  In that case, immigration attorney Mayock, the same

4  plaintiff who later filed the *Hajro* lawsuit in 2008, sued the San Francisco INS office for failing to

5  timely process A-File FOIA requests.  The INS argued that "it can be relieved of the strict

6  deadlines by [section] 552(a)(6)(C)."  *Mayock v. I.N.S.*, 714 F. Supp. 1558, 1563 (N.D. Cal. 1989);

7  *see* 5 U.S.C. § 552(a)(6)(C)(i) ("If the Government can show *exceptional circumstances* exist and

8  that the agency is exercising *due diligence* in responding to the request, the court may retain

9  jurisdiction and allow the agency additional time to complete its review of the records.")

10  (emphasis added).

11     The court found it "doubtful whether [section] 552(a)(6)(C) was really intended by

12  Congress to answer the problems presented by this case" because "[t]hat section appears to

13  contemplate separate suits in district court to enforce specific FOIA requests" and "does not

14  expressly address the 'pattern and practice' problem." 714 F. Supp at 1565.  Assuming the section

15  applied, the court "ha[d] difficulty finding that a *normal, predictable* workload is an 'exceptional

16  circumstance,' especially where the INS has made no showing that it has unsuccessfully sought

17  more FOIA resources from Congress or attempted to redirect its existing resources." *Id.* at 1565–

18  66 (emphasis added).  It concluded that "section 552(a)(6)(C) is not a defense available to the INS

19  in this case," because "[w]hile that section might be invoked as a reason for requesting additional

20  time for individual requests that are large or complicated, it does not constitute a defense to delays

21  that result from the ordinary course of business in processing FOIA requests." *Id.* at 1566.

22     The Ninth Circuit reversed, finding that it was "not clear that the district court considered

23  the government's evidence in its entirety." 938 F.2d at 1008.  In particular, it found that the

24  district court failed to consider one of the government's declarations that "created a dispute over

25  material facts, including whether the government had attempted to get increased funding in order

26  to reduce its backlog." *Id.*  Because the Ninth Circuit in *Mayock* remanded to the district court for

27  more fact-finding on agency workload, defendants argue that I should consider further fact finding

28  here as well.

United States District Court
Northern District of California

14

1    I will assume that the "exceptional circumstances" and "due diligence" defenses are

2   applicable to the pattern or practice claims in this case.[11]  But the voluminous record here does not

3   support defendants' position.

4       A few years after *Mayock*, Congress tightened the definition of "exceptional

5   circumstances" in the 1996 amendments to the FOIA statute: "For purposes of this subparagraph,

6   the term 'exceptional circumstances' does not include a delay that results from a *predictable*

7   *agency workload* of requests under this section, unless the agency demonstrates *reasonable*

8   *progress* in reducing its backlog of pending requests."  5 U.S.C. § 552(a)(6)(C)(ii) (emphasis

9   added).  Here, a reasonable fact finder could only conclude that defendants' increasing workload

10  was predictable.  We are not considering a sudden spike in cases; defendants have had a FOIA

11  backlog every year since at least 2012.

12      Moreover, since 2017 these defendants have employed aggressive immigration

13  enforcement policies that made an increasing workload predictable and expected.  The unfortunate

14  reality is that FOIA is the only realistic mechanism through which noncitizens can obtain A-Files.

15  Given the critical importance of the information in A-Files to removal defense and legalizing

16  status, it is not at all surprising that the number of A-File FOIA requests have increased along with

17  this increase in immigration enforcement.  *See, e.g.*, Ex. 1, Declaration of Tammy M. Meckley

18  ("Meckley Decl.") ¶ 30 (table demonstrating "from FY 2012 to FY 2020, there has been a steady

19  rise in FOIA requests submitted to USCIS").

