Pages 1 - 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

ZACHARY NIGHTINGALE, et al.,    )
                                )
              Plaintiffs,       )
                                )
   VS.                          )    **NO. C 19-03512 WHO**
                                )
U.S. CITIZENSHIP AND            )
IMMIGRATION SERVICES, et al.,   )
                                )
              Defendants.       )
_____  )

                        San Francisco, California
                        Wednesday, December 9, 2020


**TRANSCRIPT OF REMOTE ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM WEBINAR:**

For Plaintiffs:
                    AMERICAN IMMIGRATION COUNCIL
                    1331 G Street, N.W., Suite 200
                    Washington, D.C. 20005
               **BY:  CLAUDIA VALENZUELA, ATTORNEY AT LAW
                    EMILY J. CREIGHTON, ATTORNEY AT LAW**

                    NORTHWEST IMMIGRANT RIGHTS PROJECT
                    615 - 2nd Avenue, Suite 400
                    Seattle, Washington 98104
               **BY:  MATTHEW H. ADAMS, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



Reported Remotely By:  Ana M. Dub, RMR, RDR, CRR, CCRR, CRG
                       CSR No. 7445, Official U.S. Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiffs:

3                              NATIONAL IMMIGRATION LITIGATION ALLIANCE
                             10 Griggs Terrace
                             Brookline, Massachusetts 02446
4                    BY:   **TRINA A. REALMUTO, ATTORNEY AT LAW**
                          **MARY A. KENNEY, ATTORNEY AT LAW**
5                          **TIFFANY LIEU, ATTORNEY AT LAW**

6                              LAW OFFICES OF STACY TOLCHIN
                             634 South Spring Street, Suite 500A
7                              Los Angeles, California 90014
                     BY:   **STACY E. TOLCHIN, ATTORNEY AT LAW**
8

9   For Defendants:            UNITED STATES DEPARTMENT OF JUSTICE
                             CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
10                             1100 L Street, N.W.
                             Washington, DC 20005
11                   BY:   **CRISTEN C. HANDLEY, TRIAL ATTORNEY**
                          **MATTHEW C. SKURNIK, TRIAL ATTORNEY**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **Wednesday - December 9, 2020**                          **2:16 p.m.**

2                          **P R O C E E D I N G S**

3                              **---o0o---**

4          **THE CLERK:**  Okay.  Hearing no objections, then we're

5   going to move forward in Case Number 19-3512, Nightingale

6   versus U.S. Citizenship and Immigration Services.

7          Counsel, if you would please state your appearance for the

8   record.

9          **MS. REALMUTO:**  This is Trina Realmuto from the

10  National Immigration Litigation Alliance on behalf of the

11  plaintiffs.

12         **THE COURT:**  Good afternoon.

13         **MS. VALENZUELA:**  Claudia Valenzuela from the American

14  Immigration Council on behalf of plaintiffs.

15         **MS. CREIGHTON:**  Emily Creighton from the American

16  Immigration Council on behalf of the plaintiffs.

17         **MS. KENNEY:**  Mary Kenney from the National Immigration

18  Litigation Alliance on behalf of plaintiffs.

19         **MR. ADAMS:**  And Matt Adams with Northwest Immigrant

20  Rights Project, again, on behalf of plaintiffs.

21         **MS. TOLCHIN:**  And Stacy Tolchin, Law Offices of Stacy

22  Tolchin in Los Angeles, on behalf of plaintiffs.

23         **MS. LIEU:**  And Tiffany Lieu from the National

24  Immigration Litigation Alliance on behalf of plaintiffs.

25         **THE COURT:**  Great.

1          **MS. HANDLEY:**  And good afternoon, Your Honor.  This is

2    Cristen Handley from the Department of Justice Civil Division

3    on behalf of the defendants.

4          **MR. SKURNIK:**  Good afternoon.  This is Matthew Skurnik

5    from the Department of Justice on behalf of defendants.

6          **THE COURT:**  Great.  Well, good afternoon to all of

7    you.

8          Let me tell you what I'm thinking about this.  In other

9    contexts, I have some sympathy for the Government's arguments

10   about lack of resources in carrying out FOIA activities that

11   leads to non-compliance with timelines; but in the context of

12   immigration proceedings and A-Files, I don't.

13         The A-File is central, its foundational for the

14   adjudication of every immigration proceeding.  The fairness of

15   those proceedings, some involving non-citizens who are

16   detained, unrepresented, and unfamiliar with the complexities

17   of immigration law, is undermined when those non-citizens can't

18   get timely access to the documents that are used to evaluate

19   their cases.

20         This isn't a due process case.  It's a FOIA case.  But it

21   arises in a context where compliance has real-life consequences

22   to those involved, and justice delayed is justice denied.

23         So there is, I think, a pattern or practice of violating

24   FOIA processing timelines.  There's been a backlog every year

25   since 2012.  In fiscal year 2015, it was 16,247.  In August of

2020, it was 25,446.  There have been three prior lawsuits that haven't resolved this.  The defendants note that the number of A-File requests has increased a lot in the last three years. That's completely predictable, given the current Administration's policies and practices regarding immigration matters.

If the exceptional circumstances and due diligence defenses apply to pattern and practice cases, I don't think they have any merit here, as I'll explain in a second; but I am interested in the parties' argument and authorities regarding the potential applicability of those defenses in these cases.

But on the merits of those defenses, given the fact that the increase in requests has been predictable; the USCIS hasn't sought more funding from Congress to address them; the DHS allocates a lower percentage of its personnel to its FOIA Department than other agencies; that the FIRST Software System, while an improvement, focuses on FOIA intake and delivery systems and not on the retrieval of documents from multiple locations, which is where the biggest delays occur; where you've got the 2020 MOA, which is not permanent and only addresses ICE's delay in processing records, not USCIS's inability to process them timely; and where USCIS has invoked unusual circumstances as a blanket extension in all Track 2 and 3 cases, which seems a questionable use of that phrase, I think the defenses don't lack merit.  So I'm inclined to grant the

1  declaratory relief, that USCIS's failure to comply with the

2  processing timelines is unlawful.

3      And once I hear argument on that -- I understand

4  the Government's divided up the argument.  So once I hear

5  argument on that, then we'll go to the injunctive relief and

6  its potential scope.

7      So I'd like to hear from the Government first.

8        **MS. HANDLEY:**  Certainly, Your Honor.  Again, this is

9  Cristen Handley on behalf of the defendant.

10      So if it's okay with Your Honor, I'll begin with your

11  question about the applicability of the exceptional

12  circumstances defense in FOIA pattern or practice cases.

