

1612 K Street NW Suite 808
Washington, DC, 20006
(202) 457-0034
whistleblower.org

December 19, 2025

Honorable Chuck Grassley, Chair
Honorable Richard J. Durbin, Ranking Member
U.S. Senate Committee on the Judiciary
Washington, D.C. 20510

Honorable Rand Paul, Chair
Honorable Gary Peters, Ranking Member
U.S. Senate Committee on Homeland Security and Governmental Affairs
Washington, D.C. 20510

**VIA ELECTRONIC SUBMISSION**

**RE: Protected Whistleblower Disclosure Regarding USCIS Violations of the Freedom of Information Act, Regulations, and *Nightingale* Court Order**

To Whom It May Concern,

    Pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 7211, Government Accountability Project submits this protected whistleblower disclosure on behalf of our client, Frank Armstrong,[1] an official employed by the U.S. Citizenship and Immigration Services' (USCIS) National Records Center (NRC). Mr. Armstrong discloses apparent efforts by NRC leadership to manufacture compliance with a court order in *Nightingale v. U.S. Citizenship and Immigration Services*, 3:19-cv-03512 (*Nightingale*). That 2020 order requires USCIS to meet FOIA's statutory determination deadlines for A-File requests, the immigration records to which noncitizens are entitled and need for their status proceedings, including asylum, deportation, and detention determinations. The order also requires USCIS to eliminate existing request backlogs within 60 days and submit quarterly compliance reports.

    In its December 15, 2025 compliance report, USCIS claimed that since its September 15, 2025 submission the agency has reduced its A-File FOIA backlog by 99.96% to only two cases and attributed this success to staffing measures.[2] This purported elimination occurred while the agency lost roughly one-quarter of its FOIA personnel and endured a 43-day federal shutdown that impacted the availability of external support from other components of the Department of Homeland Security (DHS). These circumstances alongside Mr. Armstrong's disclosures suggest the reported reduction does not reflect timely, good-faith FOIA processing but rather mass closures of requests and other procedural mechanisms that remove requests from the pending inventory without reasonable searches or release of responsive records.

    This disclosure describes how NRC leadership implemented policy changes resulting in the premature closure of possibly thousands of FOIA requests, often despite the existence or

---

[1] Frank Armstrong is a pseudonym for our client who wishes to remain publicly anonymous, but is available for briefings with Congress. The whistleblower is a disabled Marine Corps infantry combat veteran who has worked with USCIS's FOIA office for over a decade and who has received high performance appraisals and numerous awards for exemplary performance. Exhibit 34; Exhibit 35; Exhibit 36; Exhibit 37; Exhibit 38; Exhibit 39

[2] Michael D. Arnold, Jr., Declaration, ¶ 12, *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Aug. 8, 2019).

identification of responsive records, to manufacture the appearance of compliance before the December 15, 2025 reporting deadline.

I. **Background on *Nightingale* Injunction and the Public Interest in Timely DHS FOIA Responses**

Noncitizens routinely request their Alien Files ("A-Files")—the comprehensive case files DHS maintains on each individual containing their immigration history, applications, supporting documents, and enforcement records—to meaningfully prepare for and participate in immigration processes, including responding to enforcement actions, defending against removal in immigration court, and applying for lawful status or citizenship. USCIS's NRC manages the largest FOIA program by volume in the federal government, responding to FOIA requests for Department of Homeland Security (DHS) components on 55.6 million immigration records.[3]

FOIA generally requires federal agencies to determine within 20 business days whether they will comply with a request and to notify the requester of that determination, and the law permits up to 10 additional working days in "unusual circumstances." 5 U.S.C. § 552(a)(6)(A)(i); 5 U.S.C. § 552(a)(6)(B). However, DHS has repeatedly failed to meet these statutory time limits, resulting in chronic FOIA backlogs and significant harm to noncitizens who depend on timely access to their records.

Without timely access to their records, individuals face a severe information imbalance. Government attorneys and immigration prosecutors have full access to the A-File while the noncitizen and their counsel remain in the dark. The imbalance caused by FOIA compliance failures creates a substantial and specific threat to public safety as processing delays result in unjust deportations, prolonged detention, and family separation.[4]

---

[3] "Immigration Records and Identity Services Directorate," USCIS, last modified May 9, 2025, https://www.uscis.gov/about-us/organization/directorates-and-program-offices/immigration-records-and-identity-services-directorate.

