Diana L. Christian
California State Bar No. 236726
Admitted, U.S. District Court for the
Northern District of California
T.M. Guyer & Friends, PC
116 Mistletoe Street
Medford, OR 97501
Telephone: (206) 535-2395 / (202) 227-3590
Email: DianaC@whistleblower.org
Counsel for Proposed Amici Curiae
Timothy Turner and
Government Accountability Project

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ZACHARY NIGHTINGALE, et al.,
Plaintiffs,
v.
U.S. CITIZENSHIP AND IMMIGRATION SERVICES, et al.,
Defendants.

**Case No. 3:19-cv-03512-WHO**
Hon. William H. Orrick

# BRIEF OF AMICI CURIAE TIMOTHY TURNER AND GOVERNMENT ACCOUNTABILITY PROJECT IN SUPPORT OF PLAINTIFFS

## CORPORATE DISCLOSURE AND INTERESTED-ENTITIES STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(a)(4)(A) (used here as the content model for this district-court amicus brief), amicus curiae Government Accountability Project states that it is a nonprofit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Amicus Timothy Turner is an individual and is not a corporation.

## IDENTITY AND INTEREST OF AMICI CURIAE

Timothy Turner is a former employee of the National Records Center with direct knowledge of USCIS FOIA processing systems, including the FIRST system, production and closure practices, administrative appeals, and staffing. Mr. Turner's signed whistleblower declaration (hereinafter the "Turner Declaration"), submitted as an attachment to this brief, supplies the factual foundation for this brief. Mr. Turner has an interest in ensuring that the quarterly compliance reports ordered by this Court accurately measure the timely production of A-Files, not merely the entry of FOIA request closure codes.

Government Accountability Project (GAP) is a nonprofit organization that represents and supports whistleblowers and works to promote government and corporate accountability and transparency. GAP has an interest in the enforcement of FOIA's statutory deadlines and in the integrity of court-ordered supervisory mechanisms that depend on accurate agency reporting. GAP's perspective, informed by whistleblower experience and public-interest FOIA advocacy, is offered to assist the Court in evaluating whether the 2020 injunction's reporting mechanism continues to measure the relief the Court ordered.

Amici seek leave to file this brief as friends of the Court. The brief is submitted in support of Plaintiffs and is intended to aid the Court's ongoing supervision of the permanent injunction entered December 17, 2020, by providing a comparative analysis of the Director's reported

compliance metrics against internal data and the governing standards for civil contempt of a structural injunction.

**AUTHORITY TO FILE AND DISCLOSURE OF AUTHORSHIP AND FUNDING**

This brief is filed with a motion for leave to appear as amici curiae. Pursuant to the disclosure model in Federal Rule of Appellate Procedure 29(a)(4)(E): (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person other than the amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE AND INTERESTED-ENTITIES STATEMENT....2
IDENTITY AND INTEREST OF AMICI CURIAE....2
AUTHORITY TO FILE AND DISCLOSURE OF AUTHORSHIP AND FUNDING....3
INTRODUCTION....6
I. STATUTORY FRAMEWORK AND THE 2020 ORDER....8
II. USCIS'S DEFINITION OF "COMPLETED PROCESSING" NO LONGER MEASURES TIMELY ACCESS TO A-FILES AS THE INJUNCTION WAS DESIGNED TO ENSURE....10
III. RAPID CHANGES IN REPORTING METRICS SUGGEST UNRELIABILITY OF THE GOVERNMENT'S DATA....14
IV. A SURGE IN APPEALS CASES, A TWO-TIER POLICY FOR PROCESSING APPEALS, AND STAFFING RECORDS EVIDENCE THAT GOVERNMENT REPORTING NO LONGER MEASURES COMPLIANCE....15
V. THE LEGAL STANDARDS GOVERNING ENFORCEMENT OF THE 2020 INJUNCTION....21
- A. The "All Reasonable Steps" Standard and the Remedial Purpose of Civil Contempt....21
- B. The Impossibility Defense....23
- C. Performance Measures and the Meaning of "Completed"....24
- D. Reporting Requirements as Supervisory Tools and the Integrity of the Mechanism....25
- E. Enforcement Versus Modification....27
- F. Clear-and-Convincing Evidence in Practice....27
- G. The Record Supports Issuance of an Order to Show Cause....28
- H. The Legal Foundation of the 2020 Injunction Remains Intact....29

VI. CONCLUSION....30

# TABLE OF AUTHORITIES

**Cases**


| | |
|---|---|
| Coleman v. Newsom, 131 F.4th 948 (9th Cir. 2025) | 22, 23, 24, 27 |
| Donovan v. Mazzola, 716 F.2d 1226 (9th Cir. 1983) | 22 |
| Food Mktg. Inst. v. Argus Leader Media, 588 U.S. 427 (2019) | 29 |
| FTC v. Affordable Media, LLC, 179 F.3d 1228 (9th Cir. 1999) | 21, 23, 27 |
| Hajro v. U.S. Citizenship & Immigration Servs., 811 F.3d 1086 (9th Cir. 2016) | 29 |
| In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693 (9th Cir. 1993) | 22 |
| Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y, 774 F.3d 935 (9th Cir. 2014) | 22 |
| Kelly v. Wengler, 822 F.3d 1085 (9th Cir. 2016) | 22 |
| Mayock v. Nelson, 938 F.2d 1006 (9th Cir. 1991) | 29 |
| McComb v. Jacksonville Paper Co., 336 U.S. 187 (1949) | 22 |
| Nehmer v. U.S. Dep't of Veterans Affairs, 494 F.3d 846 (9th Cir. 2007) | 26, 27 |
| Nightingale v. U.S. Citizenship & Immigration Servs., No. 3:19-cv-03512-WHO (N.D. Cal.) | passim |
| Parsons v. Ryan, 949 F.3d 443 (9th Cir. 2020) | 23–24, 26–28 |
| Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126 (9th Cir. 2006) | 22 |
| Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367 (1992) | 27 |
| Shell Offshore Inc. v. Greenpeace, Inc., 815 F.3d 623 (9th Cir. 2016) | 22 |
| Stone v. City & Cnty. of San Francisco, 968 F.2d 850 (9th Cir. 1992) | 22, 23, 24, 28 |
| United States v. Asay, 614 F.2d 655 (9th Cir. 1980) | 23 |
| United States v. Bright, 596 F.3d 683 (9th Cir. 2010) | 21, 27 |
| U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136 (1989) | 29 |


