**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**ZACHARY NIGHTINGALE**, et al.,

Plaintiffs,

v. Case No. 3:19-cv-03512-WHO

**U.S. CITIZENSHIP AND IMMIGRATION SERVICES**, et al.,

Defendants.

# DECLARATION OF TIMOTHY TURNER

**TABLE OF CONTENTS**


I. THE TERMINOLOGY IN DIRECTOR ARNOLD'S DECLARATION IMPRECISELY REFERS TO CASES AS HAVING BEEN PROCESSED WHEN INSTEAD MANY ARE CLOSED WITHOUT PROCESSING

II. DIRECTOR ARNOLD'S DECLARATION EXCLUDED CERTAIN "OFFICES" FROM NIGHTINGALE REPORTING NUMBERS

III. MOST PEOPLE WHO SUBMITTED FOIA REQUESTS DID NOT ACTUALLY RECEIVE DOCUMENTS IN RESPONSE TO THEIR REQUEST.

IV. USCIS'S REPORTED COMPLIANCE METRICS CREATE THE APPEARANCE OF COMPLIANCE BY COUNTING CLOSURES WITHOUT PRODUCTION AS TIMELY PROCESSING

V. THE RESULT OF AN INCREASE IN CLOSURES IS AN INCREASE IN APPEALS, WHICH WERE NOT REPORTED TO THE COURT IN DIRECTOR ARNOLD'S DECLARATION.

VI. 5,000 APPEALS WERE MOVED THEN NEARLY HALF WERE ROUTED BACK FOR PROCESSING, AND DIRECTOR ARNOLD DID NOT REPORT THESE NUMBERS IN HIS DECLARATION

VII. USCIS IS NOT COMPLYING WITH STATUTORY TIMELINES FOR PROCESSING APPEALS

VIII. TWO TIER SYSTEM FOR APPEALS DEPENDING ON WHETHER CASE CLOSURE WAS RELATED TO SEPTEMBER 2025 VERIFICATION OF IDENTITY GUIDANCE OR NOT

IX. THE OPERATIONAL CHANGES CITED BY DIRECTOR ARNOLD DO NOT EXPLAIN THE REPORTED ELIMINATION OF THE A-FILE BACKLOG

X. THOUGH DIRECTOR ARNOLD HAS JUSTIFIED THE SEPTEMBER 2025 VERIFICATION OF IDENTITY GUIDANCE AS A QUALITY CONTROL MEASURE, USCIS EMPLOYS MINIMAL QUALITY ASSURANCE REVIEW

XI. USCIS' ONLINE FOIA REQUEST PORTAL CONTINUES TO INACCURATELY REPRESENT ADDRESS REQUIREMENTS, RESULTING IN THOUSANDS OF CASE CLOSURES.

XII. DIRECTOR ARNOLD HAS EXPRESSED THE VIEW THAT RE-FILING A REQUEST IS COSTLESS AND NRC LEADERSHIP SUGGEST RE-FILING IS FASTER THAN APPEAL

XIII. USCIS IS REVISING POLICIES RELATED TO ISSUES I HAVE RAISED IN MY DECEMBER 19, 2025, DISCLOSURE AND INTERNALLY SINCE THEN, BUT PROBLEMS PERSIST

XIV. I WOULD LIKE THE COURT TO ENTER ALL OF THE EVIDENCE ASSOCIATED WITH MY DISCLOSURES TO THE PUBLIC COURT RECORD

I, Timothy Turner, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this declaration based upon my personal knowledge and experience at the National Records Center (NRC) of U.S. Citizenship and Immigration Services (USCIS) through June 27, 2026, the date I separated from federal service.

2. To prepare my declaration, I reviewed data from the FOIA Immigration Records System (FIRST) which is a public-facing portal that allows members of the public to submit FOIA and Privacy Act requests online, allows USCIS to electronically deliver responsive records, and serves as an internal case management system for USCIS.

3. The data referenced in my declaration is drawn from FIRST through two distinct interfaces. First, the FIRST system itself includes a Reporting tab that generates standard operational reports. Second, the same underlying FIRST data is accessible in Databricks, which is the agency's internal analytics environment.

4. I understand that on December 17, 2020, Judge Orrick granted declaratory and injunctive relief in *Nightingale v. USCIS*. In that order, Judge Orrick recognized that delayed A-File FOIA processing has "real life consequences," including depriving noncitizens of information needed to defend against removal, obtain immigration benefits, and gain citizenship. Judge Orrick further stated that such delays undermine the fairness of immigration proceedings, particularly for unrepresented noncitizens.[i]

5. Judge Orrick ordered three forms of injunctive relief relevant to this declaration. First, defendants were permanently enjoined from further failing to adhere to FOIA statutory deadlines for adjudicating A-File FOIA requests, as set forth in 5 U.S.C. §§ 552(a)(6)(A) and (B). Second, defendants were required to make determinations on all A-File FOIA requests in USCIS's and ICE's backlogs within sixty days. Third, defendants were required to provide quarterly compliance reports to the Court and class counsel.[ii]

6. I understand the quarterly reporting requirement to be material because the Court and class counsel rely on USCIS's reported numbers to evaluate compliance with the injunction. The current reporting metrics have resulted in a number of representations to the Court that my data queries indicate are inaccurate, which I explain further below.

7. I do not believe that USCIS would have to create an entirely new data system to provide the court with the data I reference in my declaration because USCIS's FIRST and Databricks reporting tools already appear to track many of the fields I reference, including

office, closure code, and whether responsive records were searched, staffed, processed, and provided to the requester or closed without production.[iii]

## I. The Terminology in Director Arnold's Declaration Imprecisely Refers to Cases As Having Been Processed When Instead Many Are Closed Without Processing

8. As a threshold matter, it is important to distinguish between cases that are processed and cases that are closed without processing. Director Arnold's declaration appears to conflate the two.

9. Specifically, Director Arnold refers to cases where USCIS "completed processing." Processing implies that FOIA staff have reviewed a request along with responsive records and have determined whether or not responsive records exist. [iv] As I describe in my December 19, 2025 whistleblower disclosure to Congress,[v] following policy changes in September 2025, a significant percentage of FOIA requests are closed without a FOIA case creator or processor determining whether responsive records exist; therefore, I do not consider USCIS to have "completed processing" of these cases. Based on my understanding of USCIS's FOIA process and my observations of FOIA determinations, I refer to most cases as being "closed" rather than "processed."

10. As I described in my December 19, 2025 whistleblower disclosure to Congress, the September 2025 Verification of Identity guidance resulted in closures of cases citing "failure to comply" or "no record" for discrepancies in optional information such as parents' names, or minor errors such as transposed dates of birth.[vi] These closures often happened despite matches between other significant information in the request and USCIS's data, such as A-Number matches and requestors providing documents originally generated by the government that clearly matched information in their A-File.

11. As of April 13, 2026, USCIS implemented another closure code for cases closed per the September 2025 Verification of Identity Guidance. This code, "UV," stands for "unable to verify" and is used for closures where there is a discrepancy in the requestor's name, A-Number, date of birth, country of birth, and optionally provided parents' names. From the time of the September 2025 Verification of Identity guidance through the July 2026 policy revision, the failure to comply code was used for closures where a requestor provided their attorney's address. [vii]

12. The Court ordered defendants to make FOIA "determinations" within the statutory timeframes and to report the number and percentage of A-File requests that were filed, timely completed, or pending beyond the statutory deadlines.[viii] Based on my experience with the FIRST system and USCIS FOIA operations, closing a case does not necessarily mean USCIS made a substantive FOIA determination on responsive records. For that

reason, I believe it is important to distinguish between records-producing determinations and administrative closures without production.