20      Nor does the record demonstrate reasonable progress in reducing the backlog of pending

21  requests.  Defendants contend that the FOIA offices within USCIS and ICE have submitted

22  requests to leadership within their respective agencies on an annual basis seeking enhancements to

23

---

24  [11] Plaintiffs argue that the issues on appeal in *Mayock* were whether and how the district court was
required to consider the "exceptional circumstances" and "due diligence" defenses under to 5
25  U.S.C. § 552(a)(6)(C) as applied to the plaintiff's FOIA requests, but that those defenses are not
applicable here where a class has been certified.  Plaintiffs' Opposition to Defendants' Cross-
26  Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary
Judgment ("Pls. Oppo.") [Dkt. No. 79] 5.  Defendants respond that there is no reason why absence
27  of class-certification questions in *Mayock*, which is otherwise on all fours with this case, would
allow me to disregard the Ninth Circuit's analysis.  Defendants' Reply in Support of Cross-Motion
28  for Summary Judgment ("Defs. Reply") [Dkt. No. 82] 4.  The Ninth Circuit's short opinion in
*Mayock* does not squarely address this question.

United States District Court
Northern District of California

their FOIA programs, including additional FOIA personnel, investment funds (such as the $10 million investment for FIRST), overtime approval, approval to hire contractors, and technological improvements.  *See* Keenan Dep. at 48:10–49:2; Meckley Dep. at 58:21–59:5; Meckley Decl. ¶¶ 24–25.  But when questioned by members of Congress about delayed A-File FOIA processing, neither DHS's Deputy Chief FOIA Officer nor USCIS's Senior Executive requested, or even suggested, that the agencies would benefit from additional or specifically-designated funding for FOIA processing.  *See* Ex. Y, Statement of James V.M.L. Holzer, Deputy Chief FOIA Officer before Subcommittee on Oversight, Management, and Accountability (failing to raise the issue at October 17, 2019 congressional hearing).

Rather than seek congressional funding, defendants continue to rely on a patchwork of short-term fixes—overtime, staff detailed from other departments, and contract support—none of which has succeeded in the long-term.  Holzer Decl. ¶ 8 ("DHS Privacy Office at times assists it components with processing certain types of requests in order to reduce outstanding backlogs."); Meckley Decl. ¶¶ 71, 77 ("USCIS has [] entered into a number of contracts to retain FOIA processors," and these contracts "typically contain a base period of one year and several option years"; USCIS has also authorized overtime in an effort to address the backlog," and "[w]hile overtime is not a panacea solution, if the agency has not authorized overtime, the backlog today would be significantly larger").  Defendants contend that since 2010, USCIS's FOIA office has grown from 48 government information specialists to 162.  Meckley Decl. ¶ 69.  But their own expert reports that  in FY 2019, "USCIS faced 22.8% of all FOIA requests [government-wide] with only 7.04% of the government's FOIA staff."  Ex. 6, Expert Declaration of Lindsay Steel ("Steel Decl.") ¶ 17.  One would expect that as an agency that "consistently receives more FOIA requests on an annual basis than any other federal agency," USCIS would have a proportionately higher number of FOIA staff to meet that demand.  *Id.* ¶ 15.

Defendants' explanation of why USCIS does not routinely request FOIA funding from Congress is unconvincing.  They contend that because Congress has designated USCIS as an agency that does not receive congressional appropriations for its FOIA operations, USCIS has to rely on its own generated income.  Cross MSJ 18 (citing 8 U.S.C. §§ 1356(m), (n)).  8 U.S.C. §

16

1356(m) applies to "adjudication fees as are designated by the Attorney General in regulations," whereas the mechanism for FOIA processing and production fees are designated by Congress under 5 U.S.C. § 552(a)(4)(A). Even if 8 U.S.C. § 1356(m) is applicable, nothing in that statute prevents DHS or USCIS from seeking additional or independent funding from Congress to resource their FOIA operations to ensure compliance.[12]

The Ninth Circuit has recognized that "Congress wrote a tough statute on agency delay in FOIA compliance, and recently made it tougher," and "[t]hough FOIA doubtless poses practical difficulties for federal agencies, *federal agencies can educate Congress* on the practical problems they have, and attempt to persuade Congress to change the law or provide additional funds to achieve compliance." *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999) (emphasis added); *see id.* at 1041–42 (finding district court erred in finding "exceptional circumstances" where the Federal Bureau of Investigation ("FBI") had an increasing workload since the early 1980s and claimed an "unexceptional . . . slight upward creep in the caseload"; while the FBI claimed "repeated rejection of its budget requests within the executive branch . . . before the requests even got to Congress," "[t]he decision of the executive branch not to pass on the bureau's request to the legislative branch would be consistent with a policy choice by the executive branch to delay FOIA requests rather than ask for additional funds to meet them in a timely way"). There is no evidence in the record that defendants have even attempted, let alone succeeded, in persuading Congress to change the law or provide additional funds to achieve compliance.[13]