13      So, of course, as the Court is aware, this is a relatively

14  underdeveloped cause of action.  So it's sort of not clear in

15  any express sense of the term whether that exception is a

16  mandatory thing the Government must invoke, whether

17  the Government merely may invoke it in pattern or practice

18  cases.

19      I think probably the Ninth Circuit case that best

20  addresses this issue is the *Mayock v. Nelson* case; and I think

21  that although that case does not give us a lot on the substance

22  of this question, it does indicate that the answer is:  Yes,

23  the exceptional circumstances defense can be invoked in

24  response to a pattern or practice claim, and that's because --

25  well, first of all, the Court -- the Ninth Circuit said the

1   central question is whether exceptional circumstances may be

2   invoked.  And rather than affirming on the basis that it may

3   not be invoked and finding in favor of the plaintiffs, the

4   Ninth Circuit reversed the summary judgment entry and the

5   injunction for further fact finding on the question of whether

6   exceptional circumstances were met in that case.  So I think

7   our reading of that case is that the answer is:  Yes,

8   the Government can invoke that as a defense.

9        However, there's been no subsequent case law really

10   expanding on that or, you know, finding that the Government

11   must invoke it in every case.  And indeed, you know, I think

12   that there's a substantial amount of overlap between what is

13   considered factually to find exceptional circumstances and what

14   other courts, including the Ninth Circuit, have considered as

15   factual defenses to the pattern or practice claim, regardless

16   if the exceptional circumstances defense is expressly invoked.

17        So on that note -- and, Your Honor, I think this goes to

18   some of the other points you made about the backlog, the

19   increase in requests, which Your Honor characterized as

20   predictable, given, you know, policies or practices and other

21   factual -- I'm not trying to say an exhaustive list here but --

22   other factual things that Your Honor mentioned.

23        So I think another thing *Mayock* tells us is that

24   the Government's efforts in response to increases in the volume

25   of requests are material facts that the Court must consider in

determining a pattern or practice claim and must weigh.  And
because they are material facts, they have the capacity to
allow the Government to prevail in defense of a pattern or
practice claim.  And I think many of these facts that
Your Honor is sort of using to conclude that there is a pattern
or practice here were also present in *Mayock*, and that did not
prevent the Ninth Circuit from finding that the district court
needed to consider those facts.

     And, you know, I don't want to --

     **THE COURT:**  So, Ms. Handley, how would I -- would you
propose that I consider them more than I already have?  Because
I have considered them.  I just don't -- I don't think that
they add up to a defense.

     **MS. HANDLEY:**  So, yes, Your Honor, I do think you
should consider them more than you have, to the extent you
considered them and concluded that they don't add up.  And
that's because the -- first of all, the first fact that
Your Honor mentioned is the backlog.

     Well, I think that's what plaintiffs rely most heavily on
in their briefing.  And it seems clear from the cases in which
agency delay is the basis for the pattern or practice alleged,
that agency delay itself evidenced by a backlog is not enough.
So while, of course, the plaintiff must show that there is a
backlog in order to even begin with a pattern or practice
claim, it's simply not enough.

1        And in response to the backlog, I think USCIS and ICE, as

2   evidenced by the results that they've achieved from their

3   efforts, have made significant effort, especially in the last

4   year, in terms of -- well, let's just begin with ICE with the

5   backlog reduction.

6        That is a significant and concrete improvement in the

7   record, showing that ICE has reduced its backlog by a total of

8   70 percent in the last six months.  That is not an

9   insignificant fact.  And ICE is on track to completely

10  eliminate its referral backlog in -- by the end of the current

11  fiscal year.  So within this fiscal year, ICE will not have a

12  backlog; ICE will not have a referral backlog, that is.

13       And the way that ICE was able to achieve that success was

14  because of this interagency agreement in which USCIS took on

15  the processing burden for what I would characterize as the

16  greater good of the overall FOIA program.  USCIS took on this

17  additional work, this additional burden of processing ICE's

18  records, and the result of that has been to allow ICE to

19  develop this plan to eliminate its backlog.

20       And I think that further evidence that the agreement has

21  had a net or aggregate positive effect is that USCIS's backlog

22  probably should have gone up a lot more than it did in response

23  to the additional processing burden USCIS took on; but instead,

24  we've seen the opposite.  We've seen that USCIS's backlog has

25  only gone up by, I think, around -- sorry.  Let me just refer

1    to my notes because I actually -- I do have a couple of updated

2    facts.

3         So USCIS's current backlog is 23,177.  And we're happy to

4    provide, you know, supplemental declarations if the Court would

5    prefer for this to be formally in the record.  But, so 23,177.

6    That is a slight increase, but it is far less of an increase

7    than how much ICE has been able to decrease its backlog in the

8    last six months.  And so I think that shows that the, you know,

9    net effect of the MOA has been positive.

10        And in terms of the MOA not being permanent, Your Honor,

11   we've previously explained that that's really just a matter of

12   standard language that's sort of required in these interagency

13   agreements in order to comply with the Antideficiency Act and

14   other regulations and statutes governing the expenditure of

15   agency funds.  So it by no means indicates that the agencies

16   are not committed to this agreement.  And, in fact, to the

17   contrary, ICE and CIS have expressly said that they're

18   committed to keeping this agreement in place indefinitely.

19        So there's just no evidence that despite these kind of

20   standard provisions in the MOA, that these agencies are going

21   to, you know, turn their backs on this agreement in the absence

22   of any sort of injunctive relief in this case.

23        And I would also add, Your Honor mentions that CIS has not

24   sought additional funding.  Well, I mean, I guess I have two

25   responses to that.

 1          First of all, CIS is not an agency that ordinarily

 2    receives congressional appropriations.  CIS is fee funded; so

 3    it relies almost exclusively on immigration benefit application

 4    fees.  So it cannot just, in the ordinary course, go to

 5    Congress and ask for more money.

 6          And in extraordinary circumstances, such as in emergency

 7    settings, USCIS has requested additional funding from Congress.

 8    We stated in our brief, as recently as May of this year, USCIS

 9    requested $1.2 billion from Congress as part of a sort of

10    emergency request for relief.  Part of that was due to the

11    effects that this year has had on not just USCIS, but I'm sure

12    it's had effects on other agencies as well.  Due to COVID-19

13    and other factors, USCIS saw, I think, a 50 percent decrease in

14    its immigration fees.  And so that projected budget shortfall

15    caused USCIS to request additional funding from Congress.  That

16    funding ultimately was not provided.