[4] For example, one attorney reported that her client, a survivor of domestic violence, was forced to remain in her abuser's home for months because USCIS delayed responding to an expedited FOIA request needed to file for lawful status. Kursten Phelps, Declaration, ¶ 9, *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Aug. 8, 2019). Another attorney explained that despite requesting an A-File under an expedited processing track for a client in removal proceedings, USCIS failed to respond before the filing deadline, jeopardizing the client's eligibility for relief. Nancy A. Falgout, Declaration, ¶ 7, *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Aug. 8, 2019). Attorneys representing vulnerable populations, such as unaccompanied minors, emphasize that without A-Files they cannot reconstruct basic facts like entry dates or prior shelter placements, leaving them unable to prepare defenses. Hyunjoo Lee, Declaration, ¶ 7, *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Aug. 8, 2019). Similarly, FOIA is often the only mechanism for attorneys to investigate decades-old immigration histories when prior counsel is unavailable or disbarred. Marc A. Asch, Declaration, ¶ 6, *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Aug. 8, 2019). In some cases, delays have had life-threatening consequences: one attorney reported that his client was removed to a country where Christians are killed or persecuted before DHS produced the requested A-File. Attorneys routinely describe months-long waits that prevent them from determining eligibility for relief or correcting false information submitted to DHS by prior counsel. Nancy A. Falgout, Declaration, ¶ 8, *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Aug. 8, 2019). Further, the information disadvantage created when FOIA requests are not timely processed comes at increasing risk to noncitizens, at a time where courts increasingly express concerns about the truthfulness of some federal government lawyers and their conduct in legal proceedings,

Recognizing the harms attendant to untimely FOIA processing, on December 17, 2020, Judge William Orrick III of the Northern District of California granted summary judgment in favor of the plaintiffs and declaratory and injunctive relief in the *Nightingale* lawsuit seeking FOIA compliance.[5] Judge Orrick noted that delays in meaningfully processing FOIA requests undermine "the fairness of immigration proceedings, particularly for the vast number of noncitizens who navigate our immigration system without assistance of counsel."[6] Specifically, Judge Orrick ordered:

**Declaratory Relief:**

Defendants have violated the FOIA by failing to make timely determinations on plaintiffs' A-File FOIA requests within the mandated statutory time frames. Defendants have engaged in a "pattern or practice" of violating FOIA's statutory deadlines when responding to requests for A-Files.

**Injunctive Relief:**

a. Adhere to FOIA Timing Requirements: Defendants are permanently enjoined from further failing to adhere to the statutory deadlines for adjudicating A-File FOIA requests, as set forth in 5 U.S.C.§§ 552(a)(6)(A) and (B);

b. Eliminate the Backlogs: Within sixty (60) days of this order, defendants shall make determinations on all A-File FOIA requests in USCIS's and ICE's backlogs;

c. Quarterly Compliance Reports: Until further order, defendants shall provide this court and class counsel with quarterly reports containing information regarding the number and percentage of A-File FOIA requests that were filed and timely completed as well as the number and percentage of cases that remain pending beyond the twenty or thirty-day statutory periods, respectively 5 U.S.C.§§ 552(a)(6)(A) and (B). The first compliance report is due within ninety (90) days of this order.[7]

Agency policies that result in obstruction of access to records, whether through delay or premature closure, undermine the statutory mandate of FOIA and the spirit of Judge Orrick's order. This disclosure addresses serious concerns that USCIS is not only failing to meet these obligations but actively circumventing them. The disclosure details these practices, their impact on

---

including making false or unsupported factual representations, evading and ignoring court orders, and overstepping prosecutorial authority Alan Feuer, "Trump's Justice Department Tested the Patience of Federal Judges," *The New York Times*, August 4, 2025, https://www.nytimes.com/2025/08/04/us/politics/trump-justice-department-judges-courts.html; Christine Berger and Joe Gaeta, *The Department of Justice's Broken Accountability System* (Brennan Center for Justice, 2025), https://www.brennancenter.org/our-work/research-reports/department-justices-broken-accountability-system.

[5] *Nightingale v. USCIS*, No. 3:19-cv-03512 (N.D. Cal. Dec. 17, 2020), Order Granting Summary Judgment and Injunctive Relief.
[6] *Id.* at 1.
[7] *Id.* at 2.

individuals, and the evidence demonstrating the agency's intent to evade judicial scrutiny ahead of its December 15, 2025 reporting deadline.

## II. Relevant Statutes

Since 1967, FOIA has enabled the public to obtain information from federal agencies through a presumption of openness that favors disclosure. FOIA authorizes withholding only where the agency reasonably foresees that disclosure would harm an interest protected by a FOIA exemption or where disclosure is prohibited by law.[8] The statute outlines specific and limited circumstances that authorize withholding requested information.

Specifically, 5 U.S.C. § 552(b)(6)-(7) exempts from release certain information, including:

(6) personnel and medical files and similar files the disclosure of which would ***constitute a clearly unwarranted invasion of personal privacy***;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

> (A) could reasonably be expected to interfere with enforcement proceedings,
>
> (B) would deprive a person of a right to a fair trial or an impartial adjudication,
>
> (C) ***could reasonably be expected to constitute an unwarranted invasion of personal privacy***,
>
> (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,
>
> (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or
>
> (F) could reasonably be expected to endanger the life or physical safety of any individual (emphasis added).

---

[8] "About," FOIA.gov, U.S. Department of Justice, accessed December 9, 2025, https://www.foia.gov/about.html.

Further, the statute imposes requirements on the federal government to make meaningful a effort to find records responsive to requests. 5 U.S.C. § 552(a)(3)(C)-(D) states:

> (C) In responding under this paragraph to a request for records, an agency shall make *reasonable efforts* to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.
>
> (D) For purposes of this paragraph, the term "search" means *to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request* (emphasis added).