**Statutes**


| | |
|---|---|
| 5 U.S.C. § 552(a)(6) | 6, 8–9, 17, 25–26 |
| 5 U.S.C. § 552(a)(6)(A) | 8, 9 |
| 5 U.S.C. § 552(a)(6)(B) | 8 |


**Other Authorities**


| | |
|---|---|
| Declaration of Timothy Turner (Aug. 25, 2026) | passim |
| Eighth Declaration of M. David Arnold, ECF No. 208-1 | 11, 13, 14 |
| Ninth Declaration of M. David Arnold, ECF No. 220-1 | 11, 14 |
| Order Granting Permanent Injunction, ECF Nos. 89, 90 | 8, 9, 30 |

## INTRODUCTION

This brief is submitted as a friend of the Court to assist in the ongoing supervision of the permanent injunction entered on December 17, 2020. That injunction rested on a clear finding: the defendants had engaged in an unlawful pattern or practice of failing to meet the statutory deadlines for processing FOIA requests for Alien Files. The Court ordered the defendants to clear the existing backlog, to adhere going forward to the twenty- and thirty-day deadlines in 5 U.S.C. § 552(a)(6), and to file quarterly compliance reports so that the Court could monitor compliance.

The reporting mechanism has now been in place for more than five years. For a substantial portion of that period the reports showed progressive improvement. More recently the same reports have begun to display extreme volatility. Successive declarations signed by the Director of the National Records Center have claimed near-total elimination of the A-File backlog and timely-completion rates approaching or exceeding 99 percent, even as the agency continued to receive well over 100,000 new A-File requests each quarter and experienced staffing reductions. Those figures appear under oath in filings made with this Court.

This brief outlines a significant problem in the agency's reporting to the Court: the agency's count of "completed processing" no longer measures timely access to A-Files, which is the relief the 2020 injunction was designed to secure. Section II of this brief uses data from the agency's own databases to illustrate that most cases the government counts as "completed processing" do not actually result in record production. As explained in Section III, recent and rapid changes in the government's compliance metrics suggest the unreliability of the government's data, an apparent trend then corroborated in Section IV through data on appeals, information about the government's two-tier policy for processing appeals, and staffing data.

The Court's institutional knowledge of this case is an asset. Having supervised the injunction from its inception, the Court is uniquely positioned to recognize when the metrics it

ordered begin to diverge from the relief it intended. That institutional continuity is one of the principal advantages of structural-injunction supervision, and it supports careful examination of the current record.

The Turner declaration submitted as an attachment to this brief places the reported figures in a different light. Data drawn from the agency's own FIRST system show that in each of the two most recent reporting periods, closures counted as "completed processing" more often delivered no records to the requestor than delivered records. The same declaration documents a sharp rise in administrative appeals—many of them challenges to non-production closures—that the quarterly reports do not disclose. Operational explanations offered for the reported backlog elimination are difficult to reconcile with staffing data and with the timing of the most dramatic improvements.

Everything claimed in this brief about the divergence between reported metrics and actual production is supported with data drawn from the agency's own systems and set out paragraph by paragraph in the Turner Declaration. The Court need not rely on external estimates or speculative inferences. The data are internal, contemporaneous, and specific.

Amici do not ask the Court to revisit the original liability determination. The legal foundation of the 2020 order remains intact. The question presented by the current record is narrower and institutional: whether the supervisory mechanism the Court created continues to measure actual compliance with the statutory deadlines and with the relief the Court ordered. When the government's reported statistics, read against internal data from the same agency, raise a serious question on that point, the Court retains full equitable authority to examine the matter and to take further steps if necessary.

The individuals who request their A-Files do so because those records are often essential to the fair adjudication of immigration proceedings and benefits applications. Timely access to an A-File can determine whether a noncitizen is able to present relevant evidence, respond to

government allegations, or pursue available forms of relief. Delays and non-production closures do not merely inconvenience requestors; they can affect the outcome of proceedings in which fundamental interests are at stake. The 2020 order was entered to secure timely access to those records. If the metrics by which compliance is now measured have come to count closures without production as successful processing, then the supervisory regime no longer tracks the relief the Court ordered.

This brief does not seek to expand the scope of the original injunction or to impose new obligations beyond those the Court has already ordered. It seeks only to ensure that the existing supervisory mechanism continues to perform its intended function. The Court designed the quarterly reports as a window into the defendants' compliance. When that window begins to show numbers that move at unusual speed and that appear to measure something other than the timely production of records, the Court is entitled to look more closely. The argument that follows examines the factual record in detail and then sets out the governing legal standards for civil contempt of a structural injunction, including the "all reasonable steps" standard, the impossibility defense, the function of reporting requirements as supervisory tools, the meaning of "completed" in the Court's own reporting requirement, the distinction between enforcement and modification, and the basis for an order to show cause.

## I. STATUTORY FRAMEWORK AND THE 2020 ORDER

FOIA's timing provisions are mandatory. Section 552(a)(6)(A) requires an agency to determine within twenty working days after receipt of a request whether to comply with the request. Section 552(a)(6)(B) permits an extension of not more than ten working days in defined unusual circumstances. These deadlines are not aspirational targets; they are the statutory measure of timely processing. Congress enacted them to ensure that individuals and the public receive prompt access to agency records.