## II. Director Arnold's Declaration Excluded Certain "Offices" from Nightingale Reporting Numbers

13. Within FIRST, an "office" is a processing queue, or routing bucket identified by a three letter/digit code. Cases are assigned to offices based on operational considerations. An A-file request in FIRST is assigned to one office at intake and may be reassigned to one of more additional offices during its lifecycle.

14. The offices and their uses of which I am aware are:

    a. OPQ, COW and SPL: generally, for Agency Record requests.

    b. VCO: for cases the agency has identified as requiring special handling and sensitivity.

    c. BL3: the queue where cases are placed for contractors to work to reduce the backlog.

    d. EB5: for requests specific to the Immigrant Investor Program.

    e. SAF: for cases processed with the auto-redaction tool (ART), first launched at the end of FY25, and described by Director Arnold in April 2026 as "not meeting needs or expectations".

    f. NRC: for cases where records are located at the National Records Center, which is the primary A-File office; requests in this office are for entire A-Files.

    g. MRC: purportedly for "special FOIA projects".

    h. SDO: for requests for up to two specific files where files are not at the NRC or available digitally.

    i. SMP: for requests of one specific document located at the NRC or digitally, versus for requests for entire A-Files that are housed in the NRC office.

    j. ALF: Refugee & Asylum requests.

    k. APP: Appeals: cases under appeal.

    l. BL2 and BLR: Currently inactive backlog reduction offices.

m. CNT: Agency record contract requests.

n. HQS: inactive office formerly used for processing agency records requests.

o. LIT: FOIA requests in litigation.

p. PFL: requests for Petition files (P-files).

q. PPO: Post-appeal remands: cases found wrongly closed.

r. PRD: proactive disclosures.

s. REM: remands.

t. RTN: routine use for sharing information with a specific outside party for a government related reason.

u. SPL: agency record requests from 2025-2026.

v. UFA: Up-front Approver used for closed cases though I am unaware whether it is still in use given the expanded use of automation.

w. UNP: appeal requests.

x. VAP: high visibility appeal cases.

15. Based on a search of FIRST and Databricks, the following offices contained A-file related FOIA requests but were excluded from the Nightingale A-File report that appears to have formed the basis for Director Arnold's reporting numbers:

    a. Office: APP

        i. ID: 111

            1. Appeals: cases under appeal.

    b. Office: PPO

        i. ID: 117

            1. Post-appeal remands: cases found wrongly closed.

    c. Office: COW

        i. ID: 83

1. Intake/correspondence.

d. Office: SPL

i. ID:1126

1. Agency records (DHS directive).

e. Office: VCO

i. ID: 1124

1. For cases the agency has identified as requiring special handling and sensitivity.

16. APP and PPO exclusions are significant because these offices hold A-file cases that are either under appeal or awaiting correction and production after a successful appeal. Their exclusion means the compliance data presented to the court does not account for cases cycling through closure, appeal, reversal, and reprocessing.[ix]

## III. Most People Who Submitted FOIA Requests Did Not Actually Receive Documents In Response To Their Request.

17. The distinction between "closing" and "processing" cases is significant. The Nightingale order addressed delayed access to A-Files because timely access to those records is necessary for requesters to use them in immigration proceedings and benefits applications. However, for most cases Director Arnold refers to as "processed," in his eighth declaration, the cases were actually closed and the requestors did not receive any responsive documentation.

18. Director Arnold stated that "From December 15, 2025, through the end of the day on March 14, 2026, USCIS received approximately 124,812 new FOIA requests for A-Files and ***completed processing*** approximately 121,349 A-File requests" (emphasis added).[1]

19. However, data from the FIRST system for the same period shows that of approximately 122,058 FOIA cases that were closed, only 45,447 or 37.2% of requestors actually received documents in response to their request; 69,522 of the remaining closures, or 56.9%, were based on the September 2025 VOI guidance without providing any responsive documents to the requestor.

20. In his Ninth Declaration, dated June 15, 2026, covering March 15, 2026 through June 14, 2026, Director Arnold states that USCIS "received approximately 127,780 new FOIA

[1] Eighth Arnold Decl. ¶ 5, No. 3:19-cv-03512-WHO, Dkt. No. 208-1, March 16, 2026.

requests for A-Files and completed processing approximately 123,607 A-File requests."[x] For that same period, FIRST data shows approximately 123,813 A-File closures, of which approximately 55,819 or 45.1% produced records to the requestor and approximately 58,172 or 47.0% were closed citing failure to comply, no record, or unable to verify without producing responsive documents.[xi]

21. Detained persons have been particularly impacted by the September 2025 Verification of Identity policy changes. From January 15, 2025 to September 15, 2025, 66.7% of closed cases resulted in detained persons receiving their files; however, from September 16, 2025 to May 15, 2026, only 35.2% of closed cases resulted in detained persons receiving their files.[xii]

22. During that same January 15, 2025 to September 15, 2025 period, 27.1% of closed cases were closed for failure to comply or no record. After implementation of the September 2025 Verification of Identity guidance, from September 15, 2025 to May 15, 2026, when I pulled this data, nearly half of cases closed for detained people (46.5%) were closed for failure to comply or no record.

23. People with pending immigration court cases, whose requests are in Track 3, have also been significantly impacted by closures citing the September 2025 Verification of Identity guidance. To illustrate, in the two declaration periods immediately preceding the September 2025 Verification of Identity policy, the closure rate for Track 3 cases citing failure to comply and no records was 8.2% during the third declaration period from March 15-June 14, 2025, and 8.5% during the fourth declaration period from June 15-September 14, 2025. In the period covered by Director Arnold's eighth declaration from December 15, 2025-March 14, 2026, the combined closure rate increased to 38.2%.

24. In the most recent partial period ending when I pulled this data, from March 15-June 14, 2026, the closure rate was 19.3%, still more than twice the pre-September 2025 Verification of Identity policy baseline. Because closures citing failure to comply and no record do not produce records to the requester, this rate change means an increasing share of Track 3 cases are being counted as "completed" without records being delivered.[xiii]

25. In his Eighth and Ninth declarations, Director Arnold stated that backlog for track 3 requestors who show they have a scheduled immigration proceeding continues to remain at zero. While it is accurate that there is a zero backlog for those in track 3, the mechanism for achieving this metric has relied heavily on the failure to comply and no record closures following the September 2025 Verification of Identity guidance, as explained in the paragraph above.[xiv] [xv]

26. As Figures 4 and 5 illustrate, the number of track 3 cases that resulted in document production in the seven months prior to the September 2025 Verification of Identity policy

and the period following this policy through April 16, 2026, the number of cases that resulted in records production remained relatively unchanged while the percentage of cases closed citing no record and failure to comply jumped from 8.2% to a peak of 38.2%. Therefore, the Track 3 zero backlog is not an indicator that Track 3 requesters received their A-Files.

## IV. USCIS's Reported Compliance Metrics Create the Appearance of Compliance by Counting Closures Without Production as Timely Processing

27. In his eighth declaration, Director Arnold reports average processing times of 7.82, 7.25, and 4.2 business days for Track 1, Track 2, and Track 3 cases respectively. However, data from the FIRST database reveals that processing times for cases that produce records are significantly higher, and the averages Director Arnold reported appear to be due to the faster timelines for closing, not processing, cases.

28. Director Arnold's Ninth Declaration reports average processing times of approximately 7.12, 10.37, and 5.02 business days for Track 1, Track 2, and Track 3 respectively. The reported Track 2 average rose from 7.25 business days in the Eighth Declaration to 10.37 business days in the Ninth.