---

[12] USCIS also complains that it recently tried to increase its fees through a new regulation that could have added more resources to its FOIA budget, but that effort is currently preliminary enjoined in this District. *See Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-JSW, 2020 WL 5798269, at *1 (N.D. Cal. Sept. 29, 2020) (granting preliminary injunctive relief to plaintiff organizations that serve low-income applicants for immigration benefits and staying USCIS rule implementing fee changes for immigration benefit requests). This argument is particularly troubling as it insinuates that FOIA processing is entirely dependent on the fees paid by the very people who are harmed by the defendants' delays.

[13] At the hearing, defendants stated that due to the COVID-19 pandemic, USCIS saw a 50% drop in incoming immigration -related fees. This budget shortfall prompted it to request $1.2 billion in emergency funds from Congress. There is no indication that any part of this $1.2 billion request is earmarked for FOIA processing, as opposed to general operating expenses.

In sum, the evidence is clear that USCIS, ICE and DHS have a pattern of unreasonable delay in responses to A-File FOIA requests.  Even if there is no "egregious" policy to violate FOIA's statutory deadlines, "informal agency conduct resulting in long delays in making requested non-exempt records available may serve as the basis for a policy or practice claim." *Nightingale*, 333 F.R.D. at 460 (quoting *Judicial Watch, Inc. v. United States Dep't of Homeland Sec.*, 895 F.3d 770, 777–78 (D.C. Cir. 2018)).  Defendants cannot use a predictably increasing workload to excuse their chronic failure to make timely determinations on A-File FOIA requests.

Summary judgment is GRANTED in plaintiffs' favor because no genuine issue of material fact exists concerning defendants' pattern or practice of not making timely determinations on A-File FOIA requests.  I GRANT declaratory relief that (i) defendants have violated the FOIA by failing to make timely determinations on plaintiffs' A-File FOIA requests within the statutory time frames mandated by FOIA and that (ii) defendants have engaged in a long-standing pattern or practice of violating FOIA's statutory deadlines when responding to requests for A-Files.  *See OCE I*, 2015 WL 4452136, at *7 ("[E]ntering declaratory judgment that the agency violated the FOIA is appropriate when the agency has a pattern and practice of violating these time limits.") (citing *Payne*, 837 F.2d at 494–95).

## II.     INJUNCTIVE RELIEF

Injunctive relief is warranted in order to remedy a pattern or practice of FOIA violations by an agency where there is "a probability that alleged illegal conduct will recur in the future." *Long v. IRS*, 693 F.2d 907, 909 (9th Cir. 1982).  "In determining whether injunctive relief is appropriate to resolve a FOIA dispute, the court's prime consideration should be the effect on the public of disclosure or nondisclosure." *Id.*  Where "prolonged delays have repeatedly hindered the timely disclosure of non-exempt documents, the district court should seriously consider the likelihood of recurrence, weighing the good faith of any expressed intent to comply, the effectiveness, if any, of the discontinuance and the character of past violations." *Id.*

The "prime consideration," the effect on the public of disclosure or nondisclosure, weighs heavily in favor of plaintiffs as class members who must rely on FOIA in order to obtain records necessary to determine eligibility for immigration benefits, defend against removal, or challenge

ongoing detention.  Defendants admit that the "current FOIA process raises several concerns," including delay that "adversely impacts [noncitizens], delays immigration proceedings, and potentially extends detention."  Ex. D, DHS Chief Privacy Officer Privacy Office Overview at Bates 85216-REP.

The likelihood of recurrence continues as thousands of class members either still have unanswered A-File FOIA requests in the agencies' backlog or will file an A-File FOIA request that will likely end up in the backlog.  The character of the past violations, discussed above, also weighs in favor of granting injunctive relief.