17          So USCIS has, in the areas where it can control, done what

18    it can to maximize its resources.  Rather than go to Congress

19    for funding, USCIS -- and this is in the record in

20    Ms. Meckley's declaration -- it submits requests annually to

21    its own internal leadership to bolster its FOIA resources.

22    Ms. Meckley's declaration states that those requests are

23    generally granted.  That's where the $10 million for FIRST came

24    from.  That's where contract renewals and overtime

25    authorization comes from.

```
 1          So in terms of staffing and investing in technology,
 2    I think it's worth noting here that the FOIA is said to be a
 3    technology-forcing statute, which I think is a benefit of the
 4    FOIA.  It sort of forces agencies to look into their systems
 5    and implement better technology.  And that's exactly what USCIS
 6    has done with the development and implementation of FIRST.
 7          And in terms of FIRST, which Your Honor says does not
 8    focus on the factor most -- or the factor that is most of the
 9    cause for the delays, first of all, I would dispute that
10    characterization.  The record shows that document retrieval is
11    not the single factor that is, you know, most responsible for
12    the delays.  To the contrary, the factor most responsible for
13    the delays is the overwhelming and increasing volume and
14    complexity of requests that the agency receives.
15          Now, to be sure, document retrieval is a factor that
16    causes the delays, but I think to focus singularly on that
17    would sort of ignore some of the efforts that USCIS has
18    undertaken to --
19          THE COURT:  Well, Ms. Handley, you can't blame the
20    people who are requesting the documents that are foundational
21    to those immigration proceedings for the fact that you've got
22    the delay.
23          And I appreciate that you -- that the Government has
24    divided up the responsibilities for how immigration proceedings
25    operate between the USCIS and ICE and CBP, in some instances in
```

1    bringing cases forward, and OIL, and everybody who gets to play

2    in this.

3        At the end of the day, the issue is timely receipt of the

4    foundational documents.  And so to point to complexity of

5    requests or the volume of requests, which is caused by, at

6    least in great part, the policies and practices of

7    the Government, I think -- I understand it; I'm not saying

8    anybody's acting in bad faith; but it needs to stop.

9        This is something that needs a systemic solution that is

10   permanent.  And there have been three lawsuits that have

11   addressed this issue before, and they haven't been able to do

12   it.  And the MOA is -- it may be a great thing for the long

13   run, but there's no guarantee that even that's going to stay in

14   effect.

15       And I appreciate what you think about the Government doing

16   things that are reasonable and appropriate going forward, and

17   sometimes that's true.  A lot of times it's true, but it's not

18   always true.

19       So, anyway, go ahead.

20       **MS. HANDLEY:**  Your Honor, just to briefly respond to

21   that, I mean, first, I think I -- I apologize if I in any way

22   suggested that we're blaming, you know, requesters for this.

23   I think I just mean, as a matter of fact, that's what's causing

24   these delays.

25       But I will say, to address your concerns about, you know,

1   these individuals in immigration proceedings, I would just

2   bring the Court's attention to the data on that particular

3   group.

4        So the record shows that currently, USCIS is complying

5   with the 30-day deadline, on average, for Track 3.  Now, Track

6   3 is the track that is for individuals with an upcoming

7   immigration hearing.  And so the records show that, in the face

8   of these overwhelming requests, USCIS is, you know, dividing

9   its attention and focus on to the -- by the categories of

10  requesters who are most in need of these documents, which

11  I think goes to some of the concerns that Your Honor expressed

12  at the beginning; and they're, on average, complying with the

13  30-day deadline.

14       So the most recent average I have of the past three-month

15  average is 26 business days.  So that's if you're a requester

16  in Track 3, you are getting your files, on average, within

17  26 business days.

18       Apologies, Your Honor.  Let me just look at my notes

19  briefly to see what I've missed.

20            **THE COURT:**  Go ahead.

21       **MS. HANDLEY:**  And I think, you know, another note,

22  Your Honor mentioned the staffing and other resources.  So

23  aside from the things that USCIS cannot control, which are

24  congressional appropriations that it does not receive, USCIS

25  has made efforts over the last decade to bolster its staffing

1   and resources.  The number of its FOIA processors in its office

2   has gone up by 237 percent, from 48 to 162.  And USCIS does

3   have these performance metrics that are, you know, meant to

4   keep their processors on track and keep them, you know, on

5   pace.

6          They're really -- the records show -- so what we have to

7   show is that USCIS has made significant efforts and that there

8   are reasons justifying the delays.  And I think that in the

9   aggregate, you weigh all of the evidence showing every step all

10  three agencies have taken, specifically USCIS, it shows that

11  there really isn't much else within the realm of reasonableness

12  that the agency can do in balancing all of its competing

13  mission interests to further improve.  USCIS has come into

14  compliance for Track 3, on average, with the 26-business-day

15  average.  And ICE, for its part, is, you know, well on track to

16  completely eliminate its backlog.

17         So I think that when you're weighing all of the evidence

18  in the aggregate, it does establish that these agencies have

19  reasons and justifications for their delays and that they're

20  only going to continue to improve.

21             **THE COURT:**  Thank you, Ms. Handley.

22      Who's going to take this on?  Ms. Realmuto.

23             **MS. REALMUTO:**  I will, Your Honor.

24             **THE COURT:**  Go ahead.

25             **MS. REALMUTO:**  Okay.  So that's a lot to unpack, but

1   let me start with Your Honor's initial question about whether

2   or not exceptional circumstances would apply in this case.

3        We do not think that it applies in this case, and, in

4   fact, the Government hasn't invoked it.  But in addition to

5   that, if you look at the language of the statute, it talks

6   about an individual request.

7        And so in *Mayock*, where it wasn't a class action and there

8   were some individual requests at issue, what the Court, the

9   Ninth Circuit in *Mayock* really did was send the case back to

10  the district court to develop the record, which we have in this

11  case developed.

12       So some of the things the Ninth Circuit was interested in

13  looking at were things like staffing and whether or not the

14  agency had made efforts to raise funds and the number of

15  requests and how predictable the backlog was.

16       All of those things are in the record before this Court.

17  So we don't think it applies, but we also think that the Court

18  has the record before it that it needs.

19       And so let me get to a couple of the Government's points.

20  You know, the Government -- one of the things that we think is

21  happening here is that the root cause of the delays are really

22  the failure to allocate existing resources to prioritize

23  funding and the Government's failure to take appropriate steps

24  to secure enough resources to be able to timely comply.