### III. First Round of Policy Changes: Blanket Withholding of Certain Documents Not Justified by FOIA Exemptions

Despite the statutory requirements for federal agencies to release information absent specific circumstances, over the last year in particular, the USCIS FOIA office has initiated policy changes that result in closing requests prematurely for reasons not permitted by statute and that fail to meet the reasonable search standard.

First, on March 4, 2024, FOIA leadership issued a new policy directive that required USCIS to close requests from Cuban nationals as "no record" when a requester seeks certain documents to confirm entry or admission to the United States such as an I-94 arrival or departure record,[9] or parole document, notwithstanding the fact that a Memorandum of Understanding exists between USCIS and CBP requiring USCIS to process such requests and provide responsive documentation.[10] This new policy meant that USCIS was failing to conduct a reasonable search for a record by categorically closing requests for these documents even though responsive documents may exist in the file.

NRC policy changes implemented in May 2025 resulted in FOIA processors redacting entire forms from immigration A-Files citing (b)(6) and (b)(7) privacy and law enforcement exemptions, even though the withheld information was initially provided to DHS by the noncitizen. These redactions and withholdings include, for example, marriage certificates, joint bank statements, tax forms, portions of immigration court hearing transcripts and enforcement documents such as Form I-213 (Record of Deportable/Inadmissible Alien).[11] These blanket withholdings appear inconsistent with FOIA where the withheld information is the requester's own information or is otherwise reasonably segregable and does not implicate a cognizable third-party privacy or law-enforcement harm.[12]

Moreover, the May 2025 policy also directs the withholding of any correspondence that is not directly to or from the requester, even correspondence sent by or to their attorney from

---

[9] "Form I-94 Arrival-Departure Record," USA.gov, last modified November 13, 2025, https://www.usa.gov/arrival-departure-record.
[10] Exhibit 1
[11] Exhibit 41
[12] Exhibit 2

USCIS.[13] Withholding attorney correspondence prejudices noncitizens who may no longer have communication with previous attorneys and need to know what information was provided to the government on their behalf.

These May 2025 policy changes additionally direct USCIS to inappropriately designate certain documents as "out of scope." The term "out of scope" refers to documents that are not substantively germane, such as a placeholder page for scanning purposes that says, "left side of file," instructing processing personnel to which side of the physical file a document should be returned after scanning. However, the May 2025 policy changes now require the withholding of documents provided by the noncitizen that are in the language of their country of origin and not translated into English as "out of scope."[14] Again, this policy prejudices noncitizens who may no longer have access to an original document contained in their A-File and need access to the document for purposes of obtaining immigration relief.

These changes contrast April 2025 policy guidance that explicitly states that "Record of Proceeding" (ROP) materials in an A-File are "In general... subject to Privacy Act and FOIA requests without significant redactions."[15] The NRC's FOIA Processing Guide defines a Record of Proceeding as "an organization of certain immigration records that were considered, or referenced, during an administrative immigration proceeding that resulted in a final administrative decision or action."[16] Types of ROP material include, "immigration benefit applications/petitions and supporting/related documents."[17] Documents now withheld under (b)(6) exemption, such as joint tax returns, utility bills, marriage/divorce certificates, or marked as "out of scope" such as birth/marriage certificates in a foreign language, are ROP material that should be disclosed per the April 2025 policy.

### IV.     Motive to Prioritize Fast Case Closure

The apparent intent of this policy change is to process requests as fast as possible while sacrificing release of content to which requesters are legally entitled. Rather than a processor having to review individual documents to determine whether information in the documents needs to be redacted, under the new policy, processors can quickly withhold in full documents that contain information about persons other than the requester, thus avoiding an individual analysis.

Indeed, management sent emails demonstrating their motive to find ways to maximize case closure as a means to reduce the FOIA backlog and manufacture compliance with the text and spirit of Judge Orrick's order. For example, on May 27, 2025, a supervisor on the FOIA policy team sent an email stating, "Here's a way to close 99% of FOIA requests as failure to comply," then explained that a 2022 regulatory change requiring requesters to specify their country of citizenship and residency could be used to pretermit requests.[18] Though the regulations changed in 2022 to require listing country of citizenship, USCIS never updated the FOIA request form to

---

[13] Exhibit 2; This withholding expands to include public domain documents like research from legal research databases such as Westlaw that attorneys provide to the agency.
[14] Exhibit 2; Exhibit 4; Exhibit 33
[15] Exhibit 16
[16] Exhibit 41
[17] Exhibit 41
[18] Exhibit 3

include a field to list the requester's country of citizenship and residency; therefore, compliance was *impossible*, through no fault of the requester.[19] The NRC Chief of Staff responded to this idea with gratitude saying, "please keep them coming," and immediately forwarded the email to the NRC Director and Deputy Director stating, "great to see folks thinking about how we can change our business."[20]

Ultimately, leadership decided to add a field to the FOIA request form where requesters could list their country of citizenship or residence.[21] However, in practice this policy can result in case closure where a requester enters a city (e.g., "Mexico City") in a field USCIS treats as requiring a country (e.g., "Mexico").