A FOIA "determination" is not a mere administrative closure. Under the statute, an agency must determine whether to comply with the request, communicate the reasons for its decision, and —upon a determination to comply—make the records promptly available. 5 U.S.C. § 552(a)(6)(A). A closure that delivers neither records nor a substantive determination that no responsive records exist after a search does not fulfill the statutory obligation.

The mandatory character of the deadlines has long been recognized. Agencies may not treat the twenty- and thirty-day periods as flexible guidelines subject to the press of other business. When an agency systematically fails to meet those deadlines, failure can constitute a pattern or practice that warrants prospective injunctive relief. The statute supplies the measure of compliance; the Court's role is to enforce that measure when the agency does not.

In December 2020 this Court found that the defendants had systematically failed to meet those deadlines for A-File requests. The evidence before the Court showed years of delay, a growing backlog, and no adequate justification under the statute. The Court held that the failure constituted an unlawful pattern or practice, entered a permanent injunction, ordered the defendants to clear the then-existing backlog within sixty days, and required quarterly compliance reports containing the number and percentage of A-File requests that were filed and timely completed, as well as the number and percentage remaining pending beyond the statutory periods. (ECF Nos. 89, 90.)

The reporting requirement was the Court's chosen instrument of ongoing supervision. It was designed to give the Court visibility into whether the defendants were meeting the deadlines the statute imposes and the injunction enforces. The reports have been filed regularly. For several years they showed improvement. The question now is whether the numbers contained in the more recent reports continue to supply the information the Court needs to perform its supervisory function.

The Court's authority to require those reports, and to examine their reliability, follows directly from its equitable power to ensure that its own structural injunction remains effective. A structural injunction is not self-executing. It depends on accurate information about the defendant's performance. When that information becomes unreliable or incomplete, the Court retains the power to look further. Nothing in the intervening years has diminished that authority. The legal framework that supported the entry of the 2020 order continues to support its enforcement.

The quarterly reports are not an end in themselves. They are a means by which the Court can determine whether the defendants are delivering the relief the Court ordered—timely determinations on A-File FOIA requests within the statutory deadlines. If the reports no longer measure that relief, the Court is entitled to know.

## II. USCIS'S DEFINITION OF "COMPLETED PROCESSING" NO LONGER MEASURES TIMELY ACCESS TO A-FILES AS THE INJUNCTION WAS DESIGNED TO ENSURE

The central ambiguity in the current reporting regime is the distinction between cases that are processed and cases that are closed without production of records. The Turner Declaration addresses that distinction directly and at length.

As a threshold matter, the Declaration explains that Director Arnold's use of the phrase "completed processing" conflates two different outcomes. Processing, in the ordinary sense, implies that FOIA staff have reviewed a request along with responsive records and have determined whether or not responsive records exist. Closing a case without production is a different act. (Turner Decl. ¶¶ 8–9.) The Declaration states that, following the September 2025 Verification of Identity guidance, a significant percentage of FOIA requests are closed without a FOIA case creator or processor determining whether responsive records exist. For that reason, the Declaration refers to most such cases as "closed" rather than "processed." (Turner Decl. ¶ 9.)

The quantitative evidence is set out in consecutive paragraphs. For the period from December 15, 2025 through March 14, 2026, Director Arnold reported that USCIS received approximately 124,812 new A-File requests and completed processing approximately 121,349. (Eighth Arnold Decl. ¶ 5, ECF No. 208-1; Turner Decl. ¶ 18.) FIRST-system data for the same period show that of approximately 122,058 FOIA cases that were closed, only 45,447—or 37.2 percent—of requestors actually received documents in response to their request. An additional 69,522 closures, or 56.9 percent, were based on the September 2025 Verification of Identity guidance without providing any responsive documents to the requestor. (Turner Decl. ¶ 19.)

The next reporting period shows the same structural pattern. Director Arnold's ninth declaration reported receipt of approximately 127,780 new A-File requests and completion of processing for approximately 123,607. (Ninth Arnold Decl. ¶ 5, ECF No. 220-1.) FIRST data for that period show approximately 123,813 A-File closures, of which approximately 55,819—or 45.1 percent—produced records to the requestor and approximately 58,172—or 47.0 percent—were closed citing failure to comply, no record, or inability to verify, without producing responsive documents. (Turner Decl. ¶ 20.)

These are not marginal percentages. In two successive quarters presented to this Court as periods of high compliance, closures that delivered no A-File records outnumbered closures that delivered records among those counted toward the reported "completed processing" totals. The 2020 injunction was entered because individuals need timely access to their A-Files for immigration proceedings and benefits applications. A closure that delivers no records does not fulfill that purpose, even if it is recorded as timely.

The practical consequences of this discrepancy are significant. A requestor whose case is closed without production receives neither the records sought nor a substantive determination that no responsive records exist after a search. The closure is counted toward the agency's timely-

completion rate in the same manner as a full production. From the standpoint of the compliance metric, the two outcomes are treated as equivalent. From the standpoint of the requestor, and from the standpoint of the relief this Court ordered, they are not.

While a non-production closure is counted as a successful completion in the compliance metric, for an individual requestor, it is a denial of access. That inversion of meaning is the core problem. The Court ordered reports of timely completion so that it could monitor timely access. If the reports now measure something else, the Court's supervisory design has been undermined.

The inversion is particularly acute for Track 3 requestors—those with pending immigration court proceedings—for whom timely access to the A-File is often critical to the fair adjudication of the case. For those requestors, the A-File is often essential to the presentation of a defense or a claim for relief; the consequence of an unsuccessful outcome is a deportation order.

The zero-backlog figure reported for Track 3 has been maintained in significant part by the increase in non-production closures after the September 2025 guidance took effect. (Turner Decl. ¶¶ 21–26). Before the guidance, the share of Track 3 closures citing failure to comply or no record was in the range of 8 percent. After the guidance, this share rose sharply, reaching 38.2 percent in one of the periods covered by Director Arnold's eighth declaration. (Turner Decl. ¶ 23.) Because closures citing failure to comply or no record do not produce records to the requester, the zero-backlog metric for Track 3 does not indicate that Track 3 requesters received their A-Files.