29. Failure to comply and no record closures, both closure types where no records are produced, are processed at substantially lower average times than closures that deliver records. For example, during the period of September 16, 2025 to June 24, 2026, track 2 failure to comply closures average 6.0 days and track 2 no record closures average 6.8 days, while the average processing time for PD, the most common closure code for cases in which people actually received records, is 21.7 days. While track 3 average processing times for PD closures that produce records is 5.4 days, track 1 average processing times for PD is 15.6 days, nearly 8 days over the reported average.[xvi] [xvii] [xviii]

30. The speed differential is not incidental. Failure to comply and no records closures are faster because they require neither a records search nor exemption analysis of responsive records before closure, the substantive work the injunction was designed to compel. In my view, speed alone does not show compliance if the closure did not involve a substantive search for responsive records or exemption review.

31. Further, in his eighth declaration Director Arnold states, "USCIS completed processing approximately 108,303 of those new A-File FOIA requests, 107,559 of which were timely completed," reflecting a "timely completion rate of approximately 99.35%"[2] for the reporting period. However, as noted, cases closed citing failure to comply and no records do not involve producing responsive records. Including these closures in the "timely

[2] Eighth Arnold Decl. ¶ 8, No. 3:19-cv-03512-WHO, Dkt. No. 208-1, March 16, 2026.

completion" metric artificially produces a fast processing time and masks the fact that most requestors receive a timely closure, while those who do receive records receive them past the statutory time frames.

32. Without a requirement to specify which cases are timely completed due to closure versus timely completed due to production, the quarterly compliance report does not allow the Court or class counsel to determine whether USCIS is timely providing A-Files or merely timely closing a growing share of requests without production.[xix]

## V. The Result of An Increase in Closures is An Increase in Appeals, Which Were Not Reported to the Court in Director Arnold's Declaration.

33. Following the September 2025 Verification of Identity guidance that resulted in an increase in case closures citing no record or failure to comply, the number of appeals began to increase. Figures 11 and 12 illustrate this inverse relationship.[xx] [xxi]

34. Figure 11 illustrates that while the number of appeals received has increased, the number of appeals closed has not proportionately increased. [xxii]

35. From the time the FIRST system was created in 2019 through January 14, 2026, the total number of appeal cases *created* at any given time recorded was rarely more than 30 cases and often fewer than 10 cases.[xxiii] Throughout the month of January 2026, there were thousands of appeal cases created.[xxiv]

36. Further, from 2019 to 2024, the total number of appeals *closed* each year was typically around 2,000 and never more than 6,500 at most.[xxv] However, in 2025 the total number of appeals cases closed jumped to 14,170 with a monthly count that nearly doubled from between ~750-1100 per month from January to September to 1,939 in October, 1,914 in November, and 2,553 in December, more than double the pace from earlier in the year.[xxvi] Over 2,000 appeals cases have been closed in each of January, February, and March as of the March 29, 2026 report date.[xxvii]

37. The increase in the number of appeals cases is directly tied to the number of cases closed citing failure to comply and no record per the verification of identity guidance originally issued September 2025, and the lack of quality assurance review for such closures. For instance, a FOIA Supervisor reported at an April 7, 2026 Expanded Leadership Meeting, with Director Arnold present, that 40-45% of appeals cases reviewed by the Office of Chief Counsel that were closed based on verification of identity information as failure to comply or no records were being reversed and sent back for reprocessing. The same FOIA supervisor reiterated this point at an April 28, 2026 All-Hands meeting.[xxviii]

## VI. 5,000 Appeals Were Moved Then Nearly Half Were Routed Back for Processing, and Director Arnold Did Not Report These Numbers in his Declaration

38. Once an appeal case is created in the APP office, a first work step is for attorneys from the USCIS Office of Chief Counsel (OCC) to review the appeal. The queue of cases waiting for this review is referred to as the "general counsel queue."

39. On March 3, 2026, I attended an Expanded Leadership Forum Call attended by the NRC Front Office, Associate Center Directors, and Section Chiefs. Representatives from the USCIS Office of Chief Counsel were not included in this meeting. At this meeting, leadership decided to move closures related to the September 2025 Verification of Identity policy out of the general counsel queue for processing.

40. Specifically, an Operations Support Branch (OSB) Section Chief stated that there were "three to five thousand" cases "sitting in the GC queue right now" that "we identified… were appealed, that were up front closed due to the VOI." The NRC Deputy Director then stated that if these cases had the "information" necessary to process, they should be processed "now."

41. When the NRC Chief of Staff noted that there would be a "hit to our compliance" because the cases would be moved from the appeals office back into a processing queue that presumably would be included in reporting numbers for the next compliance report, the FOIA Section Chief clarified that moving these cases would not impact compliance because "[i]t's all tracked outside. It's in its own separate office. It's not associated with anything like mail. There's no timeline." I understood this comment from the FOIA Section Chief to mean that there is no tracking number on the individual cases like mail tracking numbers from the U.S. Postal Service.

42. I left this meeting with the understanding that these leaders had knowledge that several thousand cases in a processing queue would not be included in the next *Nightingale* compliance report.

43. At times attorneys from OCC contact me with questions about FIRST and requests to run reports for them from FIRST. A few weeks after this meeting on March 25, 2026, OCC contacted me and said they had 9,800 appeals to review, but overnight 5,000 disappeared from their queue. The OCC contact asked me if I knew what happened to the cases. I suspected, but was not certain, that these cases might have been those referenced at the March 3rd meeting.

44. I then asked my supervisor and a FOIA Section Chief what happened to these cases so that I could relay the information to OCC. The FOIA Section Chief told me that those 5,000 cases were moved to be reevaluated for correct case creation and confirmed that they were

the appeals cases identified as having been closed per the September 2025 Verification of Identity guidance and discussed at the March 3rd call.

45. Though the FOIA Section Chief shared this information, my supervisor, unaware of the FOIA Section Chief's response, directed me to not provide a response to OCC because the front office would, described the movement of those cases as a system routing nuance, and stated "training that was given had some bad info" because appeal case creators had continued routing certain cases to GC rather than the PPO processing office.[xxix]

46. I found my supervisor's explanation difficult to reconcile with the facts and documents available to me. While my supervisor blamed the movement of 5,000 cases on "bad" training information, the revised Appeals Case Create Guide[xxx] and training materials were circulated to the FOIA Program Manager and Acting FOIA Officer on February 3, 2026,[xxxi] before the training occurred, so leadership had knowledge of and approved the training materials.

47. Additionally, at a February 9, 2026 meeting FOIA leadership discussed the precise issue: whether corrected Verification of Identity information submitted on appeal should be treated as a proper appeal or as a new FOIA request. The later movement of approximately 5,000 cases from GC to PPO therefore appears to reflect a correction or change in the agency's handling of VOI-related appeals, not merely a case-creator training mistake. This distinction matters because the March 3 leadership discussion acknowledged that moving cases into PPO affected whether they were included in appeals-reporting numbers.

48. Approximately two weeks later, at an Extended Leadership Meeting on April 7, 2026 with Director Arnold in attendance, a FOIA Supervisor briefed leadership and shared that 40-45% of those approximately 5,000 cases would be moved to PPO for processing. Some of these cases actually had sufficient information to be processed in the first instance, and some had new information provided in their appeal that now made them ripe for processing.

49. Either way, the 5,000 cases, whether they remained in the appeals office or were moved to the PPO office for processing, were not reported to the court. Given the amount of time these cases were routed through closure, appeal, then re-processing, it is likely that they were past the statutory processing times.