Defendants' recent efforts, including those taken in response to this lawsuit, do not undermine the need for comprehensive injunctive relief.  They have done little to address the systemic problem and do not indicate that defendants have created a path forward towards achieving substantial compliance with FOIA's statutory deadlines.

A.    **Defendants' Efforts to Increase Efficiencies**

Defendants argue that they have shown good faith effort to comply in future.  They primarily point to two recent improvements—a software program called "FIRST" and a new inter-agency Memorandum of Agreement executed between USCIS and ICE (the "2020 MOA").

1.    **FIRST**

In May 2018, USCIS introduced FIRST, a new system that "allows users to submit and track FOIA requests and receive documents digitally."  Press Release, USCIS Expands FIRST: A Fully Digital FOIA System (Jun. 25, 2019), available at https://www.uscis.gov/news/news-releases/uscis-expands-first-a-fully-digital-foia-system; *see* Meckley Dep. at 52:9–10, 53:4–9. FIRST focuses on making the FOIA intake and delivery process more efficient, but it fails to address the most time-consuming steps in between – document retrieval.  Meckley Dep. 123:5–11, 229:16–230:1.  The retrieval of documents is time-consuming because A-Files may be stored in multiple locations across the country, including the National Records Center ("NRC"), off-site commercial storage vendors, or "hundreds of different field offices."  *Id.* at 115:15–116:13, 123:5–11.

While USCIS "acknowledge[s] that FIRST does not loosen every knot in the FOIA system

that causes delayed determination on certain A-Files" and admits that FIRST "does not reduce the time it takes to physically scan paper A-Files," it points to a separate multi-million dollar project pursued to digitize existing paper A-File records. Cross MSJ 16; Meckley Decl. ¶ 15. A 2016 study prompted the agency to conclude that continuing digitization efforts on existing paper records was not "cost efficient." Meckley Decl. ¶ 15. The agency instead determined that the better option would be to focus on decreasing its reliance on paper records in the future and increasing the use of electronic records from intake of an application through the agency's determination on that application. *Id.* As defendants themselves recognize, "[w]hile there have been some efforts to digitize some of the forms in A-Files, the records are largely paper-based." Ex. E, DHS FOIA Backlog Reduction Plan 2020-2023 at Bates 88275.

USCIS contends that the NRC is generally able to scan and ingest paper A-Files within three business days. It does not say if any of the hundreds of field officers where A-Files may be located have a similar capability. Indeed, if files are located at a field office, the files are mailed to the NRC for scanning, another cause for the delay. Meckley Dep. at 226:13–227:10.

Defendants submit that FIRST has reduced the average processing time from 1 hour 14 minutes to 51 minutes, 30 seconds. Meckley Decl. ¶¶ 50, 52. That is all well and good, but the agency only starts processing the request, *i.e.*, reviewing the record for release or redactions, once all A-File records are scanned into FIRST. Meckley Dep. 113:4–15; *see also* Ex. E, DHS FOIA Backlog Reduction Plan 2020-2023 at Bates 88275 ("To process a FOIA request for an A-file, USCIS must locate and retrieve the file and digitize its contents using a high speed scanner *before* the documents can be reviewed.") (emphasis added). FIRST may introduce some efficiencies in intake and delivery but it does little to address the time-consuming part of the process.[14]

---

[14] The parties disagree on whether FIRST is hampered by problems with its implementation and underutilized by requesters. *See* Hoppock Decl. ¶¶ 27–36 (testifying that FIRST is "inaccessible"); Ex. CC, USCIS FOIA Reduction Project (Apr. 7, 2020) at Bates 702-SUPP ("FIRST slows down overall FOIA process," and USCIS must "[m]itigate FIRST risks with Dev Team and end user learning curve."); Ex. EE, USCIS FOIA Reduction Project (Jul. 7, 2020) at Bates 705-SUPP ("FIRST development [was] slowed by remediation actions" and that "[a]dditional testing and code reviews" were required; due to a "FIRST data security incident," it had to request that 344 individuals return or destroy records); Meckley Decl. ¶ 53–56 (USCIS has around 10 developers working on additional enhancements to FIRST and is continually searching for ways to increase functionality); *Compare id.* ¶ 57 (incoming requests skyrocketed from around