25       So, but let's unpack that a little bit.  The Government

1   raised this idea that CIS, which is the custodian of the

2   A-Files, has to get its funding based on the statute of

3   8 U.S.C. 1356(m).

4        We have read that statute.  That statute says no such

5   thing.  That statute says that application fees have to cover

6   application processing, and the collection of application fees

7   can also be covered.  Congress is very specific about that.

8        FOIA requests are not applications that are adjudicated.

9   They are requests that are processed.  And there's nothing in

10  that statute that prohibits the agency from going to Congress

11  and asking for additional resources.

12       Now, the Government would have you believe that this one

13  time that they asked for 1.2 billion from Congress is

14  indicative of them being turned down by Congress for FOIA

15  resources.  That is not the case.  That was a general request

16  for funding.  There's nothing in the record about that request

17  and whether or not there was funds earmarked for FOIA

18  processing.  So they can't try to claim that that 1.2 billion

19  that they asked for was actually intended for FOIA processing.

20  And that is what the courts and the legislative history of the

21  FOIA statute contemplates.

22       But let me -- let me go back to some of the issues that we

23  think are at play and respond to some of the Government's

24  comments about, for example, the backlog and the efforts

25  they've made to reduce the backlog.

1      Well, the backlog still exists.  In fact, the Government

2  counsel just told you it went up by 3,000, despite all of these

3  surge efforts, despite FIRST, despite the MOA, and despite the

4  resources that we know the Government is throwing at this case

5  in light of the fact that, you know, this issue is now in the

6  spotlight.

7      If we learned anything from the *Brown v. CBP* case, it's

8  that when you sue, they devote the resources to try and

9  eliminate the backlog.  And in that case, there was a court

10  ruling that was avoided.  In fact, all the other cases, the

11  ruling was avoided.  And what happened after the spotlight left

12  the case is that the backlog increased.

13      And so a commitment to reduce the backlog is not the same

14  as a commitment to comply with the FOIA statute.  And that is

15  what we are not hearing from the agencies in this case, and

16  I think that that's really important.

17      You know, there's several ways that their statements have

18  been undermined by their own actions, which the Court pointed

19  out, the track record.  They are taking the position that

20  compliance is not mandatory; the only penalty is the person can

21  get to court.  They're arguing and their expert is arguing that

22  compliance is generally impossible.  And now they are treating

23  the applicable deadline as a 30-day business deadline, not the

24  20-day business deadline.

25      So let me talk a little bit about those Track 3 numbers

1    and what they really reflect.  That is just a snapshot in time,

2    untethered from this years-long failure to comply.  And if you

3    look at the average processing time that they're giving to you,

4    but in terms of the fiscal year, that average processing time

5    for Track 3 for 2019 was 38 business days and for Fiscal Year

6    2020, it was 54 business days.  So, you know, that's one thing.

7         But even in the context of the processing time today, if

8    you look at the CIS website, now the processing time is -- as

9    the Government says, currently is processing at 24 days today.

10   But that is a FOIA violation in and of itself because the

11   statute requires processing within 20 business days.

12        And as I mentioned, it's sort of no surprise to us that,

13   you know, progress has been made with the Track 3 processing

14   because it's just indicative of the surge efforts that they

15   continue to put in these cases when the spotlight is shone on

16   it.

17        But by comparison, and significantly, there is no

18   comparable progress in reducing the Track 2 backlog, which

19   consists of any A-File requests for four or more documents.

20   That backlog is processing at 71 days.

21        Now, turning to the MOA, I just wanted to make the point,

22   Your Honor pointed out that there is no indication that it

23   continues.  That is true, the funding piece of it.  But also,

24   if we look at the fact that they had one of these MOAs before

25   and it ended in 2012 -- and the reason that it ended is sort of

 1    revealed in Exhibit BB in the record, which is that USCIS was

 2    making serious errors in processing ICE documents.  And so

 3    there's many reasons.  The future can't tell why that MOA,

 4    you know, might not last forever.

 5         And then, also, I just really want to emphasize that we

 6    have sued DHS, USCIS, and ICE, the agencies.  And what

 7    the Government has come back with us -- to us, is that their

 8    FOIA departments, you know, have requested resources.

 9         We didn't sue their FOIA departments.  We sued the

10    agencies.  And it's incumbent upon the agency to go to Congress

11    and make requests for funding, not just to reduce backlogs but

12    to ensure compliance.

13         And that's especially important here, as Your Honor noted,

14    where the requesters, the very same people who need the

15    information are subject to deportation, to detention, denial of

16    benefits.  And the agency has designated this as the only

17    process by which individuals can obtain A-Files.

18         And on that note, just flipping back to sort of the

19    agency's obligation to go to Congress and ask for funding, when

20    the very same witnesses that we have representing USCIS and DHS

21    were before Congress in October 2019, after we filed this

22    lawsuit, alleging a lack of sufficient resources, they

23    testified at a hearing before Congress on FOIA processing at

24    DHS; and neither mentioned, let alone asked for, additional

25    funding to comply.

1          So it's very disingenuous to say that -- there's been

2     really no effort to comply.  And, again, I would emphasize that

3     a commitment to reduce the backlog is not a commitment to

4     comply with the FOIA statute.

5          So we really do need a strong injunction here in order to

6     make sure that this doesn't happen again, and the same thing

7     that happened to *Brown* doesn't happen again and the individuals

8     don't get their requests.

9          So I'm happy to talk further if you have further questions

10    about the injunction, but I think I'll stop there for now.

11          **THE COURT:**  Okay.  Excellent.

12          Ms. Handley, do you want to have any response to that

13    before we move on to the injunction?

14          **MS. HANDLEY:**  Yes, Your Honor, I would appreciate just

15    a few minutes to respond to that.

16          So there's still more to unpack there.  I guess I'll just

17    begin with the discussion of *Mayock*.  I don't think or,

18    frankly, understand why the absence of class certification in

19    *Mayock*, which was a pattern or practice claim by requesters who

20    are identified by the same categorical identity as the

21    requesters in this case -- perhaps not the exact same but quite

22    similar.  I don't understand why the absence of class

23    certification in that case really has any distinguishing

24    relevance here.  Class certification doesn't change the legal

25    standard.  It just changes the number of, you know, formal

1   plaintiffs in the room asserting that legal standard.