V. **Second Round of Policy Changes: Closing Cases at Case Creation/Intake Stage**

Additional policy changes first disseminated on September 16, 2025, the day following the submission of a compliance report, have resulted in FOIA requests being closed for "failure to comply" or citing no responsive records even when FOIA staff have located a responsive record.[22] 6 C.F.R. § 5.21(e) provides that when an individual requests access to their own records, identity must be verified and the individual must provide their full name, current address, date and place of birth, and country of citizenship or residency. The regulation further explains that "[i]n order to help the identification and location of requested records," an individual may also voluntarily include other identifying information relevant to the request (e.g., passport number, A-Number).[23]

Closing cases at the case creation/intake stage for either failure to comply or citing no responsive record means that a case processor does not ever review the file even though a responsive file might exist.

To illustrate, the process upon receipt of a FOIA request is as follows: Once a request is submitted, a FOIA Assistant employee, whose role is to initiate cases, reviews the request, determines whether the information required for verification of identity (VOI) is satisfactory, then searches various systems to locate where the A-File might be among the various USCIS offices. Once the FOIA Assistant determines the location of the responsive records, they request the records so NRC staff can scan the physical file, a process referred to as "staffing" the case. After the file is scanned, a Processor reviews the electronic file and redacts information as necessary. Closing a case based on a mismatch between optional VOI information implicates violation of the 5 U.S.C. § 552(a)(3)(C)-(D) requirement to conduct a reasonable search for the file.

  a. **Closing for use of Attorneys' Address**

---

[19] Exhibit 3
[20] Exhibit 3
[21] Exhibit 3
[22] For clarity, this disclosure uses "closed" to refer to dispositions that USCIS records as completed case actions ("No Record" and "Failure to Comply") that remove a request from pending inventory and are treated as final responses to the requester. Many of the problematic closures described here occur during intake, before an A-File is scanned and before any line-by-line review occurs.
[23] 6 C.F.R. § 5.21(e) (2024).

It has been past practice for the USCIS FOIA office to accept an attorney's address as the address for the requester. Indeed, it is common for attorneys to list their addresses to receive clients' legal correspondence.[24] However, a policy change communicated via email on September 19, 2025 requires requests that provide either no address or their attorneys' address to be closed for failure to comply.[25] Recent guidance provides exceptions only when the subject of record is a minor or has certain protections as a victim of abuse or a crime.[26]

### b. Closing cases for providing multiple last names

The September guidance requires closure where the requester's surname information does not exactly match USCIS's records, including where USCIS's record reflects a compound surname (e.g., "Santos Perez") but the requester provides only one surname (e.g., "Santos") or vice versa.[27] Shockingly, this is the case *even when there is a match between the A-Number of the requester and the A-Number in the file*. This example illustrates a trend in the new guidance of prejudicing requesters for providing *more* information than what is required to verify identity.

### c. Closing cases for A-Number discrepancy even when providing documentation with correct A-Number

Requesters can also submit documents produced by DHS that should also be found in the A-File to assist in identifying responsive records. Per the September 2025 guidelines, a request should be closed citing no responsive record if a requester provides an erroneous "Alien Registration Number" (A-Number) despite matches to other verification of identity information. This policy means that even if a requester provides DHS created documentation with their correct A-Number but also makes an error in listing their A-Number on the request form, a FOIA Assistant will close the request even though the requester provided clear evidence through a government record that a responsive file must exist.[28]

### d. Closing cases for date inversion

The September guidance enables the closure of requests as "Failure to Comply" when the month and date of the requester's birth date are inverted, even though many countries outside of the United States list dates in day/month/year order.[29]

### e. Closing for discrepancy in optional parent information

---

[24] Once an attorney enters an appearance as "attorney of record," they become the official recipient of pleadings, notices, and other legal correspondence on behalf of the client, meaning the attorney's office address functions as the address of record for service and communications. See Federal Rules of Civil Procedure, Rule 5(b)(1), https://www.law.cornell.edu/rules/frcp/rule_5; Legal Information Institute, *Attorney of Record*, Cornell Law School Wex, https://www.law.cornell.edu/wex/attorney_of_record; LegalClarity, *What Does It Mean to Be an Attorney of Record?*, https://legalclarity.org/what-does-it-mean-to-be-an-attorney-of-record.
[25] Exhibit 5; E.g., Exhibit 26
[26] Exhibit 45
[27] Exhibit 6
[28] Exhibit 32
[29] Exhibit 32

Additionally, the FOIA request form invites requesters to provide optional information to assist in locating a responsive file, such as parents' names. However, under the September policy guidance, FOIA Assistants and Case Processors are to close requests citing no responsive records for minor discrepancies in this optional VOI information even when a responsive record exists.[30] Guidance provided to the NRC FOIA staff states that if parents' names are provided and the order of the first name and last name, or first name and middle name is inverted, if a middle name does not match, or if a parent's name is abbreviated, or if one parent's name matches and another does not, the case must be closed for no responsive records.