A metric that counts such closures as success does not measure the timely access that Track 3 requestors need and that the 2020 order was designed to secure. It measures the timely entry of a closure code.

Average processing times reported to the Court are likewise affected. The Declaration explains that failure-to-comply and no-record closures are processed at substantially lower average times than closures that deliver records, because they require neither a records search nor

exemption analysis. Including those faster closures in the reported averages produces numbers that do not fully disclose the time required for cases that actually result in production. (Turner Decl. ¶¶ 27–32.) The Declaration states that the speed differential is not incidental: speed alone does not show compliance if the closure did not involve a substantive search for responsive records or exemption review. (Turner Decl. ¶ 30.)

The distinction between processing and non-production closure is therefore not technical. It goes to whether the compliance metrics this Court has received since 2020 continue to measure the relief the Court ordered. The comparison between the Arnold declarations and the FIRST-system data is documented paragraph by paragraph in the Turner Declaration. No external estimate is required. The Court is entitled to take the comparison seriously.

If a large share of the closures counted as “completed processing” involve no production of records, then the timely-completion rate no longer measures timely access to A-Files. It measures the timely entry of a closure code. That is a different metric, and it is not the metric this Court ordered the defendants to report. The discrepancy is visible on the face of the record and warrants examination.

The Court ordered the defendants to report the number and percentage of A-File requests that were timely completed. The natural reading of that requirement is that “completed” means a substantive determination resulting in the production or proper withholding of responsive records. If a large share of the closures counted as completed involve neither production nor a search-based determination, then the reports no longer measure compliance with the Court’s order. The Turner Declaration supplies the data necessary to identify the gap between compliance and reporting.

## III. RAPID CHANGES IN REPORTING METRICS SUGGEST UNRELIABILITY OF THE GOVERNMENT'S DATA

The quarterly reports were never intended to be ornamental. They were the mechanism by which this Court retained visibility into whether the defendants were meeting the deadlines the statute imposes and the 2020 order enforces. When those reports begin to show near-total backlog elimination and sustained timely-completion rates at or above 99 percent, while the agency has recently received more than 120,000 new A-File requests each quarter, has lost FOIA processing staff, and has seen administrative appeals rise sharply **(as Section IV details)**, the reported figures require an explanation the reports do not supply. (Turner Decl. ¶¶ 35-36, 59-61.)

Director Arnold's eighth declaration, filed in connection with the reporting period ending March 14, 2026, stated that USCIS received approximately 124,812 new FOIA requests for A-Files and "completed processing" approximately 121,349 of them. (Eighth Arnold Decl. ¶ 5, ECF No. 208-1.) The ninth declaration, covering the subsequent period ending June 14, 2026, reported receipt of approximately 127,780 new A-File requests and completion of processing for approximately 123,607. (Ninth Arnold Decl. ¶ 5, ECF No. 220-1.) These figures appear under the signature of the official responsible for the National Records Center and are presented to the Court as evidence of substantial compliance with the 2020 injunction.

The absolute numbers are large. The National Records Center processes the largest FOIA workload in the federal government. When an operation of that scale reports that it has reduced a multi-year backlog to near zero and then maintained timely-completion rates approaching or exceeding 99 percent while absorbing more than 120,000 new requests each quarter, the reported improvement is extraordinary on its face. Ordinary fluctuations in request volume or processing capacity do not typically produce swings of this magnitude in such a short period.

The declarations attribute the improvement to a package of operational measures. Yet the Turner Declaration's staffing data show net losses rather than the capacity expansion that would

ordinarily be required to produce such results. The temporal alignment between the September 2025 Verification of Identity guidance, the rise in non-production closures, and the most dramatic reported backlog reductions supplies an alternative explanation that the reports do not address.

The Turner Declaration's paragraph-by-paragraph response to those claims is submitted as an attachment to this brief. The Court is entitled to weigh that response against the declarations when deciding whether further inquiry is warranted.

The Court designed the reporting requirement precisely so that it could notice when the data stop behaving like ordinary compliance metrics and begin to require explanation. The declarations describe a package of operational measures—workforce reorganization, temporary promotions, detail assignments, contract support, overtime, hiring solicitations, targeted training, and technology improvements—but they do not address why the metrics have moved with such speed or whether the underlying counts continue to reflect the timely production of records.

This behavior is what the record predicts when a metric begins counting non-production closures as completions. The volatility in the reported numbers is not merely statistical noise; it is a signal that the underlying counts no longer track the timely production of A-Files.

## IV. A SURGE IN APPEALS CASES, A TWO-TIER POLICY FOR PROCESSING APPEALS, AND STAFFING RECORDS EVIDENCE THAT GOVERNMENT REPORTING NO LONGER MEASURES COMPLIANCE

The appeals data corroborate the same problem from a second direction. The rise in non-production closures has been accompanied by a sharp increase in administrative appeals that the quarterly compliance reports do not disclose.

As described in the Turner Declaration, from the time the FIRST system was created in 2019 through January 14, 2026, the total number of appeal cases created at any given time was rarely more than 30 and often fewer than 10. Throughout the month of January 2026, however, there were thousands of appeal cases created. (Turner Decl. ¶ 35.) From 2019 to 2024 the total

number of appeals closed each year was typically around 2,000 and never more than 6,500. In 2025 the total number of appeals cases closed jumped to 14,170, with a monthly count that nearly doubled from the prior pace—approximately 750–1,100 per month from January to September 2025, then 1,939 in October, 1,914 in November, and 2,553 in December. Over 2,000 appeals cases were closed in each of January, February, and March 2026. (Turner Decl. ¶ 36.)