## VII. USCIS Is Not Complying With Statutory Timelines For Processing Appeals

50. I understand the *Nightingale* injunction to require compliance with FOIA's statutory timing requirements in 5 U.S.C. §§ 552(a)(6)(A) and (B). Section 552(a)(6)(A)(ii) requires an agency to make a determination on an administrative appeal within twenty working days after receipt of the appeal, and § 552(a)(6)(B) governs limited extensions of the time

limits in both clauses.[xxxii] As noted previously, data on FOIA appeals has not been reported to the court.

51. My review of FIRST and Databricks shows that USCIS has not been complying with statutory FOIA processing timelines for appeals. As of June 24, 2026, there were approximately 25,090 open appeals. Of these, only approximately 5,717 were within the twenty-working-day statutory deadline and approximately 772 were within the maximum extension period, while approximately 6,645 had been open 31 to 90 working days and approximately 11,956 had been open more than 90 working days since receipt. In other words, only about 5,717 of the roughly 25,090 open appeals remained within the basic statutory deadline, and approximately 18,600 had been pending beyond even the maximum extension period. A report dated June 11, 2026 separately showed approximately 13,952 appeal cases sitting unassigned pending case creation.[xxxiii]

## VIII. Two Tier System for Appeals Depending on Whether Case Closure Was Related to September 2025 Verification of Identity Guidance or Not

52. Around February 2026, USCIS adopted a different appeals standard for closures related to the September 2025 Verification of Identity policy than for all other appeal types, apparently to address the growing backlog of closure appeals related to the policy change.

53. Generally, when requestors whose cases were closed submit new information on appeal, the prevailing attitude within USCIS is that this is an "abuse" of the appeals process. The view follows that if a requestor is submitting new information, they should just submit a new FOIA request.

54. On February 3, 2026, the FOIA Program Manager and Acting FOIA Officer were provided the Appeals Case Create Guide and a PowerPoint presentation of the Appeals Case Create training.[xxxiv] That training, given the next day, noted that "if the original case was closed correctly, do not remand."[xxxv] Indeed, in a February 9, 2026 meeting attended by the FOIA Officer and FOIA Program Manager, supervisors confirmed that existing policy treated new information submitted on appeal as a "new request," requiring the requester to submit a new FOIA request rather than having the appeal accepted with new information. A supervisor explained the rationale for this policy: USCIS would not accept additional information on the appeal because the agency adjudicated the request "correctly the first time" based on information provided in the initial request.

55. However, in the February 9 meeting, the FOIA Program Manager stated that for appeals of cases closed based on the September 2025 Verification of Identity policy, the NRC would begin accepting corrected identity information and would route cases to the PPO office for reprocessing, which the FOIA Officer concurred with.

56. This change was a departure from past guidance, as evidenced by comments of a FOIA supervisor in this same meeting, who said "we'll have to obviously change what constitutes a valid appeal now" that "our criteria has obviously just been flipped on its head," from the criteria previously approved by OCC. The FOIA Officer confirmed the change was driven by the need to "draw down or burn down the appeals backlog as quickly as we can," validating concerns that the September 2025 Verification of Identity policy generated appeals at a rate and reversal level that required an exceptional remedial process.

57. By March 2026, this selective approach was formalized: in an executive meeting with Director Arnold in attendance, Deputy Director Smith stated the goal was to "look at all of these VOI [appeals], and if we have the information now let's process them, rather than having that idea of, oh, no, it's an abuse," again referring to the prevailing view of the agency that submitting an appeal with new information is an "abuse" of the appeals process.

58. The policy change to accept new information with appeals related to the September 2025 Verification of Identity guidance was not publicly announced, nor does it appear that these exceptions were extended to other appeal requests. FOIA at 5 U.S.C. § 552(a)(6), and its implementing regulations at 6 CFR § 5.8(a), along with DHS appeal procedures, do not distinguish between appeal types based on the underlying closure reason.

## IX. The Operational Changes Cited by Director Arnold Do Not Explain the Reported Elimination of the A-File Backlog

59. Director Arnold has attributed USCIS's reported backlog reduction, first reported at zero in his December 15, 2025, fifth declaration, and high timely-completion rate to workforce reorganization, temporary promotions, detail assignments, contract support, DHS/ICE assistance, overtime, hiring solicitations, targeted training, and technology.[xxxvi]

60. Between July and December 2025, the backlog was reduced by approximately 20,000 cases according to the FOIA Associate Center Director who stated at a February 3, 2026 NRC All Hands meeting that the backlog had "continued to grow to a high water mark at the end of July of around 20,000 cases,"[xxxvii] but had then been brought down "to two cases in backlog with over 99% compliance" by the December 15 declaration. Data that I have reviewed does not appear to support the conclusion that operational changes referenced by Director Arnold significantly contributed to the backlog reduction.

61. First, hiring data shows that USCIS has not gained FOIA staff but, in fact, has lost staff over the last calendar year and thereafter.[xxxviii] For example, as of April 30, 2026, hiring data on the FY26 Management Branch (MBR, now called the Operations Support Branch) Staffing/Hiring Story dashboard reflects only eleven total new employees onboarded to

the National Records Center, all in the Immigration Services Analyst series and none as FOIA Assistants or Government Information Specialists. In fact, the NRC was not approved to hire FOIA positions until June 11, 2026,[xxxix] with job announcements being posted on July 9 and 20, 2026.[xlxli]

62. Additionally the USCIS Hiring Pipeline dashboard shows that between March 15, 2025 and May 13, 2026, 0306 series positions, those with FOIA processing responsibilities, have declined by 71 positions and only one internal hire has been completed.[xlii]

63. The USCIS Hiring Pipeline also shows that onboard headcount declined 29.3% from 270 to 191 for the FOIA Operations Branch and FOIA Policy Branches combined, with one completed recruitment action.[xliii]

64. In my view, this hiring composition does not support an explanation that the backlog was eliminated through expanded records-producing FOIA processing capacity.

65. Second, staff processing hours do not reflect a sustained capacity increase significant enough to explain the reported near-total elimination of the A-File backlog. For this comparison, I used September 2024 through August 2025 as the baseline because those were the twelve full months preceding the September 2025 Verification of Identity guidance. Across the nine A-File offices, total staff processing hours averaged approximately 27,700 hours per month during that baseline period. During September through December 2025, when the backlog was substantially reduced, staff hours averaged approximately 28,800 hours per month, only modestly above baseline. By November and December 2025, staff hours fell below baseline, and in January 2026 staff hours dropped to approximately 16,400 hours, about 41% below baseline. This data does not indicate that a sustained increase in staff time contributed to the reported elimination of the FOIA backlog.

66. Director Arnold's Ninth Declaration cites approximately 10,821 hours of overtime worked between February 22 and May 16, 2026. The May 8, 2026 internal materials cited below documented a 23.5% loss of FOIA processors against a 6% decrease in receipts, and an 11% productivity increase needed merely to sustain prior response times.[xliv]

67. Third, DHS/ICE assistance processed, meaning reviewed responsive records, redacted material, and applied exemptions to, approximately 990 cases between July and October 2025. DHS/ICE assistance ended in October 2025, before the backlog reduction from 4,831 to 2, reported in Arnold's December 15, 2025 Fifth Declaration, occurred. The majority of DHS/ICE assistance involved approving, meaning a back end case review, not processing. Figure 17 illustrates cases DHS processed in red, all others processed in blue, and cases DHS approved in yellow with all others approved in green. [xlv]

68. Fourth, a change in technology use does not appear to have significantly contributed to the backlog reduction. Internal planning materials related to auto-reduction technology circulated via email on May 8, 2026, by a Section Chief in the Operations Support Branch to Director Arnold, with the FOIA Officer copied, documented that the FOIA program had experienced a 23.5% loss in FOIA processors against a 6% decrease in receipts, requiring an 11% productivity increase to sustain prior response times.[xlvi] The same materials stated that while the beta auto-redaction tool (ART) had previously increased productivity by 10% in testing, as its use expanded to new teams, at the time of the email it demonstrated only a combined 5% work-performance increase, requiring further investigation of the root cause of the decrease in performance.[xlvii] This data is consistent with Director Arnold's April 13, 2026 description of the ART in a meeting as "not meeting needs or expectations."