United States District Court
Northern District of California

### 2.    2020 MOA

Prior to June 2020, USCIS reviewed the documents within an A-File and referred documents with ICE equities to ICE for its own separate review and direct response to the requester.  Ex. 4, Declaration of Fernando Pineiro ("Pinerio Decl.") ¶ 13.  On June 1, 2020, USCIS and ICE implemented the MOA to streamline processing ICE records within an A-File. Pursuant to this agreement, USCIS is now responsible for processing ICE records contained within an A-File.  *See* Ex. FF (copy of the 2020 MOA).

The scope of the agreement is as follows:

> USCIS will process all ICE records within A-files responsive to FOIA requests.  Processing of ICE records shall be completed in accordance with training and guidance provided to USCIS by ICE.   Once processing is complete ICE will have 48 hours to review, incorporate any additional withholdings, as appropriate, and approve the release of ICE records.   Once approved, or at the expiration of 48 hours, whichever occurs first, ICE records will be electronically delivered to USCIS for final approval, close out and delivery to the FOIA requester.  In the event ICE records warrant further review, ICE will notify USCIS within the first 36 hours of receipt and complete its review and provide its response back to USCIS no later than 24 hours beyond the original 48 hours allotted.  This will occur on a case by case basis and will not be considered common practice.  *See* attached Appendix B for general outline of USCIS and ICE responsibilities.

*Id.* at 2.

Given that the vast majority (91%) of ICE's backlog consists of A-File referrals from USCIS, defendants contend that the 2020 MOA structural shift has enabled ICE to prevent additional increases in its referral backlog.  It can instead focus its resources singularly on eliminating its remaining backlog of 27,836 (as of October 15, 2020), which it anticipates doing by the end of the current fiscal year (September 30, 2021).  *See* Pineiro Decl. ¶ 5, 11, 26–27.[15]

Despite USCIS and ICE's assertions that they are "committed to renewing the agreement

---

4% to 50% since the system launched) *with* Ex. DD, USCIS FOIA Reduction Project (Feb. 11, 2020) at Bates 703-SUPP (reporting 28% of total receipts in the first quarter of FY 2020 were requests made through FIRST).  But even if the system is properly utilized and free of glitches, FIRST only focuses on the intake and delivery process and does little to improve the overall efficiency of responding to FOIA requests.

[15] It is worth noting that this timeframe is at odds with ICE's claim that, as of October 2020, it is processing an average of 8,000 backlogged FOIA requests per month since, at that rate, the remaining backlog of approximately 28,000 cases would be cleared by the end of January or February 2021.  *See* Pineiro Decl. ¶¶ 5, 27.

United States District Court
Northern District of California

1  for years to come," there is no guarantee that the 2020 MOA will continue beyond FY 2021.

2  Cross MSJ 18; Pinerio Decl ¶ 23; Meckley Decl ¶ 65.  Indeed, the two agencies entered into a

3  similar cooperative agreement in FY 2012, only to have it end "after a cost analysis conducted by

4  ICE revealed that it was more cost-effective to open the Orlando ICE FOIA office and have

5  contractors there work through the USCIS A-File referrals than it was to pay USCIS to continue

6  processing the records via the MOA."  Pinerio Decl. ¶ 19.

7        To the extent that this MOA remains in place, it will—for FOIA requests filed after June 1,

8  2020—resolve only one aspect of the agencies' delays in responding to A-File FOIA requests:

9  ICE's delays in processing its own records.  The MOA does not address USCIS's years-old

10  backlog.  If anything, the MOA increases USCIS's workload by requiring it to process ICE

11  records instead of referring documents to ICE.  Furthermore, while the MOA contains time limits

12  for ICE to reply once its portion of an A-File is processed, it does not similarly bind USCIS.

13  USCIS still must process both its own documents and ICE documents prior to transferring the file

14  to ICE for review, but without any deadlines to prevent delay.

15        The 2020 MOA appears to be a step in the right direction, but it is not enough to show that

16  defendants are on a path towards substantial compliance with FOIA statutory deadlines.