2      And so I think *Mayock* is still quite helpful for

3   the Court, at least in figuring out, you know, which facts are

4   material to the pattern or practice claim and that the

5   exceptional circumstances defense is available to

6   the Government to invoke against pattern or practice claims.

7   If it weren't, like I said, the Ninth Circuit wouldn't have

8   reversed for further fact finding on whether exceptional

9   circumstances existed in that case.

10      Speaking of the interagency agreement, you know, again, we

11   have declaratory statements made in good faith by agency

12   officials stating that they -- their intent to keep this

13   agreement in place in years to come.

14      The fact that there was a previous agreement that fell

15   through unaccompanied by those similar statements in 2012, plus

16   unaccompanied by some of the key provisions in the 2020

17   agreement that have enabled it to succeed -- so there's more

18   training in the 2020 agreement.  And that training has already

19   gone through, and as I understand it, it continues as any

20   problems arise.

21      And there's also a substantial difference in this

22   agreement because ICE -- all of ICE's records are now being

23   reviewed by USCIS, whereas in the previous agreement, I

24   understand that there was a big problem because not all of

25   ICE's records were being reviewed.  So the agreement really

1    wasn't as efficient as it could be since ICE was still having

2    to do all of this work in the review process.  USCIS is now

3    taking on all of the ICE records, which has enabled ICE to

4    focus singularly on eliminating its backlog.

5         And my last point, Your Honor, in terms of the fee

6    requests to Congress, again, first of all, I don't think the

7    fact that two officials who are testifying before a

8    congressional committee -- not a budgetary committee in which

9    formal requests for the budget are supposed to be made.  It was

10   a subcommittee talking about the FOIA problem.  It was not a

11   committee in which USCIS would request budget, you know, from

12   Congress for its FOIA budget.

13        And that said, the absence of a request to Congress by

14   USCIS, by offices that are not the FOIA office is subject to

15   the same response here.  USCIS at large is a fee-funded agency,

16   not just its FOIA office.  And so the same reasons for why

17   USCIS at large cannot just ordinarily go to Congress seeking

18   additional resources.  It is in the statute, and it is how the

19   agency has interpreted the statute, and it is just not

20   something that is within USCIS's ordinary course to go straight

21   to Congress for appropriations.

22        Rather, as I've already said, the record here shows that

23   USCIS does take the measures that are within its control to

24   maximize its resources.

25        And, Your Honor, unless you have any other questions on

1   the merits, I will give my time to my colleague.

2        **THE COURT:**   Okay.  Well, we'll move on to the

3   injunctive relief.  Thank you, Ms. Handley.

4        So let's assume for the moment, for purposes of this

5   argument, that I think that a systemic fix is required because

6   a backlog has existed for eight years at least, despite all of

7   the efforts that have been made through time and for the

8   factors that I mentioned.  Let's just pretend that that's where

9   I stick.

10       So now the question is:  What do I do with that?

11  Declaratory relief would be simple enough.  For injunctive

12  relief, I do think -- if I stuck with my tentative, I would

13  think that it was required.  And so the question is:  What's

14  required?

15       And so it's not obvious to me that I can wave a wand and

16  say:  In 30 days, the Administration has to be in substantial

17  compliance, because holidays are coming and 30 days seems

18  short.  I think this problem is an urgent problem, however,

19  that requires a fix.  And so I think waiting for 90 days for

20  that is probably too long.

21       So I'm more inclined, I'm thinking about 60 days as a

22  period of time.  I'm thinking about quarterly reports on the

23  backlog until there is something in place that gives me comfort

24  that this problem is going to be solved by the next

25  Administration.

1        And then the final thing that I'm thinking about is the

2   question of some sort of notice for people that I am

3   particularly concerned about who are unrepresented, who are in

4   proceedings, who have a right to their files if they request

5   them but they need to know that they have that right to request

6   them and get them within a short period of time, 20 days.   But

7   I also recognize that that's not immediately in the -- it's not

8   a typical FOIA kind of response.   It is a broad equitable

9   power.

10       And, Mr. Skurnik, federal judges love to exert broad

11  equitable power when they can.   So those are the things that

12  I'm thinking about, and I'd like to start with you and get your

13  reactions to all of those.

14       **MR. SKURNIK:**  Yes, Your Honor.   Let me start out by

15  addressing why we think declaratory relief -- if the Court's

16  going to go there, declaratory relief, that should be

17  sufficient and the Court should not enter injunctive relief.

18       When you look at the record, it's a comprehensive record

19  here.   We produced over 100,000 documents in discovery.

20  Plaintiffs have taken deposition -- Rule 30(b)(6) depositions

21  of each of the agencies.   What you find is, despite all of

22  this, despite looking for ways the defendants FOIA offices

23  could increase efficiencies, ways that they could improve their

24  processes, all the plaintiffs have really come up with here is

25  that the Government should either ask for more money or that

1  the Government should seek to reallocate funds, away from other

2  activities that the agencies engage in, into FOIA.

3      I think there's two problems with what they've landed on

4  there.  First, the agencies have requested more funds.

5  Specifically, it's in the record, it's undisputed that USCIS

6  submitted a request for $1.2 billion to Congress over the last

7  year and it wasn't granted.  USCIS also published a new rule

8  which would increase fees on certain immigration applications.

9  That would have helped them shore up their budget, but that's

10  now subject to litigation and has been preliminarily enjoined.

11      And then, as far as reallocating funds within the agency,

12  you know, it certainly is possible in theory that the agency

13  could take funds directed to their mission-related activities,

14  take those resources, redirect them to FOIA, but there's always

15  a cost to doing so.

16      Just as one example, USCIS could, for example, take

17  resources that are currently being used to process asylum

18  applications and redirect those to FOIA, but then that would

19  result in longer waits for asylum applications, where there is

20  also a backlog at this time.

21      So we think what the agency has done is, under very

22  difficult circumstances, it has reasonably balanced competing

23  interests and the competing objectives of doing the best they

24  can to comply with the FOIA obligations while also executing

25  their mission-related responsibilities.

1     So I think aside from those points, it's clear when you

2    look at the record, when you consider the Memorandum of

3    Agreement, the implementation of FIRST, USCIS's 237 percent

4    increase in personnel over the past decade, the request to

5    Congress, what you get is you get a picture of an agency that

6    is, despite very difficult circumstances, taking its FOIA

7    obligations seriously and doing everything reasonably available

8    to it in order to meet those obligations.

9     Now, under those circumstances, injunctive relief -- even

10    if declaratory relief is granted, injunctive relief is not

11    appropriate.