Currently, the only enumerated exceptions to this strict-match rule are:

1. Hyphens (e.g., "Smith-Jones" vs. "Smith Jones");

2. The use of "de," an indicator of a married name in Spanish (such as "Hernandez" versus "de Hernandez");

3. Spacing variations (e.g., "Xiuncheng" vs. "Xiun Cheng");

4. Mother's maiden name where provided;

5. Name-length or character-limit truncation issues; and

6. Limited "sounds like" spelling variations (e.g., "Gonzales" vs. "Gonzalez") when all other VOI matches. [31]

Oddly, common abbreviations, such as "Ma." for the forename Maria, are explicitly prohibited.[32]

Closing cases prematurely based on minor discrepancies is extremely prejudicial to requesters because of their immense informational disadvantage compared to the agency. The information the agency has could be many years old, so requesters may no longer be familiar with what the documentation the agency possesses says. Furthermore, they may never have had a meaningful opportunity to review the information the government possesses about them; for instance, to determine whether a border agent incorrectly listed their data. It would be impossible for someone with limited literacy to determine whether the information in their FOIA request matches the information the agency has on file, especially in the case of a mistake on the part of the government.

The VOI policy change immediately had detrimental impact. In one case received on October 22, 2025, the requester provided documentation issued by the Department of State that included A-Numbers and photos of two parents and their child. Despite this clear indication of identity and the existence of responsive records identified via A-Number, the request was closed

---

[30] Exhibit 6
[31] Exhibit 46; The NRC added exceptions 4-6 as part of training guidance implemented on December 11, 2025. Exhibit 45.
[32] Exhibit 6; Colleen Brewster, "A Guide to Spanish Surnames and Forenames: History, Structure, and Genealogy," *FamilyTreeDNA Blog*, September 18, 2024, https://blog.familytreedna.com/spanish-surname-forename-guide/; "Spanish naming customs," *Wikipedia*, last modified December 9, 2025, https://en.wikipedia.org/wiki/Spanish_naming_customs.

two days after the request was received, on October 24, 2025, citing "No Record" because the parents' first names were not an exact match.[33]

Beginning on September 19, 2025, Mr. Armstrong made internal reports to his leadership about his concerns that the new policy guidance violates the law. First, on September 19, Mr. Armstrong sent an email to the acting FOIA officer Jarrod Panter asking for the legal basis for the policy change to close requests citing no responsive record for the VOI discrepancies enumerated in the September policy guidance.[34] Panter stated that Senior Advisor Jim Baxley[35] authored and communicated the new policy. On September 29, 2025, Mr. Armstrong verbally reported his concerns about the illegality of the new policy to his direct supervisor, who concurred with Mr. Armstrong's concern.[36]

On September 23, 2025, Mr. Armstrong contacted Baxley again asking for legal authority for the policy changes.[37] Mr. Armstrong specifically expressed his reasonable belief that closing a case as "no record" based on optional VOI information, such as a parent's name, is incompatible with governing regulations.[38] Baxley told Mr. Armstrong that the new process was meant to "enhance" and "streamline" the process; Mr. Armstrong understood that this meant to close as many cases as possible to create the appearance of *Nightingale* compliance.[39] The new policy changes were formalized in a September 26, 2025 Policy and Procedure Manual.[40]

In response to Mr. Armstrong's inquiries, the agency implemented a "solution" to inform requesters that their case was closed because parents' names do not match.[41] However, this does not solve the information imbalance and only informs a requester that a file exists for them that they may never be able to access lest they successfully divine what the agency's file says.

Since the policy change, from September 16, 2025 to December 15, 2025, the USCIS FOIA office closed 878 cases citing no responsive record, and 1,047 cases for failure to comply for requesters who had upcoming immigration court dates.[42] Over one weekend in November, from the 7th to the 11th, USCIS closed 1,131 cases citing no record, and 1,076 cases for failure to comply.[43] Two and a half months into FY 2026, USCIS closed more cases for failure to comply as in FY 2025 and over 23% of all cases for no record as in FY 2025:[44]

---

[33] Exhibit 12
[34] Exhibit 7
[35] Jim Baxley was originally hired as the FOIA officer but unofficially reassigned to a Senior Advisor role because of an alleged disagreement among leadership.
[36] Exhibit 40
[37] Exhibit 7
[38] Exhibit 7
[39] Exhibit 7
[40] Exhibit 9
[41] Exhibit 40
[42] Exhibit 25; Recognizing the urgency for individuals who have upcoming immigration court dates to have access to their immigration records, USCIS designates such requests as "Track 3" of a three track system and requires expedited processing.
[43] Exhibit 27
[44] Exhibit 28; Exhibit 31

| Date range | Closures citing failure to comply | Closures citing no record found | Total Cases Closed |
|---|---|---|---|
| FY 2025: 10/01/2024-09/30/2025 | 25,533 | 153,694 | 583,205 |
| 09/15-12/15/2024[45] | 5,427 | 38,024 | 135,576 |
| 09/15-12/15/2025[46] | 41,918 | 40,623 | 170,635 |
| FY 2026: 10/01-12/15/2025 | 36,396 | 35,555 | 147,079 |
| Percent of FY 2025 cases closed in the first two and a half months of FY 2026 (10/01-12/15/2025) | 142.5% | 23.1% | 25.2% |

### VI. Examples of Cases Closed Despite the Existence of Responsive Record Following the September 2025 Policy Guidance

The examples provided below are a sampling of requests that were pretermitted following the September 2025 VOI policy guidance. Names have been changed in accordance with privacy requirements but are illustrative of each case.