The information provided in the Declaration indicates the increase in appeals is tied directly to the non-production closures. A FOIA supervisor reported at an April 7, 2026 Expanded Leadership Meeting, with Director Arnold present, that an NRC FOIA team was reviewing approximately 5,100 appeal cases pulled back from the Office of the Chief Counsel that had been closed under the verification of identity guidance as failure to comply or no records, and that 40 to 45 percent of the cases reviewed were not upheld and were routed to the PPO office for reprocessing. At an April 28, 2026 All-Hands meeting, the same supervisor confirmed that the review of approximately 5,000 such cases was complete and that about 40 percent were sent back for processing. (Turner Decl. ¶¶ 37, 47-48.)

The volume of reversals is evidence that a significant number of the closures counted as "completed processing" did not survive internal scrutiny. The quarterly reports filed with this Court contain no corresponding disclosure of the appeals surge or of the rate at which non-production closures are being overturned. The omission is material. A supervisory regime that records closures as successful compliance while a large fraction of those closures are being reversed on appeal does not give the Court an accurate picture of performance under the injunction.

The institutional response to the high volume of closures based on the September 2025 Verification of Identity guidance, along with the associated appeals and reversals, is evidence that these closures carried a high likelihood of error. Around February 2026, USCIS adopted a two-tier standard for administrative FOIA appeals. For ordinary appeals, new information submitted by the

requestor is treated as an “abuse” of the appeals process, and the requestor is told to file a new FOIA request. For appeals of closures under the September 2025 Verification of Identity guidance, however, corrected identity information is accepted and the cases are routed to the PPO office for reprocessing. (Turner Decl. ¶¶ 52–58.) The change was confirmed in a February 9, 2026 meeting attended by the FOIA Officer and FOIA Program Manager and was formalized by March 2026 in an executive meeting at which Director Arnold was present. A FOIA supervisor described the shift as flipping the criteria for a valid appeal “on its head.” The exceptional track was created expressly to “draw down or burn down the appeals backlog as quickly as we can.” (Turner Decl. ¶¶ 55–56.)

FOIA, 5 U.S.C. § 552(a)(6), and DHS implementing regulations do not authorize different appeals standards based on the underlying closure reason. The selective acceptance of new information only for VOI-related appeals is a unilateral departure from the uniform statutory scheme. The policy was not publicly announced and was not extended to other appeal types. (Turner Decl. ¶¶ 52–58.) As of June 24, 2026, approximately 25,090 appeals remained open; only about 5,717 remained within the basic twenty-working-day statutory deadline, while approximately 18,600 had been pending beyond even the maximum extension period. (Turner Decl. ¶¶ 50–51.) None of this information appears in the quarterly reports filed with the Court.

Approximately 5,000 of these VOI-related appeals cases were identified for movement into PPO for reprocessing, and similar to the appeals backlog, were not reported to the Court. (Turner Decl. ¶¶ 47–49.) APP and PPO offices hold A-File cases under appeal or awaiting correction and production after a successful appeal; their exclusion means the compliance data presented to the Court does not account for cases cycling through closure, appeal, reversal, and reprocessing. (Turner Decl. ¶ 16.)

Administrative FOIA appeals backlogs are not unknown across the federal government. Agencies routinely report appeals inventories in their Annual FOIA Reports and Chief FOIA Officer Reports, and the Department of Justice's Office of Information Policy monitors those figures government-wide. Ordinary backlogs are typically attributed to staffing constraints, request complexity, and diversion of resources to litigation. Those explanations are familiar, and when an agency is making measurable progress and reporting the backlog transparently, they are often accepted as the ordinary friction of FOIA administration.

The appeals inventory described in the Turner Declaration is distinct because it suggests a metric-integrity problem under the Court's supervisory authority caused by a combination of structural factors tied to the September 2025 Verification of Identity guidance.

First, the appeals volume was generated by the same non-production closures that the defendants counted as successful "completed processing" in the reports to this Court. Ordinary appeals backlogs arise from the ordinary flow of adverse determinations, fee disputes, and adequacy challenges. Here, the surge from a historical baseline of roughly 2,000 appeals closed per year to 14,170 in 2025, with approximately 25,090 still open as of June 24, 2026, tracks the timing of the September 2025 Verification of Identity guidance and the subsequent rise in closures that delivered no records. (Turner Decl. ¶¶ 35–37, 50–51.)

Second, a substantial share of those closures are being reversed. The 40 to 45 percent reversal rate briefed to leadership with Director Arnold present is evidence that a large fraction of the closures counted as completed did not survive internal legal review. (Turner Decl. ¶¶ 37, 48.) Ordinary appeals backlogs do not typically rest on a documented internal finding that some 40 percent of a defined category of closures must be sent back for reprocessing.

Third, the agency responded by creating an exceptional, non-public remedial track for one category of appeals while maintaining a different standard for all others. (Turner Decl. ¶¶ 52–58.)

FOIA's appeals provision and DHS implementing regulations impose a uniform twenty-working-day deadline and do not authorize different standards based on the reason for the underlying closure. Other agencies prioritize within a single appeals framework. They do not maintain a non-public exceptional track for the category of closures that is driving the reported compliance metrics and a "file a new request" track for everything else.

Fourth, none of this data appears in the quarterly compliance reports the Court ordered. Other agencies' appeals inventories appear in the Annual FOIA Reports that Congress and the Department of Justice require. Those reports are public. This Court ordered a different and more specific form of reporting; namely, quarterly disclosures of the number and percentage of A-File requests that were timely completed, to monitor performance under its injunction. The open inventory of approximately 25,090 appeals, the cycling of approximately 5,000 cases through closure, appeal, and reprocessing, the two-tier policy itself, and the exclusion of APP and PPO cases from the compliance data are all omitted from those reports. (Turner Decl. ¶¶ 16, 47–51, 52–58.)

The distinction matters for the Court's supervisory function. An ordinary backlog, reported and worked in good faith, is a resource problem. An appeals inventory generated by the reported completions, managed through a non-public exceptional process, and omitted from the supervisory reports is a circularity problem: the closures produce the numbers that look like compliance; the numbers generate appeals that reveal the closures were not final; the appeals are absent from the reports to the Court; and the Court continues to receive metrics that do not disclose the cycle. The Court designed the quarterly reports so that it could see whether the defendants were meeting the statutory deadlines. A large volume of cases generated by the reported completions and then excluded from the reports defeats that purpose.