69. This capacity gap was reflected in contemporaneous internal communications. In a June 16, 2026 Microsoft Teams exchange, the Associate Center Director of the Operations Support Branch informed me that FOIA's "daily output is shrinking" while "their numbers of cases needing worked are growing," and that USCIS was "trying to focus on A-File processing for the next two weeks" and "may be pulling everyone out of other [work] streams" to do so, and noted they were "losing too many resources now ourselves."[xlviii] In sum, the operational data I reviewed does not show sufficient capacity gains to attribute the reported near-total backlog elimination by December 15, 2025 primarily to increased records-producing A-File processing. The most significant change to staff hours was a reduction in time, DHS/ICE assistance was limited and ended before the final backlog reduction, hiring did not add FOIA-coded processing capacity at a level that would explain the backlog reduction, and technology gains did not close the productivity gap the agency itself identified.

70. The magnitude of the backlog reduction, without corresponding evidence of increased records-producing capacity, appears more consistent with a sharp shift in the composition of reported completions following the September 2025 Verification of Identity guidance, including a much larger share of fast closures citing failure to comply and no records, along with other patterns I identify in this declaration including moving cases between offices and selective reporting criteria.

## X. Though Director Arnold Has Justified the September 2025 Verification of Identity Guidance as a Quality Control Measure, USCIS Employs Minimal Quality Assurance Review

71. In his sixth declaration,[xlix] at an All-Hands meeting, and in a March 2, 2026 conversation with me,[l] Director Arnold has stated that closures citing failure to comply and no records

per the September 2025 Verification of Identity guidance are necessary to safeguard personal information and prevent suspected information spills.

72. Yet, the NRC Chief of Staff stated in an April 28, 2026 all hands meeting that the number of Significant Incident Reports (SIRs), an error measure that would include instances of records being erroneously shared, is fewer than 15 for the fiscal year. This trend matches the total number of SIRs from fiscal year 2025, which was 26 total SIRs.[li] Therefore, it does not appear that the September 2025 Verification of Identity guidance has reduced the number of SIRs.

73. Additionally, if safeguarding personal information and assuring proper decisions was a priority for the agency, USCIS would improve quality assurance review. However, several years ago, USCIS largely abandoned widespread quality assurance review for their federal employees, and quality assurance review rates have not increased in tandem with the September 2025 Verification of Identity guidance. Contrasted against the quality assurance review rates in the contracting office (BL3), the numbers are stark.

74. For example, during the reporting period of Director Arnold's eighth declaration, December 15, 2025 through March 14, 2026, of the failure to comply and no records closures completed by federal employees, only 0.18% of failure to comply closures (54 of 29,856) and 0.44% of no records closures (157 of 35,464) received case approver review before being finalized. By contrast, closures of cases that produced records received case approver review at rates of 14.14% (5,024 of 35,538) and 16.97% (185 of 1,090), respectively.

75. By contrast, in the contractor office (BL3), 100% of closures during this period received case approver review (13,271 of 13,271). For the same Track 2 workload that constitutes the bulk of federal closures, contractor case approver review rates were 100% for failure to comply (1,639 of 1,639), no records (2,574 of 2,574), and production closures (8,921 of 8,921). Federal Track 2 case approver review rates for the same closure categories were 0.18%, 0.47%, and 14.11%, respectively.[lii]

76. For Track 3 cases, those where requestors are in removal proceedings, the disparity is more acute: of closures completed by federal employees, 1 of 981 failure to comply closures (0.10%) and 1 of 1,269 no records closures (0.08%) received case approver review during the same period. With no meaningful review, errors in closures citing failure to comply and no records cannot be detected before a case is finalized and counted as completed.[liii]

## XI. USCIS' Online FOIA Request Portal Continues to Inaccurately Represent Address Requirements, Resulting in Thousands of Case Closures.

77. In my December 19, 2025 disclosure, I noted a policy that requires the closure of FOIA requests that do not include the subject of record's residential address. To the best of my knowledge, as of June 27, 2026, the internal VOI Quick Guide (updated February 17, 2026) requires the subject of record's "Current Physical Address" and lists email addresses as "not acceptable." Yet, the online portal to submit a FOIA request at first.uscis.gov, as of July 30, 2026, still states that a requestor can provide their "current address or email address."liv

78. The discrepancy between USCIS' online portal instructions and our policy appears to be resulting in a disproportionately high volume of case closures. Specifically, the largest single category closures citing "failure to comply" per the September 2025 Verification of Identity policy is for cases "Missing Subject of Record Address," with 59,800 cases closed for this reason between September 16, 2025 and June 24, 2026.[lv]

79. I raised this discrepancy directly with Director Arnold in both a March 2, 2026 Microsoft Teams call[lvi] and a March 2, 2026 email,[lvii] noting that "it is difficult to reconcile statements of good faith when we are still informing the public of one set of standards while internally applying another, then closing cases [citing failure to comply or no records] for failing to meet requirements the public was never told existed." In the Microsoft Teams call, Director Arnold responded that he had personally noticed the divergence "last week," confirmed that "we don't take email addresses," and characterized the situation as one where "all that stuff is catching up." I understood Director Arnold's comments to indicate that he was aware of the problem and would address it.

80. As of July 30, 2026, more than ten months after the VOI policy took effect, twenty-one weeks after Arnold was informed of the mismatch, and twenty-two weeks after he noticed this issue, the public-facing instructions have not been updated.

81. On April 17, 2026, I provided senior FOIA leadership a "Requester Guide" I proposed be provided to the public that explains the September 2025 Verification of Identity policy (and its updates) to reduce avoidable closures. I received no response to my email, though the FOIA Program Manager later explained that there were several layers of review necessary to obtain approval to disseminate information to the public.[lviii]

## XII. Director Arnold Has Expressed the View That Re-Filing A Request Is Costless and NRC Leadership Suggest Re-Filing is Faster than Appeal

82. In our March 2, 2026 conversation, Director Arnold stated that "it doesn't cost you anything to refile." I disagreed with the premise that refiling is costless, particularly for requesters in removal proceedings or detention, because refiling restarts the process and may delay access to A-Files needed for immigration proceedings.

83. On April 13, 2026, Director Arnold characterized a new Final Action Letter as "no harm, no foul, resubmit."[lix] The NRC Deputy Director then observed that resubmitting goes much faster than the appeal route. Despite this acknowledgement, Final Action Letters encourage appeal but do not inform requestors that re-filing may result in obtaining records faster than through an appeal.

84. After the meeting, I informed my supervisor in a Microsoft Teams message that requesters are not aware that submitting a new request is faster than filing an appeal and suggested clarifying this distinction in the final action letter. He responded that he would inquire. As of the date of my exit from federal service, I have not heard back.

## XIII. USCIS Is Revising Policies Related to Issues I Have Raised In My December 19, 2025 Disclosure and Internally Since Then, But Problems Persist

85. On May 26, 2026, I was informed that USCIS was preparing additional policy changes or reversions to past policies affecting several issues discussed in this declaration and in my December 19, 2025 disclosure, including I-94 searches, law-enforcement records, requester-submitted documents, untranslated documents, and the use of voluntarily provided verification of identity information.