17        **3.        Statistics on Backlog Size and Average Processing Time**

18        Despite FIRST, the 2020 MOA, and at least three prior lawsuits raising nationwide pattern

19  or practice claims in the immigration FOIA context, the size of USCIS and ICE's backlog has not

20  significantly reduced.  Average processing time remains well beyond the statutory deadlines.

21  Defendants argue that plaintiffs have ignored USCIS's most significant achievement--USCIS has

22  reduced its processing time for Track 3 priority requests (requests from individuals who are

23  scheduled to appear before an immigration judge) to 33 business days and even further to 26

24  business days on average as of the date of the defendants' cross-motion filing.  Meckley Decl. ¶¶

25  21, 42.  This statistic is a snapshot in time that reflects the average in the last three months.  The

26  average processing time for Track 3 requests for the entire FY 2020 was 54.75 business days.  *Id.*

27  ¶ 42.

28        The statistic ignores the status of all other A-File requests in Track 1 (simple requests) and

Track 2 (complex requests).  The record shows that more than a year after this lawsuit was filed, USCIS processing time has not changed significantly for Track 2 cases, the track where USCIS processes most A-File requests.  At the time the Complaint was filed, the average processing time was between 55 and 90 days; the average now is 71 days.  Meckley Dep. at 152:8–15.  An average of 71 days is well above the statutory 20 or 30-day limit.

Defendants assert that are while they are still working on improving their Track 1 and 2 requests, their designated expert has found that "USCIS generally processes its FOIA requests in a reasonable amount of time under the circumstances and compared to other agencies."  Steel Decl. ¶ 14.  Using other agencies' failures to meet mandatory FOIA deadlines as comparators is, at best, irrelevant.  This case concerns USCIS's violation of the FOIA statute and the impact it is having on class members.  The significant negative consequence to plaintiffs in immigration proceedings caused by defendants' delay is hardly reasonable and it is not excusable, particularly given that Congress has set clear statutory deadlines.

While "not all agency delay or other failure to comply with FOIA's procedural requirements will warrant judicial intervention," *Judicial Watch*, 895 F.3d at 782, the Ninth Circuit has recognized that "unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses," *Long*, 693 F.2d at 910.  Given defendants' long and continuing history of backlogs, their admissions that even on average they continue to fail to comply with the statutory timelines, and the inadequate efforts they have made so far to solve the issue, I find that injunctive relief is appropriate and necessary to remedy this almost decade-long systemic problem.

**B.      Requested Forms of Relief**

Plaintiffs request relief in the following four forms: (i) permanently enjoin defendants from continuing to violate FOIA, ordering them to adhere to the FOIA timing requirements; (ii) clear the A-File FOIA backlog within thirty (30) days; (iii) provide the court and class counsel with quarterly reports on compliance; and (iv) order DHS and ICE to provide notice to all persons in removal proceedings of their right to request their A-File through FOIA and how to do so.

Ordering defendants to adhere to FOIA timing requirements and provide quarterly reports

1   on their compliance are forms of relief that are ordinarily granted by courts where an agency

2   routinely violates a statute or regulation.  *See, e.g.*, *Hajro*, 832 F. Supp. 2d at 1120 (ordering

3   USCIS to comply with FOIA timing provisions); *Gonzalez Rosario v. United States Citizenship &*

4   *Immigration Servs.*, 365 F. Supp. 3d 1156, 1163 (W.D. Wash. 2018) (enjoining defendants from

5   further failing to adhere to 30-day deadline for adjudicating applications for employment

6   authorization documents and ordering them to submit status reports every six months regarding

7   the rate of their compliance with the 30-day timeline).  Defendants' argument to the contrary is

8   unconvincing.

9       Defendants contend that an order requiring elimination of the backlog within thirty (30)

10  days, is "unworkable" and "likely impossible."  Cross MSJ 23–24.  I do not require 100%

11  compliance.  I do expect substantial compliance within sixty (60) days in light of the importance

12  of plaintiffs' receipt of A-files in a timely fashion.