12     And I'd like to focus particularly on the response times

13    for Track 3 requests.  We discussed this a bit earlier, but

14    I think as far as for injunctive relief, it's important to

15    remember that from the beginning of this lawsuit, a major

16    concern has been individuals who are in immigration

17    proceedings, particularly removal proceedings.  I think that

18    was clear in the Court's class certification order.  Your Honor

19    mentioned it at the beginning of the argument today.

20     Well, the average processing time for Track 3 requests is

21    currently 26 business days.  That is within the FOIA --

22        **THE COURT:**  No.  I think I heard that, Mr. Skurnik.

23        **MR. SKURNIK:**  Well, one thing the plaintiffs have

24    brought up, Your Honor, is, you know, they've submitted

25    declarations from attorneys that discuss cases of individuals

having to wait six months or a year.  But when you look at the record that's before the Court here on summary judgment, what it shows is those anecdotes are clearly outliers.

In fact, in the record here in paragraph 41 of Ms. Meckley's declaration, what she states is that for instances where individuals have had to wait more than a year for a response to their FOIA requests for an A-File, those make up less than 3/100ths of a percent of all FOIA requests submitted to USCIS.  So these are clearly outlier examples.

To shift from that, so, Your Honor, I think that is why when you consider the steps the agency has taken, when you consider the results those have led to, the processing times that the agency has reached -- which, by the way, are not just the Track 3 requests; even for complex requests, while they are outside of the FOIA statutory deadlines, they're still more than twice as fast as the rest of the federal government, on average.  The current processing time for complex requests at USCIS is 64 business days.  Government-wide, the average is 157 days.  So the agency that receives more FOIA requests than any other agency in the Government is still operating twice as fast as the rest of the federal government.

What all this shows is an agency taking its FOIA obligations seriously in difficult circumstances, and that's why we think injunctive relief is not appropriate, even if the Court does enter declaratory relief here.

1    Now, to address the other issue that Your Honor discussed

2    about possible forms of injunctive relief if the Court was

3    going to enter injunctive relief, I'll start with the notice

4    issue.  Notice presents a host of problems here.

5    The first one is that any notice that defendants would

6    issue, say, to individuals who are in immigration proceedings,

7    notice about their ability to request A-Files through the FOIA,

8    it wouldn't redress any injury by either the named plaintiffs

9    or the certified class.  And as a result, the Court wouldn't

10   have jurisdiction to enter that form of relief.

11   And so here's what I mean by that.  All of the plaintiffs,

12   the named plaintiffs, either already have submitted FOIA

13   requests for A-Files or they are attorneys who regularly do so.

14   And then the members of the certified class, they are

15   individuals who either have or will submit FOIA requests for

16   A-Files.  So by definition, all members of the certified class

17   already know or will know of their ability to submit requests

18   for A-Files.

19   So given that, an injunction that says, "USCIS, you have

20   to notify these individuals of the right to request A-Files,"

21   it wouldn't remedy any injury, and the Court lacks jurisdiction

22   on that point.

23   Stepping back from the jurisdictional concern, FOIA itself

24   has no requirement to provide this notice.  Plaintiffs have

25   brought statutory claims under the FOIA, and so we don't really

see any grounds for ordering that as part of injunctive relief here.

Now, to move from notice to the rate of processing and backlogs, if the Court is inclined to issue an injunction here, we think the injunction -- based on the record that's been presented, what would be at least realistic for the Government to comply with would be an injunction tailored at the backlog at ICE.

I think the record makes clear that ICE has made substantial progress on its backlog. It's reduced it since -- since the Memorandum of Agreement went into place on June 1st, ICE has reduced its backlog by 53,000 requests. It's currently right around 20,000 requests. That's a 72 percent reduction. It's realistic for ICE to reduce its backlog to zero within this current fiscal year. And so we'd ask that, if the Court is going to enter an injunction, that it focus specifically on ICE reducing its backlog within that period.

For USCIS, given, first of all, the pandemic, which has led to a significant decrease in the immigration fees that the agency is taking in to fund its operations which has sort of forced the agency to have to institute a hiring freeze and to not be able to approve overtime, as well as the uncertainty about what the volume of incoming requests will do in the near future, whether those will increase or decrease or kind of stabilize, stay the same, it's not clear at this point if, on

1  the current record before the Court, if USCIS -- if the backlog

2  there will tend to increase, tend to decrease, or stay around

3  the same at this point in time.  So we don't think it's

4  reasonable for any injunctive relief to extend to USCIS's

5  backlog.

6       And just to be clear, it's an unfortunate reality, but

7  backlogs are routine across the federal government in FOIA

8  operations.  The average time to process --

9            THE COURT:  Yeah.  No, no.  And that's why I said at

10  the beginning, Mr. Skurnik, I recognize that every agency is

11  underfunded when it comes to FOIA and that everybody is -- the

12  waits are endemic across the Government.

13      But when you've got a system that's set up the way that

14  this system is, those deadlines are critically -- they're

15  critically important.  And the argument that CIS doesn't have

16  the resources to process the requests in a way that would meet

17  the time deadlines, well, maybe that should be high on the list

18  of Secretary Designate Mayorkas for the entire department.

19      But this is something that -- as long as the system is set

20  up the way that it is, I think it's something that has to be

21  complied with by the Government.  And I can think of a lot of

22  different systems that would absolve FOIA of this

23  responsibility, but that's not the system that we have.

24            MR. SKURNIK:  Your Honor, just to address, I guess,

25  the concern about the current system, you know, I think the

1    agencies would be the first to admit that the current situation

2    is not ideal.  You know, the extreme -- the very high volume of

3    requests coming in, limited resources, it certainly is not

4    ideal.

5        But, you know, if A-Files were provided, say, through some

6    other channel, I think the concerns or the factors that lead to

7    any delays in producing A-Files now would likely still be

8    present.  There would still be a very high volume of incoming

9    requests.  There would still be a need to identify and locate

10   A-Files, to load them into a system, and then for processors to

11   carefully review them, whether they are produced through FOIA

12   or through some other channel.  So these are serious -- serious

13   factors at play here.

14       In finding a way forward for the agencies, I think it is

15   key to remember that the FOIA is not necessarily a proper tool

16   to remedy this situation.  Given that the fact that the

17   agencies, at least on average, are complying with the 30-day

18   deadline for individuals who are in immigration proceeding, to

19   the extent that there are individuals who fall outside of that

20   average, their requests take longer, they can always submit

21   requests to an immigration judge for a continuance.  If a

22   continuance isn't granted or if there are due process concerns

23   about not receiving their A-File materials in time, they can

24   raise due process claims in their immigration proceeding.