A request received September 26, 2025 with a "backlog date" of November 12, 2025 was closed on November 10, 2025 with a notice to the requester that "We have completed our search and no records responsive to your request were located. We could not find records matching the name of the subject of record's parents provided in your request."[47] Yet in this case a record did exist with the same name, date of birth, country of birth, and A-Number for the subject of record. Indeed, the subject of record's parents' names were substantively the same between the request and the requester's A-File. The request listed a surname for the requester's father that matched the first initial for the same name in the USCIS record, and the request listed the requester's mother's name with both her maiden and married names, which were individually listed in USCIS's records. Yet the request was rejected with "no records" located.

|  | Request | USCIS Record |
|---|---|---|
| Subject of Record | Adam Smith Doe<br>[first name][ second name][third name] | Adam Smith Doe<br>[first name][second name][third name] |
| Father's name | John Smith Jones<br>[first name][second name][third name] | John Smith J.<br>[first name][second name][third name] |
| Mother's name | Jane Doe [de] Smith<br>[first name][second name][married surname] | Jane Doe; Jane Smith<br>[first name][second name]; [first name][married surname] |

---

[45] Exhibit 47
[46] Exhibit 47
[47] Exhibit 17

A request received on October 16, 2025 was closed on November 12, 2025 prior to its backlog date of December 2, 2025 because the parents' last names did not match.[48] However, again, a record exists for this requester, identified by a matching receipt number and date of birth. Yet the case was closed because the requester's names were inverted and because of minor discrepancies in the parents' names.

|  | Request | USCIS Records |
|---|---|---|
| Father's name | Johnpaul Aeron [first name][second name] | John Paul Aron [first name][second name][third name] |
| Mother's name | Sara Aaron [first name][second name] | Sara Aron [first name][second name] |

A request received October 30, 2025 with a backlog date of December 16, 2025 was closed on November 15, 2025 because of a "parent name discrepancy."[49] The requester had an upcoming immigration court hearing on November 24, 2025. The only discrepancy between the request and the A-File was that the requester listed additional surnames for their parents. The requester's A-Number matched the A-File and the requester's mother had a unique name further supporting a match, but despite this information, the *addition of optional information resulted in a closure*.

|  | Request | USCIS Records |
|---|---|---|
| Father's name | Adam Lane Owen [first name][second name][third name] | Adam Lane [first name][second name] |
| Mother's name | Thomasina Zeferino O'Neill [first name][ second name][third name] | Thomasina Zeferino [first name][ second name][third name] |

A request received on November 10, 2025 with a backlog date of December 26, 2025 was closed a week after receipt, on November 11, 2025 despite the existence of a responsive record identified with the requester's name, date of birth, and country of birth, because the parents' names were not exact.[50] The request listed the father's full name while the A-File contained a form the requester completed in 2022 that listed the father's name with one initial. USCIS' records also listed the mother's name with an additional surname, but otherwise the parents' names were a match. Nevertheless, this case was closed citing no record *due to minor discrepancies in optional information*.

|  | Request | USCIS Records |
|---|---|---|
| Father's name | Harold Clark Matthews Gates [first name][middle name][second name][third name] | Harold C. Matthews Gates [first name][middle initial][second name][third name] |
| Mother's name | Ingrid Stevens Vander [first name][second name][third name] | Ingrid Stevens Vander Griff [first name][second name][third name] |

A request received November 3, 2025 with a backlog date of December 18, 2025 and an immigration court hearing on November 17, 2025 was closed a week following receipt on

---

[48] Exhibit 19; Under current guidance this case would be closed because the subject of record's first and last names were inverted in the request.
[49] Exhibit 20
[50] Exhibit 21

November 10, 2025 because the subject provided only one surname for their father in the request and records in the A-File showed a second surname.[51] No other discrepancy existed.

|  | Request | USCIS Records |
|---|---|---|
| Subject of Record | Margie Campbell Lawrence [first name][paternal surname][maternal surname] | Margie Campbell Lawrence [first name][paternal surname][maternal surname] |
| Father's name | Percy Vince Golding [first name][middle name][third name] | Percy Campbell Golding [first name][middle name][third name] |
| Mother's name | Olivia Jane Lawrence Davis [first name][middle name][paternal surname][maternal surname] | Olivia Jane Lawrence Davis [first name][middle name][paternal surname][maternal surname] |

### VII. Slight Improvement in Policy Will Not Result in Meaningful Change

On November 18, 2025, Jim Baxley issued a new "quick guide" to assist in implementation of the September VOI policy.[52] This guidance noted that variations in parents' names are now permitted as long as the spelling variation "sounds like" the same name, such as "Hernandez" versus "Hernandes," and all other VOI matches.[53] However, this "sounds like" standard is subjective and may not always be apparent given language differences, nor would it have resulted in a different outcome for any of the closure examples listed above.