The existence of a high reversal rate also bears on the meaning of the timely-completion metric. If a substantial share of the closures counted as timely completed are later reversed and returned for reprocessing, then the original closure did not finally resolve the request. Counting such closures as successful compliance overstates the agency's performance. The Court cannot evaluate the reliability of the reported metrics without knowing the volume and outcome of the related appeals. The reports currently provide neither.

Director Arnold has attributed the reported elimination of the A-File backlog to a series of operational changes: workforce reorganization, temporary promotions, detail assignments, contract support, DHS/ICE assistance, overtime, hiring solicitations, targeted training, and technology. (Turner Decl. ¶ 59.) The Declaration addresses those claims directly. Between July and December 2025, the backlog was reduced by approximately 20,000 cases according to the FOIA Associate Center Director, who stated at a February 3, 2026 NRC All Hands meeting that the backlog had "continued to grow to a high water mark at the end of July of around 20,000 cases" but had then been brought down "to two cases in backlog with over 99% compliance" by the December 15 declaration. (Turner Decl. ¶ 60.) Data reviewed in the Declaration do not appear to support the conclusion that the operational changes referenced by Director Arnold significantly contributed to that reduction. (Turner Decl. ¶ 60.)

On the staffing point the Declaration is specific. Hiring data show that USCIS has not gained FOIA staff but has in fact lost staff over the last calendar year and thereafter. As of April 30, 2026, the FY26 Management Branch Staffing/Hiring Story dashboard reflected only eleven total new employees onboarded to the relevant FOIA operations. (Turner Decl. ¶ 61.) Net staff losses undercut the claim that increased capacity accounts for the reported improvement. The timing of the most dramatic reported backlog reductions aligns more closely with the September

2025 Verification of Identity guidance and the subsequent rise in non-production closures than with any documented expansion of processing resources.

The Court is not required to adjudicate every operational claim. It is not required to determine whether every non-production closure was properly entered or whether every appeal was correctly decided. The record now contains two parallel sets of facts: the defendants' reported metrics showing near-perfect compliance and near-zero backlogs, and detailed internal data set out paragraph by paragraph in the Turner Declaration which shows that a large share of the closures underlying those metrics involved no production of records and generated a wave of appeals omitted from the reports to the Court. That combination is sufficient to warrant examination of whether the supervisory mechanism created in 2020 continues to measure actual compliance with the statutory deadlines and with this Court's order.

The appeals data supply an independent check on the reliability of the reported compliance metrics. An increase of this magnitude, concentrated in the period following the Verification of Identity guidance and accompanied by a high internal reversal rate, is difficult to reconcile with a narrative of straightforward operational improvement.

## V. THE LEGAL STANDARDS GOVERNING ENFORCEMENT OF THE 2020 INJUNCTION

### A. The "All Reasonable Steps" Standard and the Remedial Purpose of Civil Contempt

Civil contempt of a court order is an objective inquiry with a remedial purpose. In the Ninth Circuit, the moving party must establish by clear and convincing evidence that the alleged contemnor violated a specific and definite order of the court beyond substantial compliance. *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999). Once that showing is made, the burden shifts to the alleged contemnor.

A court may wield its civil contempt powers for two separate and independent purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628–30 (9th Cir. 2016) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947)). Because civil contempt serves a remedial purpose, "it matters not with what intent the defendant did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).

The operative test is whether the party "failed to take all reasonable steps within [its] power to comply" with a specific and definite order. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016); *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014).

The standard is rigorous. "Merely taking significant steps toward implementing [a] decree falls far short of 'substantial compliance'"; the contemnor must demonstrate that it took all reasonable steps. *Coleman v. Newsom*, 131 F.4th 948, 958 (9th Cir. 2025). Substantial compliance is a defense only when any remaining violations are merely technical or inadvertent. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The touchstone of the substantial compliance inquiry is whether the defendant frustrated the purpose of the decree—its essential requirements. Courts take a holistic view of all the available information; the contempt inquiry is not a pure numbers exercise that counts technical closures as success while the underlying relief goes undelivered.

Good faith is not a defense and is not a substitute for all reasonable steps. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695 ("there is no good faith exception to the requirement of obedience to a court order"); *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). In determining whether a defendant is in contempt of a court order, the focus is on the

defendant's actual conduct measured against the order's terms, not on the defendant's subjective belief about its performance.

These principles apply fully to structural injunctions. *Parsons v. Ryan*, 949 F.3d 443, 454 –56 (9th Cir. 2020); *Stone*, 968 F.2d at 856–58; *Coleman*, 131 F.4th at 957–58. The 2020 injunction in this case is specific and definite: it requires the defendants to adhere to FOIA's statutory deadlines for A-File requests and to file quarterly reports reflecting timely completion. (ECF Nos. 89, 90.) It matters not whether the Director subjectively intended to violate the order; rather, the inquiry is whether the defendants have taken all reasonable steps within their power to comply with FOIA and to ensure that the reports measure the relief the Court ordered, timely production of A-Files, rather than the timely entry of a closure code.

Here, the two-tier appeals policy underscores the compliance problems. An agency that counts non-production closures as completed processing, then creates an exceptional, non-public remedial track to absorb the resulting reversals, and omits the cycling cases from the reports to the Court, has not taken all reasonable steps to ensure that the supervisory mechanism measures the relief ordered. The exceptional track is itself evidence that the ordinary process could not absorb the fallout from the VOI closures. (Turner Decl. ¶¶ 52–58.)

**B. The Impossibility Defense**

Once a clear-and-convincing showing of violation is made, the burden shifts to the alleged contemnor. Inability to comply is a defense, but it is narrowly drawn. The contemnor must show "categorically and in detail" that compliance is factually impossible—not merely difficult, expensive, or constrained by operational challenges. *Affordable Media*, 179 F.3d at 1241; *Coleman*, 131 F.4th at 959–60; *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980).