86. These are the same categories of policies I previously raised to my supervisor, FOIA leadership, OCC, and Director Arnold, though as recently as February 2026, Director Arnold told NRC staff that he was "very confident in our policies and procedures," while referencing my whistleblower disclosure. While I am glad that USCIS is addressing these matters, I continue to have concerns that revised policies will result in inappropriate closures of FOIA requests.

87. First, USCIS will now conduct searches for I-94s instead of referring such requests to CBP. However, this change is concerning because USCIS's new policy appears to implement a search plan that will not, in fact, locate I-94s.[lx]

88. There are multiple ways in which USCIS can locate a record. These include 1) a "systems search" of the Person Centric Identity Services (PCIS) through the FIRST interface, which only queries a-numbers, receipt number, first & last name, DOB, and COB; 2) a search of PCIS through the PCIS website, which queries more information than a search of PCIS through FIRST; 3) a search of STACKS, which is the digital file viewing system for all official immigration record content such as application forms, supporting evidence, and other A-File material; and 4) a search of an A-file.

89. When the FOIA Officer explained the revised policy that USCIS would now conduct a "systems search" for an I-94 instead of referring requests for I-94s directly to CBP, I asked whether USCIS would staff the A-File to determine if the I-94 was located

there. The FOIA Officer responded that USCIS would conduct its usual systems search for the I-94 "like we would for any other single document," and if USCIS did not find it, would refer the requestor to CBP. The FOIA Officer's response to my question about staffing an A-File for an I-94 is concerning because it demonstrates a misunderstanding of the policies governing single document searches, which should including staffing an A-File per the Case Create Policies and Procedures Manual (PPM), not merely conducting a systems search.

90. The FOIA Officer's guidance, reflected in the draft PPMs, concerns me because based on knowledge available to me, it is my understanding that neither a "systems search" nor a search of PCIS through its website will locate an I-94. On June 8, 2026 a FOIA supervisor confirmed to me that USCIS would not know if an I-94 existed unless we staffed an A-File or if the I-94 was digitized in STACKS, though the supervisor explained that staff "don't even search STACKS."

91. Additionally, a draft Case Create Procedure Manual circulated on June 10, 2026 reinforces the FOIA Officer's guidance by stating that USCIS will conduct a "systems search" for I-94s, and if no I-94 is located, will close the case citing No Records. The draft Case Create Procedure Manual similarly directs staff to search PCIS through FIRST, then if the I-94 is not located, search PCIS through the PCIS website. Neither direct staffing for an A-File to search for an I-94.

92. On June 16, 2026, the Operations Support Branch Associate Center Director informed me by email that, at the ACD Leadership Forum that morning, the FOIA Officer and FOIA Program Manager confirmed the draft FOIA Policy Guide and Procedure Manual revisions were approved to proceed.[lxi] The approved Case Create Procedure Manual retained the system search procedure detailed in the preceding paragraph.[lxii]

93. The scale of this closure pathway is reflected in the FIRST data: for the period September 16, 2025 through June 24, 2026, approximately 7,599 cases were closed "No Record" with an I-94 letter insert.[lxiii]

94. This information forms my reasonable belief that USCIS's new policy to locate I-94s will not, in fact, result in requestors receiving their I-94s though the records may exist in their A-File. In fact, I directly observed an instance on June 8, 2026 where an I-94 was present in the A-file but did not appear as a search result from a systems search.[lxiv]

95. I was also informed that USCIS intends to stop withholding certain law-enforcement documents in full and return to line-by-line redaction; stop withholding in full certain documents submitted by requesters, including joint or family documents; stop treating untranslated requester-submitted documents as out of scope; and stop using voluntarily provided information, such as A-numbers or parents' names, as a basis for verification of

identity closure unless that information is needed to resolve uncertainty about which record matches the subject of record.

96. Further, on May 26, 2026, I was informed that USCIS intends to stop closing requests when there is a mismatch between the request and the file in optional Verification of Identity fields, including A-numbers and parents' names, and instead use optional information only when multiple records share the same mandatory Verification of Identity information and staff cannot determine which record applies to the subject of record.[lxv]

97. While this change in one part of the Verification of Identity closures is welcome, it does not address closures of requests in which requesters used an attorney address, which led to the highest number of closures where USCIS did not produce records to requestors. Approximately 59,800 cases were closed between September 16, 2025 and June 24, 2026 citing "Missing Subject of Record Address." I raised this issue to Director Arnold on March 2, 2026; later, on April 13, 2026 a FOIA Section Chief described it as a "known issue" and the Acting Chief FOIA Officer confirmed that there had been no consultation with the Office of Chief Counsel; and a version of new policy guidance approved on June 16, 2026 did not change the attorney address closure guidance.[lxvi] Even if USCIS has now rescinded this policy and permits the processing of requests with attorney addresses, I am not aware of any policy that would reopen, re-adjudicate, or provide notice of the policy change to requestors whose cases were closed under the prior guidance.

98. The magnitude of the impact of closures based on information provided in optional fields is reflected in the FIRST data. For the period September 16, 2025 through June 24, 2026, the parents'-name field, which USCIS treats as voluntarily provided, is associated with approximately 32,706 no-record closures and approximately 5,889 unable-to-verify closures totaling approximately 38,595 combined closures. The A-number field is associated with approximately 4,534 no-record and approximately 1,031 unable-to-verify closures. By contrast, the mandatory residential-address requirement that remains in the new proposed policy guidance is still the single largest closure driver, at approximately 59,800 cases.

## XIV. I Would Like the Court to Enter All of the Evidence Associated With My Disclosures to the Public Court Record

99. My goal in raising my whistleblower concerns is accountability to ensure there is compliance with the FOIA and with this Court's orders. I believe compliance and transparency are important to the public interest, and for that reason feel strongly that the public should have access to the information that accompanies my disclosures.

100. While I welcome any contemplated policy amendments that give requestors access to their records in compliance with statute and court order, these changes not only validate

the reasonableness of my belief that the September 2025 Verification of Identity guidance was out of compliance but also that the requests of thousands of individuals were closed or documents withheld wrongly. I believe any correction to policy should be applied retrospectively where requests were closed, denied, or documents were withheld pursuant to guidance USCIS is now revising.

101. I also believe that the documents that accompanied my first disclosure should be available to the public because they are part of the contemporaneous record concerning USCIS practice that impacted requestors. On September 15, 2025, USCIS reported to this Court a backlog of roughly 4,800 A-File requests past the statutory deadline, in a program that had for years kept that backlog under 100.[lxvii] The next day, USCIS issued the September 16, 2025 guidance that created new bases to close requests. USCIS has publicly acknowledged that guidance and described it in Director Arnold's later declaration.[lxviii] In the weeks that followed, the closure practices associated with that guidance produced more than 24,000 Failure to Comply closures in less than two months, compared with roughly 25,000 in all of the prior fiscal year.[lxix]

102. The exhibits to my December 19, 2025 disclosure are not merely pre-decisional discussions about possible actions but instead reflect implemented policies and the operational results of those policies that call into question statutory and injunction compliance. For instance, Exhibits 23 and 29, dated November 17 and 19, 2025, discuss the operation and effect of a closure mechanism that, by then, had already closed tens of thousands of requests. Exhibit 30, dated November 18, 2025, summarizes leadership's discussion of the operational landscape at a time when the backlog was being reduced not by producing records more quickly, but by quickly closing cases, resulting in a growing appeals queue. Exhibits 13 and 40 bear on USCIS's stated justification for the September changes, which is in tension with the data I provide in this declaration.