13      Plaintiffs' final form of requested relief, an order compelling DHS and ICE to provide

14  notice to all persons in removal proceedings of their right to request their A-File through FOIA

15  and how to do so, is different.  Plaintiffs assert that neither ICE attorneys nor IJs adequately

16  inform detained or pro se class members in removal proceedings of their right to request their A-

17  Files through FOIA.  St. John Decl. ¶ 13; Hoppock Decl. ¶ 25; Nightingale Decl. ¶ 17; Meyer

18  Decl. ¶ 7; Damast Decl. ¶ 14; *see also* Keenan Dep. at 67:5–68:5 (no knowledge of whether ICE

19  prosecutors or IJs notify individuals).  As such, injunctive relief compelling defendants to timely

20  notify individuals in removal proceedings of their right to request A-Files through FOIA would

21  ensure that plaintiffs are "actually inform[ed]."  *Nozzi v. Hous. Auth.*, 806 F.3d 1178, 1194 (9th

22  Cir. 2015); *see Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  In

23  addition, plaintiffs argue that injunctive relief allowing detained or pro se class members in

24  removal proceedings to file an A-File FOIA request via a mechanism other than the internet or

25  U.S. mail, *e.g.*, by providing it to ICE at a removal hearing, would ensure that A-File FOIA

26  requests are filed and timely processed.  This is especially true given that ICE prosecutors

27  generally possess the A-File during removal proceedings.  Hoppock Decl. ¶ 14; Sáenz Decl. ¶¶ 9,

28  16.

United States District Court
Northern District of California

1   Defendants are aware of this problem.  DHS has acknowledged that "[p]ro se litigants who

2   lack expertise to file FOIA requests are routinely unable to obtain copies of their A-Files or do not

3   receive it in a timely fashion to adequately represent themselves," and that "[t]his increases the

4   likelihood that DHS will improperly remove individuals who do not fall under any of the

5   Department's enforcement priorities."  Ex. D, DHS Chief Privacy Officer Privacy Office

6   Overview at Bates 85216-REP.

7       Plaintiffs cite case law concerning the Due Process Clause, not FOIA, in support of this

8   relief.  To be sure, there are a number of ways that the federal government could make

9   immigration proceedings more fair.  Plaintiffs' requested relief would be a small, useful and

10  inexpensive step in that direction.  But plaintiffs filed a FOIA case, not a due process challenge.

11  FOIA does not explicitly or implicitly require the additional notice plaintiffs seek.

12      I have broad equitable powers under FOIA, but I cannot see how this particular form of

13  injunctive relief "is necessary to effectuate the congressional purpose behind the [FOIA] statute."

14  *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002); *see Long*, 693 F.2d at

15  909 ("[T]he Supreme Court held that Congress did not intend to limit the court's exercise of its

16  inherent equitable powers *where consistent with the FOIA*.") (citing *Renegotiation Bd. v.*

17  *Bannercraft Clothing Co.*, 415 U.S. 1, 20 (1974)) (emphasis added); *see, e.g.*, *Animal Legal Def.*

18  *Fund v. United States Dep't of Agric.*, 935 F.3d 858, 873 (9th Cir. 2019) (district court had

19  authority under FOIA to stop the agency from holding back records it has a duty to make

20  available, which includes requiring an agency to post certain categories of documents in online

21  reading rooms pursuant to the FOIA "reading-room" provision).   I conclude that I lack

22  jurisdiction to grant plaintiffs' final form of requested relief.

23  **III.    MOTIONS TO SEAL**

24      Plaintiffs have filed two motions to seal material designated as confidential by defendants.

25  Administrative Motion to Seal [Dkt. No. 68] (portions of Plaintiffs' Motion for Summary

26  Judgment, Index of Exhibits, and Exhibits D, L, M, O, Q, R, S, V, W, X, AA, BB, FF, and GG);

27  Second Administrative Motion to Seal [Dkt. No. 78] (portions of Plaintiffs' Opposition to

28  Defendants' Cross Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Summary Judgment).

2          Defendants only seek to seal certain limited information from ten of the fourteen exhibits,

3    seven of which contain personal identifying information of certain government employees

4    (Exhibits M, Q, R, S, W, FF, and GG) and three of which contain non-final agency deliberations

5    that reveal defendants' conditional decision-making (Exhibits V, X, and BB).  Declaration of

6    Cristen C. Handley in Support of Plaintiffs' Administrative Motion to Seal [Dkt. No. 76-1].

7    Because defendants do not seek to seal any information on the remaining four exhibits (Exhibits

8    D, L, O, and AA), Plaintiffs' Motion for Summary Judgment, Index of Exhibits, and Plaintiff's

9    Opposition/Reply, those documents will be filed on the public docket.  *Id.*; Defendants' Response

10   to Plaintiffs' Second Administrative Motion to Seal [Dkt. No. 81].