25       But here, what we have is we have a statutory case raising

1    claims under the FOIA, and we don't think it's proper in that

2    circumstance to try to either rearrange immigration proceedings

3    or change the way the agencies at large handle their responses

4    to FOIA requests.

5            THE COURT:  Mr. Skurnik, do you want to make a

6    prediction for me what the backlog for Track 3 cases will be

7    six months from now?

8            MR. SKURNIK:  Your Honor, there is nothing in the -- I

9    don't believe we have anything in the record specifically.

10           THE COURT:  No.  I'm asking for your -- I know that

11   there aren't any predictions.  I'm just interested in what your

12   prediction -- if you'd like to make any prediction or

13   representation on behalf of CIS.  I think that would be a

14   terrible thing to ask you.  But how about a prediction?

15           MR. SKURNIK:  Your Honor, what I was about to say is

16   that the information we have about backlogs, at least in the

17   record now, which could be certainly the basis for a

18   prediction, is about CIS's backlog as a whole.  I don't know

19   today what the backlog is for Track 3 requests.  I just know

20   the average processing time.

21       But what I will say as far as a prediction, it doesn't

22   seem -- based on what has happened recently, it doesn't seem

23   that -- since the Memorandum of Agreement has been entered

24   into, it doesn't seem that USCIS's backlog overall has

25   increased to a huge extent.  You know, we've seen a 53,000 -- a

1  decrease of 53,000 cases in ICE's backlog, whereas USCIS's

2  backlog has ticked up less than 10,000 since the beginning of

3  fiscal year 2020.  And so I wouldn't expect a sharp increase in

4  USCIS's backlog.

5       If the pandemic is resolved hopefully fairly quickly, over

6  the next six months or so, that certainly could improve the

7  rate at which USCIS is able to process cases, and we could see

8  the backlog tick down.  It's hard to make an exact prediction

9  here based on the record that we've assembled.

10       **THE COURT:**  Well, it's an unfair question that I asked

11  you, and you did a good job answering it.  So thank you for

12  that.

13       All right.  So who's going to take this on?

14       Ms. Realmuto.

15       **MS. REALMUTO:**  I will, Your Honor.

16       So I wasn't going to go back to the 1.2 billion, but since

17  Mr. Skurnik brought it up, I just want to make clear that

18  the Government is not saying that there were any funds

19  earmarked to that proposal for FOIA processing.  General

20  operating expenses is not the same as FOIA compliance, and it

21  is not what legislative history or the courts contemplate when

22  they say you have to go to Congress and ask for funds to be

23  able to source -- resource your program.  Also, the proposal is

24  not in the record; so we don't know what it says.

25       But I just -- the Government's solution Mr. Skurnik

1    brought up was to fund its FOIA program on the backs of

2    immigrants by spiking the application fees.   Two district

3    courts have enjoined that proposal, one in the Northern

4    District and one in the D.C. District, both of them finding

5    that the agency failed to take notice of the disproportionate

6    and adverse effect that those fee hikes would have on the

7    immigrants, on non-citizens.   And those non-citizens are the

8    same folks that need the A-Files.

9        Let me talk about the unusual circumstances issue and how

10   the Government is continuing to insist that it is a 30-day

11   deadline when, in fact, it is a 20-day deadline.

12       So unusual circumstances can be invoked -- it's defined in

13   the statute -- on an individualized basis when there are -- the

14   files are not all in one place, they're voluminous, and they

15   require consultation.   The Government record shows that most

16   A-Files are located in the same place.   And Ms. Meckley

17   testified in her declaration that it takes 30 days to get to

18   the FOIA processing center.   So it is not a situation that

19   there are many places.

20       They testified that the average A-File is 200 pages.   And

21   let's talk about what's in that A-File.   Most of the people

22   before you today have been representing non-citizens for years.

23   The same documents appear in those A-Files time and time again:

24   applications, motions, government documents.   It's not like

25   they're consulting with different agencies on a daily basis.

 1          In fact, the third unusual circumstances requirement,

 2     which is consultation, they admit that the two agencies they

 3     most consult with are ICE and CBP, and they have agreements

 4     with them under the MOA.

 5          So I just think that it's very disingenuous to, again, say

 6     they're complying on Track 3 when they're not complying.

 7          And back to Track 2, they're processing those at two and a

 8     half months over the deadline.  So, again, that's not

 9     compliance.

10          Let me talk briefly about notice and the Government's

11     position that this Court should not order that.  If we look to

12     the standard in *Long*, the Ninth Circuit was very clear that

13     injunctions are required.  The primary consideration for

14     this Court is the effect of non-disclosure on the public.  And

15     the public has an interest in having an immigration system that

16     has information of quality and not an imbalance because the

17     harm to the non-citizens is grave:  denials, detention,

18     family separation, inability to remain in this country.

19          Now, the Government is saying that it's not within your

20     power, but it is within your power.  *Renegotiation*

21     *Board v. Bannercraft Clothing* is a Supreme Court case that says

22     the Court has wide latitude to enforce the FOIA statute.

23          And by not telling people -- and they admit that they

24     don't tell people in immigration proceedings.  Our declarants

25     have testified to that as well.  They're artificially

1   keeping -- or suppressing the numbers in Track 3 as a first

2   point, but they're also keeping people out of the class because

3   they don't know how to become part of a class if they're not

4   told that A-Files even exist.

5        And we're talking about pro se litigants that make up, in

6   fiscal year 2020, about 70 percent of the population of people

7   appearing before immigration judges alone.  That is a vast

8   number of people that can't be part of the class unless they

9   know that they can, that A-Files exist.  Right?  So that's

10  another point I wanted to make there.

11       Oh.  Last, I think, but not least, or maybe, when we talk

12  about the agency's responsibility, I encourage the Court to

13  take another look at the DHS declarant's declaration in which

14  he says that it is not the responsibility of DHS to ensure that

15  CIS and ICE are adequately funded.  They shirk all

16  responsibility for making sure those agencies have sufficient

17  resources, and they put them -- put that on the component

18  agency.

19       And I think that shows the sort of systemic problem that

20  we have within the agency itself, which is that different FOIA

21  departments are jockeying for funds but the senior leadership

22  is never prioritizing this.