Additional guidance issued December 11, 2025 now permits the processing of cases where a mother's maiden and married name are provided and at least one matches the information found in the subject's A-File.[54] Yet again, this update would not change the outcomes of the above listed cases where the father's name was also at issue. Also, the guidance appears to communicate that in order for a maiden name match to be processed, the name must be listed separately; therefore, cases such as those above where two surnames are listed together would continue to be closed.

Further, these policy changes do nothing to change outcomes for potentially thousands of requesters whose requests were closed during the last September 15–December 15, 2025 reporting period, many of whom may have needed their A-Files for immigration proceedings like in the cases listed above.

### VIII. Conflict Between Stated Motive to End *Nightingale* Reporting and Pretext of Significant Incident Reports

USCIS FOIA leadership have communicated that these policy changes are intended to keep FOIA response times low so that Judge Orrick will find the NRC in compliance with his orders and relieve the government of its ongoing reporting requirements.[55]

---

[51] Exhibit 24
[52] Exhibit 22
[53] Exhibit 22
[54] Exhibit 45
[55] *See, e.g.,* Exhibit 14

However, when questioned about the policy changes, leadership offered a different justification. On September 26, 2025, Robert Busey, Program Manager and Associate Center Director for the FOIA branch, told supervisors that the changes were necessary because "we have seen a rise in significant incident reports (SIRs) this year." [56] Significant incidents are events that could potentially impact USCIS facilities, operations, or personnel, and can be triggered when FOIA processors improperly release protected information, such as a third party's Social Security Number or an enforcement agent's identity.

This justification is pretextual. Agency data shows that SIRs are rare and declining, not rising. In FY 2023, there were 41 SIRs; in FY 2024, that number dropped to 27; and in FY 2025 there were only 26 SIRs, representing approximately .005% of all requests processed.[57] Moreover, draft strategic goals for FY 2026, shared by the NRC Chief of Staff on October 30, 2025, removed a proposed goal of reducing SIRs entirely, an action inconsistent with Busey's claim that SIRs were a pressing concern requiring major policy changes.[58]

The timing and substance of the policy changes, combined with the implausibility of stated rationale, support the conclusion that leadership's true objective is to create the appearance of *Nightingale* compliance rather than to address any legitimate operational concern.

### IX.    Third Round of Policy Changes: Altering Processing Time "Tracks"

FOIA requires agencies to determine within 20 business days whether they will comply with a request, with a possible 10-day extension in "unusual circumstances."[59] DHS regulations at 6 C.F.R. § 5.5(b) authorize a multi-track process to manage requests of varying complexity. Consistent with these authorities, USCIS has implemented a three-track system:

- Track 1 (Simple): For less complex requests that can be processed in 20 working days or less.
- Track 2 (Complex): For complex requests that may require more than 20 working days to process and that include searching and line-by-line review of numerous pages of information.
- Track 3 ("Notice to Appear"): To allow for accelerated access to the A-File for those individuals who have been served with a charging document and have been scheduled for a hearing before an immigration judge as a result.[60]

---

[56] Exhibit 8
[57] Exhibit 10; Exhibit 13; This estimate is based on the number of SIRs for FY 2025 as of September 29, 2025 and the total number of FOIA requests processed in FY 2024, which are 26 and 551,640, respectively. The total number of FOIA requests for FY 2025 is not yet available as of the writing of this complaint.
[58] Exhibit 13
[59] 5 U.S.C. § 552(a)(6)(A)–(B).
[60] U.S. Department of Justice, Executive Office for Immigration Review. "Special FOIA Processing Track for Individuals Appearing before an Immigration Judge." *Federal Register*, February 28, 2007. https://www.federalregister.gov/documents/2007/02/28/E7-3357/special-foia-processing-track-for-individuals-appearing-before-an-immigration-judge.

On November 17, 2025, USCIS NRC leadership redefined these tracks in a manner that significantly narrows what qualifies as "simple."[61] Under the new policy, only a single-document request, and only if the document is located at the NRC or available electronically, qualifies for Track 1. Requests for two or more documents, even when all documents are held in the same file at the NRC, now default to Track 2, effectively expanding the agency's reliance on the 10-day "unusual circumstances" extension even for requests that are not more complex in substance.[62] This change departs from prior practice, where up to three documents could qualify as simple, and from FOIA.gov's own definition of "simple" requests as those seeking fewer pages rather than being limited to one document.[63]

Importantly, there is no corresponding increase in complexity to justify this reclassification. Instead, the policy appears designed to artificially maintain compliance with the *Nightingale* injunction by shifting more requests into slower tracks, thereby creating the appearance of meeting statutory timelines while undermining FOIA's mandate for prompt disclosure.[64] This maneuver prioritizes backlog optics over transparency and due process.