Self-induced inability is no defense. *Asay*, 614 F.2d at 660; *Affordable Media*, 179 F.3d at 1241. Resource constraints and institutional difficulty, standing alone, do not establish

impossibility. *Stone*, 968 F.2d at 856–58; *Coleman*, 131 F.4th at 959–60 (rejecting California's nationwide staffing-shortage evidence where the State's own expert did not opine that compliance was actually impossible).

In the present record, the Director's declarations attribute the reported backlog elimination to operational measures. Yet the Turner Declaration shows net staff losses rather than capacity gains and ties the most dramatic reported improvements to the rise in non-production closures following the September 2025 Verification of Identity guidance. (Turner Decl. ¶¶ 59–61.) The reported figures cannot show whether A-Files were actually produced on time, because the counting practice treats closures without production as "completed processing." The agency chose that counting practice, so its reports' inability to prove timely production is a problem of its own creation. A defendant cannot claim compliance was impossible to demonstrate when its own practices made the demonstration impossible. On the materials currently before the Court, the Director has not carried the burden of showing impossibility "categorically and in detail."

Again, the two-tier appeals policy reinforces the point. The volume of VOI-related appeals that required an exceptional remedial process was generated by the same non-production closure practice that produced the reported completion rates. Any resulting appeals backlog, and the exclusion of those cases from the court reports, is self-induced. (Turner Decl. ¶¶ 47–58.)

## C. Performance Measures and the Meaning of "Completed"

*Parsons v. Ryan*, 949 F.3d 443 (9th Cir. 2020), is particularly instructive on how courts treat performance metrics embedded in structural decrees. There the parties stipulated to 103 specific "Performance Measures." When compliance fell below the agreed threshold, the district court issued an order to show cause, then held the defendants in contempt and imposed per-instance sanctions. The Ninth Circuit affirmed.

The key point for this case is that when a structural decree defines compliance by reference to measurable outcomes, the metrics themselves become part of the specific and definite order. The 2020 injunction required the defendants to report "the number and percentage of A-File FOIA requests that were filed and timely completed." (ECF Nos. 89, 90.) If "completed" is interpreted to include closures that deliver no records, the metric no longer tracks the relief the Court ordered.

A FOIA determination under section 552(a)(6) requires the agency to determine whether to comply with the request, communicate the reasons for compliance or withholding of information, and make the records promptly available upon a determination to comply. A closure that delivers neither records nor a substantive determination that no responsive records exist after a search does not constitute the timely completion the statute and the Court's order require. The natural reading of a requirement to report requests that were "timely completed" is that "completed" means a substantive determination resulting in the production or proper withholding of responsive records.

There is no need for the Court to rewrite the order. This brief simply requests that the Court enforce the meaning the Court has already given the word "completed." Cases that are closed, appealed, reversed, and reprocessed were never "completed" in the sense the Court's reporting requirement contemplates. The two-tier policy and the movement of approximately 5,000 cases into reprocessing confirm that a material share of the closures counted as completed were not final. (Turner Decl. ¶¶ 47–49, 52–58.)

### <u>D. Reporting Requirements as Supervisory Tools and the Integrity of the Mechanism</u>

Structural injunctions frequently incorporate reporting obligations so the court can monitor compliance without constant litigation. The reports are not an end in themselves; they are the mechanism by which the court retains visibility into whether the defendant is delivering the relief

ordered. *Parsons*, 949 F.3d at 454–56; *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007).

When those reports become unreliable or appear to measure something other than the relief ordered, the court retains full authority to examine the discrepancy. A district court "has the inherent authority to enforce compliance with a consent decree that it has entered in an order, to hold parties in contempt for violating the terms therein, and to modify a decree." *Nehmer*, 494 F.3d at 860. An agency "cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval." *Id.*

The 2020 order is specific and definite in two relevant respects: it requires adherence to the statutory deadlines in 5 U.S.C. § 552(a)(6), and it requires quarterly reports of the number and percentage of requests that were "timely completed." When an order is specific and definite, the defendant cannot redefine its terms unilaterally. *Nehmer*, 494 F.3d at 860. Counting non-production closures as "completed processing" is a redefinition of the reporting obligation. That redefinition, if left unexamined, converts the supervisory tool into a measure of something other than the relief the Court ordered.

The quarterly reports ordered in 2020 were the Court's chosen instrument of ongoing supervision. They were designed to show whether the defendants were meeting the statutory deadlines for A-File FOIA requests. If a large share of the closures reported as timely completions involve no production of records, and if a large volume of resulting appeals is omitted from the reports, then the supervisory tool is no longer performing its intended function. The Court is entitled to know that and to require a fuller explanation.

The two-tier appeals policy is part of that omission. An exceptional remedial track created to manage the consequences of non-production closures, the exclusion of APP and PPO cases from the compliance data, and the failure to report approximately 25,090 open appeals—including

roughly 18,600 pending beyond the maximum statutory extension—leave the Court without a complete picture of performance under the injunction. (Turner Decl. ¶¶ 16, 50–58.)

**E. Enforcement Versus Modification**

A critical distinction separates enforcement of an existing decree from modification of its terms. Enforcement asks whether the defendant has complied with the decree as written. It is governed by the civil-contempt standards set out above. Modification, by contrast, asks whether changed circumstances make the original terms inequitable. Under *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992), a party seeking modification of an institutional decree must show a significant change in facts or law and that the proposed modification is suitably tailored to the changed circumstance.

The present record does not ask the Court to modify the 2020 injunction. It asks the Court to examine whether the defendants are complying with the decree as written—specifically, whether the quarterly reports continue to measure the timely production of A-Files that the Court ordered. Unilateral changes in counting practices that treat non-production closures as "completed processing" are not a substitute for formal modification under *Rufo*. *Nehmer*, 494 F.3d at 860. The Court is being asked to supervise and enforce its existing order and the original meaning of "completed," not to impose a new obligation.