103. Furthermore, the evidence submitted with my first disclosure and filed under seal helps explain how USCIS produced its reported compliance numbers. Coupled with the data in this declaration, the exhibits show that USCIS's reported completion and backlog metrics can group materially different outcomes, such as cases where an A-File was reviewed and no responsive records were found and a case where the September 2025 Verification of Identity guidance prevented a search from being conducted, into a single closure reporting number.

104. The public interest in these materials is therefore not curiosity about internal deliberation. If the Court is asked to assess compliance through aggregate completion and backlog numbers, the documents explaining how those numbers were affected by closure codes, appeal routing, and non-production closures are part of the record needed to evaluate their accuracy. I do not object to redaction of genuine personally identifiable information, and I

waive any privacy interest in my own statements. But where the withheld material concerns operative guidance, closure mechanics, internal objections, leadership notice, and the effect of these policies on reported compliance, I believe the public interest in access is substantial. The new data I present in this declaration makes clear that the sealed materials are not peripheral. They are part of the factual record necessary to evaluate whether USCIS's public compliance representations matched what was happening operationally.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 25th day of August, 2026.

Timothy Turner

---

i Order Granting Summ. J. in Favor of Pls. for Decl. and Inj. Relief; Granting Mots. to Seal 1-2, No. 19-cv-03512-WHO, Dkt. No. 89, December 17, 2020.

[ii] Order Granting Summ. J. in Favor of Pls. for Decl. and Inj. Relief; Granting Mots. to Seal 27, No. 19-cv-03512-WHO, Dkt. No. 89, December 17, 2020.

[iii] FIRST Reports screenshots show standard Daily, Standard, Monthly, Builder, and DHS report tabs, including monthly report options for approver reports, processor reports, first-of-month reports, and closed cases by office, with date filters and export functionality. Databricks screenshots show USCIS analytics that separate records-releasing closures from upfront closures: one notebook computes a field labeled "up_front_close" over a defined set of final-action codes, and a separate query identifies cases with "records released" (final-action codes G1 and PD). In my view, these materials show that disaggregated reporting would use data categories USCIS already tracks in its own operational and analytics tools.

[iv] USCIS's Case Create Policies and Procedures Manual (PPM) treats failure to comply, unable to verify, TD, and no records closures as "Upfront Closures" within the case-create workflow, distinct from later processing steps for locating or staffing a case. USCIS FOIA PPM, Vol. 1, Case Create, §§ 2.4.1, 2.4.2, 2.4.5 (Ex. 1). The Case Processing PPM separately describes processing responsibilities, responsive-record verification, exemption application, and closing procedures. USCIS FOIA PPM Vol. II Case Processing Ex. 2 Chs. 2-3, 6, September 26, 2025.

[v] After my first disclosure, Director Arnold stated at a February 3, 2026 all-hands meeting that he had read the whistleblower report and did not "really rebut anything" other than motive. I understood that statement to mean that senior leadership did not dispute many of the facts described in the disclosure, while disagreeing with the characterization of intent. Tr. All-Hands Meeting, Feb. 03, 2026. Director Arnold obliquely validated some of my disclosures while also demonstrating inconsistencies in USCIS's policy position in a March 3, 2026 Teams call between he and I. In this meeting I described to Director Arnold a specific scenario in which a request was closed because the requester's mother's name was given as 'Maria' and the record reflected 'M-A,' even though the A-number and remaining identifiers matched. Director Arnold responded, 'We're closing those, and that's, I wouldn't say we haven't closed those in the past, but I'm also going to say it's not a practice and policy of us to close those, and we're always trying to get better." I found that statement difficult to reconcile with USCIS's written Verification of Identity guidance and training materials, which repeatedly instructed staff that parent-name mismatches should be closed as no record and specifically identified "Ma. for Maria" as an example of a discrepancy that is not included in exceptions to the rule. Additionally, in a February 17, 2026 training on the verification of identity guidance, a FOIA processor raised that USCIS's own policy manual treats "MA." as an acceptable abbreviation for Maria, but the trainer reiterated that "MA for Maria or MD" was not an exception allowed at that time.

[vi] The Case Create PPM confirms that Failure to Comply (FC), Unable to Verify (UV), Total Denial (TD), and No Records (NR) closures can occur during case creation/intake, before the ordinary locate, staffing, and records-processing workflow. *See* USCIS FOIA PPM Vol. 1 Case Create Ex. 1 §§ 2.4, 2.6, 2.8, September 26, 2025.

[vii] Director Arnold's Ninth Declaration does not reference the "unable to verify" (UV) closure code, which first appears in the reporting period at approximately 8,577 closures and was not in use during any prior declaration period.

[viii] Order Granting Summ. J. in Favor of Pls. for Decl. and Inj. Relief; Granting Mots. to Seal 27, No. 19-cv-03512-WHO, Dkt. No. 89, December 17, 2020.

[ix] It has been reported to me that beginning in approximately March 2025 there was a verbal directive to move cases from the COW office to the SPL office, which appears to allow cases to remain identifiable internally as COW-created cases while existing outside of the COW reporting framework and that the VCO and MRC offices may hold cases that are not included in USCIS's backlog reporting to the court. This is consistent with a July 9, 2025 email sent by the FOIA Associate Center Director, in which he stated that "all backlogged cases and those that would not be declaration impacting were moved into the MRC Office." On July 3, 2025, the FIRST system indicated that 24,967 cases were moved to the MRC office. I do not know the purpose of each MRC transfer.

[x] Ninth Arnold Decl., No. 19-cv-03512-WHO, Dkt. No. 220-1, June 15, 2026.

[xi] Figure 1 depicts A-File closures by declaration period, separating closures that produced records (PD and G1) from failure-to-comply, no-record, and unable-to-verify closures across the nine A-File offices and is drawn from