11         Defendants have shown a compelling reason to keep personal identifying information

12   sealed and their request is narrowly tailored to only sealable material.  *See* Declaration of

13   Fernando Pineiro [Dkt. No. 76-2] ¶ 7 (explaining that disclosure of the private contact information

14   of ICE and USCIS employees would cause unnecessary harm and subject them to harassment).

15   Motion to seal portions of exhibits M, Q, R, S, W, FF, and GG is GRANTED.

16         Defendants also contend that the non-final deliberative material in Exhibits V, X, and BB

17   should be sealed.  Exhibits V and X are draft briefing presentations in which a senior ICE official

18   presented recommendations to another senior ICE official concerning the acquisition of additional

19   resources for the ICE FOIA Division.  *Id.* ¶ 5.  The presentations include three options for seeking

20   additional resources and recommend one.  *Id.*  Because the documents do not include ICE's final

21   decision about whether and how to seek additional resources, defendants assert that public release

22   of the deliberations in these draft presentations would have an "immediate chilling effect on ICE's

23   future deliberations" and on its decision-making process.  *Id.*  Exhibit BB is a document that

24   contains internal comments, proposed responses, and discussion bullets for a December 18, 2019

25   meeting between ICE and USCIS.  *Id.* ¶ 6.  Defendants state this document also reflects non-final

26   agency deliberations and its public release would have an "immediate chilling effect on the

27   willingness of ICE officials to engage in free and frank discussions and could cause confusion for

28   the public."  *Id.*  I did not use those portions of the exhibits in my analysis of the motions and

1  agree with defendants that they may be sealed as requested.  I GRANT defendants' motion to seal

2  portions of exhibits V, X and BB.

3                                              **CONCLUSION**

4        For the reasons set forth above, summary judgment is GRANTED in favor of plaintiffs and

5  against defendants with respect to plaintiffs' pattern or practice claims.  I ORDER the following:

6        **Declaratory Relief**:

7        Defendants have violated the FOIA by failing to make timely determinations on plaintiffs' A-

8  File FOIA requests within the mandated statutory time frames.  Defendants have engaged in a

9  pattern or practice of violating FOIA's statutory deadlines when responding to requests for A-

10  Files.

11        **Injunctive Relief**:

12   a.    Adhere to FOIA Timing Requirements: Defendants are permanently enjoined from further

13        failing to adhere to the statutory deadlines for adjudicating A-File FOIA requests, as set

14        forth in 5 U.S.C.§§ 552(a)(6)(A) and (B);

15   b.    Eliminate the Backlogs:  **Within sixty (60) days** of this order, defendants shall make

16        determinations on all A-File FOIA requests in USCIS's and ICE's backlogs;

17   c.    Quarterly Compliance Reports: Until further order, defendants shall provide this court and

18        class counsel with quarterly reports containing information regarding the number and

19        percentage of A-File FOIA requests that were filed and timely completed as well as the

20        number and percentage of cases that remain pending beyond the twenty or thirty-day

21        statutory periods, respectively 5 U.S.C.§§ 552(a)(6)(A) and (B).  The first compliance

22        report is due **within ninety (90) days** of this order.

23        **Motion to Seal**

24        Defendants' request to seal portions of exhibits M, Q, R, S, W, V, X , BB, FF, and GG is

25  GRANTED.

United States District Court
Northern District of California

27

United States District Court
Northern District of California

A Status Conference is set for **April 6, 2021** at 2:00 p.m.  The parties shall file a joint status report by **March 30, 2021**.

**IT IS SO ORDERED.**

Dated: December 17, 2020



William H. Orrick
United States District Judge

28