23       And this is not, as Your Honor noted, a case where the

24  FOIA requests are delayed and so an author can't get

25  information to write a book from the National Archives or some

genealogy request.  This has real-life consequences.  And the
failure to get the A-File, as our declarants have testified,
have forced folks who can't stay detained, can't tolerate
detention, to forsake their meritorious claims because they
can't tolerate detention.  And it is also difficult for the
population of people who are mentally incompetent.  Lawyers
can't create the A-File unless they know what happened
previously, and the client can't tell them because of mental
competency or because of trauma.

     And so while there aren't, quote, due process claims
before the Court, it's a FOIA claim.  And the Court's latitude
to enforce the FOIA statute and the spirit of the FOIA statute,
which is that information should be publicly available,
particularly when it's information about the individual
themselves and it will determine their ability to stay in this
country or not, we think the Court has latitude to invoke broad
injunctive relief.

     And we would ask that the injunction enjoin CIS from this
idea that it's a 30-day deadline.  And I would note that our
understanding is that they're the only agency that calculates
their backlog that way.  ICE has stated that it doesn't
calculate its backlog on a 30-day deadline.  It calculates on a
20-day deadline.

     And with respect to the injunction, you know, of course
the Government is willing to say you should do the injunction

1   on ICE because there are no more cases getting referred to ICE.

2   But we know that immigration -- immigrants are going to need

3   case files.  They're going to have to go through CIS.  The CIS

4   processing -- their backlog is up.  Right now the record before

5   the Court shows about 43,000 outstanding FOIA requests that are

6   pending.  And this MOA, you know, there's no explanation for

7   why the number has gone up, per se; but one way to look at it

8   is, now CIS is processing all of the documents that it

9   previously used to kick over to ICE.  And, you know, as the

10  chart reflects, they used to dump those referrals on to ICE,

11  and it was a game of whack-a-mole where the CIS backlog went

12  down but the ICE backlog would go up.

13      And now the agency has more requests and its digging its

14  tails into this idea that it can't ask Congress for funding,

15  but yet it tells you that they asked one time for funding for

16  general operating expenses.

17      And so we think that it's incumbent upon the agencies to

18  prioritize FOIA compliance and allocate resources or find new

19  resources to ensure that that happens.

20          **THE COURT:**  Thank you.

21      Mr. Skurnik, do you want to have a last response?

22          **MR. SKURNIK:**  Sure, Your Honor.  Just a couple quick

23  points.

24      To start with the idea that under the Memorandum of

25  Agreement, ICE and USCIS are engaging in whack-a-mole with

requests, I mean, the backlog at ICE since the request went

into place has reduced by 53,000 requests, and we have not seen

the same increase in requests at USCIS.

What I think this indicates is that the Memorandum of

Agreement has produced pretty significant efficiencies.  It's

much quicker for USCIS to handle these requests in the first

instance rather than referring them to ICE.  And so I don't

think it's correct that they're just shifting around backlogs.

The second point is DHS -- I disagree that DHS is shirking

its responsibilities here.  It's by congressional design that

individual components of DHS are funded either by

appropriations through those components or, in the case of

USCIS, by fees that it collects based on immigration

applications.  I mean, DHS does oversee the FOIA programs of

its component agencies, but it is not responsible by

congressional design for determine -- allocating funds among

its components.

The last point, I guess I'd like to address the unusual

circumstances point, which is, USCIS has determined that

requests for A-Files generally satisfy the three statutory

requirements for unusual circumstances, and it's pretty clear

that that's appropriate.

To start with the first requirement, which is the need to

search for and collect records from offices other than the

office that processes the FOIA request.  Now, the FOIA offices

1  at ICE and USCIS, they don't have A-Files sitting there in

2  their FOIA offices.  The A-Files are around the country.

3  They're either at the National Records Center in Missouri --

4  there's 18 million there on open storage shelving -- or they

5  are at USCIS and ICE field offices around the country.  So the

6  first factor seems clearly satisfied here.

7       The second factor is the need to search for or examine a

8  voluminous amount of separate and distinct records.  A-Files,

9  on average, are 260 pages, but they can reach into the

10  thousands of pages.  There are many different types of

11  documents that make up A-Files.  No two A-Files are the same.

12  And so the second factor clearly is satisfied here.

13       And then the last one is a need to consult with other

14  agencies.  Just the number of requests that USCIS has, in

15  past years, had to refer to ICE makes clear that the third

16  factor is satisfied, not to mention the fact that USCIS also

17  regularly has to refer records to the State Department, to

18  other components within DHS, like CBP.  So it's pretty clear

19  that when USCIS determined that A-File records qualify for

20  unusual circumstances, that was an appropriate action for the

21  agency to take.

22       And ultimately, it probably doesn't matter that much to

23  the outcome of the case here or to what injunctive relief

24  the Court orders.  This is in the record, but there are only

25  around 2,300 requests currently in USCIS's backlog that fall

between the -- the 20- or the 30-day deadlines.  I just want to
make sure I say this correctly.  I believe it's when USCIS
decided to -- made the determination that unusual circumstances
applied to A-File FOIA requests going forward, at that time it
shifted about 2,300 requests.  So, you know, it's not a large
number of requests in the scheme of things for this lawsuit.

And I'll just finish with a point about injunctive relief
more generally.  I think the Court should look to what the
Ninth Circuit did in *Long*.  You know, in *Long*, the
Ninth Circuit reversed a denial of injunctive relief by the
district court.  And in doing so, it did not say:  IRS, in that
case, you need to from here forward respond to every FOIA
request within 20 or 30 days.  It did not say:  You need to
eliminate all backlogs within 30 or 60 days.  What it said was:
District court on remand, you need to enter an injunction that
requires the agency to respond to requests within a reasonable
amount of time.

And in this case, when you look at the record of the
increasing volume of requests, all of the efforts the agency
has taken, we think a reasonable injunction would be one that
is focused on the reduction of ICE's backlog.

**THE COURT:**  Okay.  All right.  Mr. Skurnik, thank you.
Ms. Handley, Ms. Realmuto, thank you very much for your
argument.

I'm going to get an order out relatively soon, I hope

1    before the holidays, because I do feel a sense of urgency in

2    this.  And I appreciate the arguments that have been made.

3        So thank you all very much.

4            **MR. SKURNIK:**  Thank you, Your Honor.

5            **MS. HANDLEY:**  Thank you, Your Honor.

6            **MS. REALMUTO:**  Thank you.

7                (Proceedings adjourned at 3:21 p.m.)

8                        ---o0o---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, December 18, 2020



_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court