### X.     Protected Activity

On September 28, 2025, Mr. Armstrong emailed an attorney within the USCIS Office of Chief Counsel again raising his concerns about the legality of the new policy.[65] The attorney informed Mr. Armstrong that he forwarded his inquiry to a supervisory attorney on October 30, 2025. On September 29, 2025, Mr. Armstrong reported his concerns about the legality of closing cases for no record based on optional VOI information to his direct supervisor.[66] Mr. Armstrong's supervisor asked Mr. Armstrong if he was considering insubordination; Mr. Armstrong stated that if the Office of Chief Counsel affirmed the legality of the new policy, Mr. Armstrong would follow it.[67]

On October 1, 2025, Mr. Armstrong and the Office of Chief Counsel supervisory attorney exchanged emails through which Mr. Armstrong learned that the FOIA policy office had not informed or received guidance from the Office of Chief Counsel about the policy change.[68] The supervisory attorney stated that it would be very helpful to have a phone call to discuss the issue.[69]

On October 2, 2025, Mr. Armstrong reported these concerns to the U.S. Office of Special Counsel and the DHS Office of Inspector General via their online portals.

---

[61] Exhibit 44

[62] The Definition of "unusual circumstances" at 5 U.S.C. § 552(a)(6)(B) includes "the need to search for and collect the requested records" from locations other than the processing office and "the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records." Neither of these conditions describe requests where the number of responsive documents is more than one but less than "voluminous" and where all responsive documents are in the same file at the NRC, though such requests are now processed under track 2.

[63] FOIA.gov, "How Long Will It Take Before I Get a Response?," accessed December 4, 2025, https://www.foia.gov/how-to.html.

[64] *Id.*

[65] Exhibit 7

[66] Exhibit 40

[67] Exhibit 40

[68] Exhibit 7

[69] Exhibit 7

On November 17, 2025, Mr. Armstrong emailed his direct supervisor again raising his concern that a request he received to approve FOIA closures based on the September VOI guidance would close cases because of discrepancies in optional information and expressing his reasonable belief that such closures would violate 6 C.F.R. § 5.21(e).[70] The reasonableness of Mr. Armstrong's belief is validated by statements made by Jim Baxley that the new "legally debatable" VOI guidance is speeding up processing.[71]

On November 19, 2025, Mr. Armstrong again emailed his direct supervisor, following the issuance of updated guidance that maintained the same issues about which Mr. Armstrong had raised concerns. In this email Mr. Armstrong outlined that the FOIA office communicates that optional information is meant to *help* process FOIA requests but is instead used to prematurely close out requests despite the existence of a responsive record. Mr. Armstrong explicitly noted his concern that the policy is not aligned with the spirit of Judge Orrick's *Nightingale* order, and violates the requirements of the FOIA Improvement Act of 2016 that instructs agencies not to withhold information absent a reasonably foreseeable harm to an interest protected by an exemption.[72] As of the date of this disclosure, Mr. Armstrong's supervisor has not responded to this email.

### XI.   Gag Order and Retaliation

On October 2, 2025, Mr. Armstrong's direct supervisor emailed Mr. Armstrong to inform him that he spoke with Chief of Staff Tom Nelson and Jim Baxley, and that the supervisory attorney and Baxley would further discuss the policy, but that Mr. Armstrong must "disengage with OCC."[73] This directive did not include the whistleblower rights language required by 5 U.S.C. § 2302(b)(13).[74]

Mr. Armstrong understood this to be both a gag order and retaliation through a significant change in his working conditions as his job duties include resolution of problems and significant customer service issues involving interpretation of the law. Mr. Armstrong does not feel enabled to ensure compliance if he is prohibited from speaking with the agency's attorneys.

On December 9, 2025, Mr. Armstrong's performance rating for FY 2025 was finalized; he was the lowest rated supervisor in his branch and was rated lower than twenty other supervisors at the NRC despite also being the most awarded supervisor at the NRC throughout FY 2025 and taking on multiple additional responsibilities in the face of staffing shortages.

---

[70] Exhibit 29
[71] Exhibit 30
[72] 5 U.S.C. § 552(a)(8)(A); Exhibit 23
[73] Exhibit 7
[74] 5 U.S.C. § 2302 (b)(13)(a) requires the following language: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling."

## XII. Conclusion

Judge Orrick ordered compliance with the Freedom of Information Act to ensure that requesters receive information that can have life-altering impacts on their ability to remain in the United States with lawful status, avoiding family separation and prolonged detention. Instead of ensuring that requests are timely processed, NRC leadership has instituted policy changes to pretermit FOIA requests even when responsive records exist. Mr. Armstrong has put himself at risk internally by raising his concerns repeatedly to supervisors and NRC leadership. He brings these concerns to Congress seeking justice and accountability. We urge you to investigate without delay.

Respectfully Submitted,

_____
Andrea Meza
Government Accountability Project
1612 K Street, NW, Suite 808
Washington, D.C. 20006
(202) 926-3311

_____
Dana L. Gold
Government Accountability Project
1612 K Street, NW, Suite 808
Washington, D.C. 20006
(202) 926-3306

Attorneys for Mr. Armstrong