**F. Clear-and-Convincing Evidence in Practice**

The moving party must show a violation of a specific and definite order by clear and convincing evidence. *Bright*, 596 F.3d at 694; *Affordable Media*, 179 F.3d at 1239; *Coleman, 131 F.4th at 957–58.*

In *Parsons*, the Ninth Circuit upheld continued judicial oversight where the district court found that deficiencies in the defendants' compliance-reporting system rendered their reported performance measures unreliable. *Parsons*, 949 F.3d at 486–88. The Turner Declaration, drawing

on the agency's own FIRST system and reviewed in comparison to the Arnold declarations filed with this Court, supplies precisely that kind of record: the discrepancy between the defendants' reported metrics versus internal data showing that closures with no production of records outnumbered those that produced records among the counted totals.

Once that showing is made, the burden shifts. The defendant must then demonstrate either all reasonable steps or factual impossibility, neither of which are demonstrable based on the record before the Court.

## G. The Record Supports Issuance of an Order to Show Cause

An order to show cause is the ordinary procedural vehicle for initiating civil-contempt proceedings. It places the alleged contemnor on notice of the claimed violations and requires an explanation under the governing standard. *Parsons*, 949 F.3d at 452–55; *Stone*, 968 F.2d at 853, 856 n.9. In *Parsons*, the Ninth Circuit affirmed a district court's contempt holding after the defendants failed to take all reasonable steps to comply following an order to show cause when performance measures fell below the stipulated threshold. *Parsons*, 949 F.3d at 452–55.

The Turner Declaration and the defendants' quarterly filings supply a sufficient evidentiary basis for an order to show cause. The injunction requires timely determinations on A-File FOIA requests and reports of the number and percentage of requests that were timely completed. (ECF Nos. 89, 90.) The Director's successive declarations report near-perfect timely-completion rates and near-zero backlogs. Yet data drawn from the agency's FIRST system show that in two successive reporting periods a significant percentage of the closures counted toward those metrics involved no production of records to the requestor. (Turner Decl. ¶¶ 18–20.) The same Declaration documents a sharp rise in administrative appeals and a high internal reversal rate, none of which appears in the quarterly reports. (Turner Decl. ¶¶ 35–37.) Operational explanations for the backlog reduction are difficult to reconcile with staffing data showing net losses. (Turner Decl. ¶¶ 59–61.)

These facts raise a serious question whether the defendants have taken all reasonable steps within their power to comply with the specific and definite terms of the 2020 injunction, or whether the reported metrics are actual measures of compliance with the Court's order. An order to show cause would require the Director to explain the discrepancies and to demonstrate either full compliance or a non-self-induced inability to comply. On the present record, the Director has not demonstrated that the defendants have taken all reasonable steps within their power to ensure that the quarterly reports measure the timely production of A-Files, nor has he shown that any inability to do so is anything other than self-induced. At minimum, the materials currently before the Court establish good cause to issue an order to show cause and require the defendants to respond under the governing Ninth Circuit standards.

Further, an order to show cause should address the two-tier appeals policy: why a different standard was adopted for VOI-related appeals, why it was not disclosed in the quarterly reports, how many cases remain in the closure-appeal-reprocessing cycle, and whether the reported timely-completion rates include or exclude those cases. (Turner Decl. ¶¶ 47–58.)

**<u>H. The Legal Foundation of the 2020 Injunction Remains Intact</u>**

The 2020 order rested on established principles that FOIA's statutory obligations are enforced according to their terms. See *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434–35 (2019); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989).

Before this Court entered the 2020 injunction, *Mayock v. Nelson*, 938 F.2d 1006, 1007–08 (9th Cir. 1991), recognized a pattern-or-practice claim based on unreasonable FOIA delay, and *Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1103–08 (9th Cir. 2016), clarified the standing requirements for seeking prospective relief on such a claim. This Court applied that preexisting framework in its December 17, 2020, decision and found an unlawful pattern or practice. (ECF No. 89 at 20–27.) The specific terms of the 2020 order remain the appropriate

remedial response. The legal imperative that compelled entry of the injunction continues to support its enforcement.

## VI. CONCLUSION

Five years ago, this Court found that the defendants had engaged in an unlawful pattern or practice of failing to meet FOIA's statutory deadlines for A-File requests. It entered a permanent injunction and created a quarterly reporting mechanism so that it could monitor compliance. The legal foundation of that order remains sound.

The factual record under the order has changed. The defendants' own filings now show extreme volatility in the reported metrics. Internal data show that in each of the two most recent reporting periods, closures counted toward those metrics that produced no records outnumbered those that produced records. A sharp rise in administrative appeals has not been disclosed in the reports to the Court. Operational explanations are difficult to reconcile with the available staffing data.

Amici do not ask the Court to modify its order or impose new obligations. They ask the Court to examine whether the supervisory mechanism it created in 2020 continues to measure actual compliance with the statutory deadlines and with the relief the Court ordered—including whether the word "completed" in the Court's own reporting requirement continues to mean what the Court intended. Where the record raises a serious question on that point, the Court retains full equitable authority under the "all reasonable steps" standard, the narrow impossibility defense, the distinction between enforcement and modification, the holistic assessment of substantial compliance, the remedial purpose of civil contempt, and its inherent power to police the reliability of the reports and performance measures it ordered, to look further and to take whatever additional steps are necessary to ensure that the 2020 injunction continues to mean what it was intended to mean.

Respectfully submitted,

/s/ Diana L. Christian

Diana L. Christian
California State Bar No. 236726
T.M. Guyer & Friends, PC
116 Mistletoe Street
Medford, OR 97501
Telephone: (206) 535-2395 / (202) 227-3590
Email: DianaC@whistleblower.org

Counsel for Proposed Amici Curiae
Timothy Turner and Government Accountability Project