these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xii] Figure 2 depicts detention center A-File closure rates before and after the September 2025 Verification of Identity policy and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xiii] Figure 3 depicts the A-File Track 3 failure-to-comply, no-record, and unable-to-verify closure rate by declaration period and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xiv] Figure 4 depicts A-File Track 3 closures before and after the September 2025 Verification of Identity policy change and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xv] Figure 5 depicts the A-File Track 3 failure-to-comply and no-record rate before and after the September 2025 Verification of Identity policy change and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xvi] Figure 6 depicts Track 2 average days open by closure code, September 16, 2025 through June 24, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5
[xvii] Figure 7 depicts Track 3 average days open by closure code, September 16, 2025 through June 24, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xviii] Figure 8 depicts Track 1 average days open by closure code, September 16, 2025 through June 24, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xix] Based on my experience with FIRST and Databricks, USCIS has the system capacity to provide this data to the Court without new data infrastructure: closure data can be obtained through queries of final action code, by reason code, or by decision letter insert; and sums of record-producing closures (PD and G1) versus non-record-producing closures (FC, NR, UV, etc.) can be queried by track and by office, including offices such as APP and PPO that appear to be currently excluded from reports to the Court. Appeals data is available from these same fields, because an appeal is itself a case in FIRST with an office assignment, a receipt date, a closed date, and a final action code, and FIRST generates a standard Appeals Report showing closed date and final action codes. Appeal intake can be obtained by counting appeal cases created in a given period; the age of an appeal measured against FOIA's twenty-working-day deadline for deciding an appeal, 5 U.S.C. § 552(a)(6)(A)(ii), can be calculated from the appeal's receipt date together with its closing date or the date of the report. Appeal dispositions can be obtained from the appeal's final action code, and appeals in which the original closure was overturned and the case routed for reprocessing can be identified by reassignment to the PPO office. PPO pipeline volume, age, and outcomes can be obtained by querying that office by days open and final action code, and processing times can be reported separately for record-producing and non-record-producing closures using the same final action code categories described above. I performed a version of this analysis using these fields, as described in paragraph 51.
[xx] Figure 9 depicts A-File open cases by office, March 1, 2025 through April 19, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xxi] Figure 10 depicts open cases by office for Appeals (APP) and Agency Records (SPL and COW), March 1, 2025 through April 19, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xxii] Figure 11 depicts appeals received compared with appeals closed and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xxiii] First Appeals Report Ex. 3, March 29, 2026.
[xxiv] *Id*.
[xxv] First Appeals Report: Closed Date & Final Action Codes Ex. 4, March 29, 2026.
[xxvi] *Id.*
[xxvii] *Id.*
[xxviii] Ex. 23
[xxix] Mem. for the R.: Correspondence Between Mr. Turner, Scott Hodes, Kelli Carlson, and David Neely Ex. 6, March 25, 2026.
[xxx] Freedom of Information Act and Privacy Act Appeals Case Create Guide Ex. 7, Jan. 30, 2026.
[xxxi] Email from Unnamed Party with Mr. Turner Copied Ex. 8, Feb. 03, 2026.
[xxxii] 5 U.S.C. §§ 552(a)(6)(A)(i)–(ii), 552(a)(6)(B); Stipulation and Order to Extend Deadline Under F.R.C.P. 54(d) for Pls. Submission of Att'ys' Fees Mot. 27, No. 3:19-cv-03512-WHO, Dkt. No. 92, December 12, 2020 (injunction binds both subsections).
[xxxiii] Figure 12 depicts open appeals by working days since receipt, as of June 24, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[xxxiv] Email from Unnamed Party with Mr. Turner Copied Ex. 8, Feb. 03, 2026.
[xxxv] Appeals Case Create Training Ex. 10, Feb. 04, 2026.
[xxxvi] Fifth Arnold Decl. ¶¶ 7, 12-18, No. 3:19-cv-03512-WHO, Dkt. No. 192-1, December 15, 2025; Eighth Arnold

Decl. ¶¶ 10-14, No. 3:19-cv-03512-WHO, Dkt. No. 208-1, March 16, 2026.

[xxxvii] A daily snapshot report shared with me on June 11, 2026, confirmed that the backlog reached 21,724 cases in July 2025. Daily Consolidated Report of Daily Snapshot Summary and FY 2025 and 2026 Backlog Data Ex. 9, June 11, 2026.
[xxxviii] On June 8, 2026, I was made aware that the NRC recently submitted a request to hire 19 positions for FOIA. However, as of the date of this declaration, the request has not been adjudicated.
[xxxix] Email from Unnamed Party to Mr. Turner Ex.11, June 11, 2026.
[xl] JA 0306-6200; Department of Homeland Security, *Job Announcement: Government Information Specialist*, USAJOBS (July 9, 2026 & July 20, 2026), https://www.usajobs.gov/job/877165400.
[xli] Figure 13 depicts the FY26 MBR (Operations Support Branch) Staffing/Hiring Story dashboard and is drawn from these sources: FY26 MBR Staffing/Hiring Story dashboard. N.D., Graphs of Databricks Data Ex. 5.
[xlii] Figure 14 depicts the USCIS Hiring Pipeline historical data comparison for March 15, 2025 through May 13, 2026 and is drawn from these sources: USCIS Hiring Pipeline dashboard. N.D., Graphs of Databrick Data Ex. 5.
[xliii] Figure 15 depicts the USCIS Hiring Pipeline dashboard, showing onboard and vacant positions by program office, data as of May 14, 2026 and is drawn from these sources: USCIS Hiring Pipeline dashboard. N.D., Graphs of Databrick Data Ex. 5.
[xliv] Figure 16 depicts total staff hours by month for A-File offices, September 1, 2024 through June 24, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databrick Data Ex. 5.
[xlv] Figure 17 depicts DHS/ICE support compared with all other teams: cases processed and approved by month and is drawn from these sources: Databricks. N.D., Graphs of Databrick Data Ex. 5.
[xlvi] Email to Mr. Turner From an Unnamed Sender Ex. 12, May 08, 2026.
[xlvii] *Id*.
[xlviii] Microsoft Teams Messages Between Mr. Turner and an Unnamed Party Ex. 13, June 16, 2026.
[xlix] Sixth Arnold Decl. 10, No. 3:19-cv-03512-WHO, Dkt. No. 196-1, Dec. 17, 2020.
[l] Mem. for the R.: Feedback Session Call with NRC Director M. David Arnold Ex. 14, March 2, 2026.
[li] Protected Whistleblower Disclosure of Timothy Turner 14, No. 3:19-cv-03512-WHO, Dkt. No. 193-1, December 19, 2025.
[lii] Figure 18 depicts the A-File Quality Review report for contractor office BL3 and is drawn from these sources: FIRST Reports. N.D., Graphs of Databricks Data Ex. 5.
[liii] Figure 19 depicts the A-File Quality Review report for the federal employee offices ALF, EB5, MRC, NRC, SAF, SDO, and SMP and is drawn from these sources: FIRST Reports. N.D., Graphs of Databricks Data Ex. 5.
[liv] Figure 20 depicts the public FOIA request portal at first.uscis.gov as it appeared on July 30, 2026 and is drawn from these sources: first.uscis.gov FOIA portal. N.D., Graphs of Databricks Data Ex. 5.
[lv] Figure 21 depicts failure-to-comply closure reasons by letter insert, September 16, 2025 through June 24, 2026 and is drawn from these sources: Databricks. N.D., Graph of Databricks Data Ex. 5.
[lvi] Mem. for the R.: Feedback Session Call with NRC Director M. David Arnold Ex. 14, March 2, 2026.
[lvii] Email from Mr. Turner to David Arnold Ex. 16, March 2, 2026.
[lviii] Mem. for the R. from Mr. Turner of a One-on-One Call with Robert Busey Ex. 17, April 24, 2026.
[lix] Mem. for the R. from Mr. Turner of a Bi-Weekly Meeting with Operations Support Branch Leadership Ex. 18, April 13, 2026.
[lx] USCIS FOIA PPM Vol. I Case Create Ex. 1 49-51, September 26, 2025.
[lxi] Teams Messages Between Mr. Turner and an Unnamed Party Ex. 13, June 16, 2026.
[lxii] USCIS FOIA Case Create Procedure Manual Draft v0.2 Ex. 20 473–509, June 2026.
[lxiii] Figure 22 depicts no-record closure reasons by letter insert, September 16, 2025 through June 24, 2026 and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.
[lxiv] Screenshot of A-File and Systems Search for I-94 Ex. 22, June 08, 2026.
[lxv] On May 28, 2026, the OSB Associate Center Director informed me that plaintiffs were asking for updates to the FOIA FIRST system by June 10, 2026 because plaintiffs claimed a requester could not choose not to provide parents' names where the platform identified parents' names as required, and that Director Arnold had said that date was "too aggressive." In that same exchange, I noted that I had previously raised to Director Arnold the mismatch between public-facing FIRST guidance and internal VOI policy regarding email addresses versus current physical addresses.
[lxvi] Ex. 24
[lxvii] Fourth Decl. of M. David Arnold ¶ 13, No. 3:19-cv-03512-WHO, Dkt. No. 188-1, September 15, 2025.

[lxviii] Seventh Arnold Decl. ¶ 16(a), No. 3:19-cv-03512-WHO, Dkt. No. 204-1, February 7, 2026.
[lxix] Figure 23 depicts A-File failure-to-comply, no-record, and unable-to-verify closures by month and is drawn from these sources: Databricks. N.D., Graphs of Databricks Data Ex. 5.